Exhibit 1

No *Shepard's* Signal™
As of: October 5, 2015 5:12 PM EDT

### *Monster Energy Co. v. Chen Wensheng*

United States District Court for the Northern District of Illinois, Eastern Division

September 29, 2015, Decided; September 29, 2015, Filed

Case No. 15 C 4166

**Reporter**
2015 U.S. Dist. LEXIS 132283

MONSTER ENERGY COMPANY, Plaintiff, v. CHEN WENSHENG, et al., Defendants.

## Core Terms

counterfeit, Products, Energy, personal jurisdiction, Internet, residents, forum state, defendants', shipping, injunction, offer to sell, interactive, buyers, infringing, minimum contact, tortious act, activities, contacts, sales, aiming, courts, trademark infringement, exhibits, Target, online, mqxxc, traditional notions of fair play, preliminary injunction, substantial justice, doing business

**Counsel:** [*1] For Monster Energy Company, Plaintiff: Kevin W. Guynn, LEAD ATTORNEY, Amy Crout Ziegler, Jessica Lea Bloodgood, Justin R. Gaudio, Greer, Burns & Crain, Ltd., Chicago, IL.

For Daimen Liang, doing business as Best Car Wrap Ltd., store at aliexpress.com/store/734633 (hits #256,257), Jack Zhang, doing business as Neon Factory Sales, store at aliexpress.com/store/1202603(hit#2?), Defendants: John R. Crossan, Crossan Intellectual Property Law, LLC, Chicago, IL.

For Legend Trading Co., LTD, Zhang Yuan, Defendants: Keith A. Vogt, LEAD ATTORNEY, Oak Park, IL.

For Wong Raymond Wai Man, Defendant: Ramon Kumar Singh, Internal Revenue Service, Chicago, IL.

**Judges:** Joan Humphrey Lefkow, U.S. District Judge.

**Opinion by:** Joan Humphrey Lefkow

## Opinion

### OPINION AND ORDER

On May 12, 2015, Monster Energy Company (MEC) filed suit against Chinese entities that have offered counterfeit Monster Energy products for sale online ("defendants")[1] alleging trademark counterfeiting and copyright infringement. (Dkt. 1.) MEC's five-count second amended complaint brings claims for (1) willful trademark infringement and counterfeiting in violation of section 32 of the Lanham Act, *15 U.S.C. § 1114*; (2) willful false designation of origin in violation of section 43 of the Lanham Act, *15 U.S.C. § 1125*; (3) willful [*2] cybersquatting in violation of section 43(d) of the Lanham Act, *15 U.S.C. § 1125(d)*; (4) willful violation of the Illinois Uniform Deceptive Trade Practices Act, *815 ILCS § 510 et seq.*; and (5) deliberate copying of MEC's copyrighted designs in violation of the Copyright Act, *17 U.S.C. § 501(a)*. (Dkt. 53 (Second Am. Compl.) ¶¶ 34-62.) On May 20, 2015, the court entered a temporary restraining order (TRO) freezing defendants' PayPal accounts. (Dkt. 22.) The court converted the TRO to a preliminary injunction on May 27, 2015. (Dkt. 33.) Two defendants, Wu Zou d/b/a the Internet Store Legend Trading Co., Ltd. ("Legend Trading") and Zhang Yuan d/b/a Internet Store mqxxc, have moved to dismiss for lack of personal jurisdiction under *Federal Rule of Civil Procedure 12(b)(2)* and to release the frozen funds. (Dkts. 50, 57.) For the reasons stated below, defendants' motions are denied.[2]

---

[1]  Defendants are operating the Online Marketplace Accounts and Defendant Domain Names listed in Amended Schedule A to the Second Amended Complaint. *See* dkt. 53. After MEC filed its most recent amended complaint, it voluntarily dismissed numerous defendants (*see* dkts. 62, 63, 64, 67, 71, 75, 81, 100) and the court ordered the dismissal of those defendants (*see* dkts. 66, 103).

[2]  The court has jurisdiction under *28 U.S.C. §§ 1331* and *1367(a)*. Venue is [*3] proper in this district under *28 U.S.C. § 1391(b)*.

## BACKGROUND[3]

In 2002, MEC launched its MONSTER ENERGY® brand of drinks bearing its now famous MONSTER ENERGY mark and design. (Second Am. Compl. ¶ 5.) MEC is the owner of numerous valid trademarks. (*Id.* at 14-15.) In addition to its MONSTER™ line of energy drinks, MEC uses its Claw Icon mark, MONSTER™ mark, MONSTER ENERGY® mark, and has copyrighted designs in connection with a large variety of products, including stickers, helmets, sports gear, clothing items, headgear, and sports bags (the Monster Energy Products). (*Id.* ¶ 8; *see also* dkt. 88 (Kingsland Dec.) ¶ 4.) Due to its substantial and continuous marketing and promotion, MEC's MONSTER™ family products have achieved substantial commercial success, with estimated retail sales exceeding $5 billion per year worldwide. (*See* Second Am. Compl. ¶ 13.) MEC has also sold millions of dollars' worth of MEC's MONSTER™ family of products to Illinois residents through brick and mortar accounts such as 7-Eleven, Walmart, Costco, Sam's Club, CVS, Target, and Circle K, to [*4] name a few. (Kingsland Dec. ¶ 7.) The success of the Monster Energy brand has resulted in its significant counterfeiting, giving rise to the present claims. (*See* Second Am. Compl. ¶ 25.)

Legend Trading and mqxxc created and operated commercial, fully interactive Internet stores on the global marketplace AliExpress.com (AliExpress). (*Id.* ¶ 23; *see also* dkts. 87 at 3, 89 ¶ 2, 92 at 3, 94 ¶ 2.) AliExpress is an English language global retail marketplace for Chinese sellers to target and sell to consumers worldwide. (Dkts. 87 at 3, 92 at 3; *see also* dkts. 89, 94 (collectively, Martin Decs.) ¶ 5.) Through AliExpress, Chinese sellers learn techniques for targeting United States buyers. (Dkt. 90, 95 (collectively, Fu Decs.) ¶¶ 21-22.)

Each defendant through its Internet store targets and offers to sell counterfeit Monster Energy Products to consumers within the United States, including Illinois. (Second Am. Compl. ¶ 23.) Defendants' offers to sell consist of displaying photographs of counterfeit Monster Energy Products and inviting potential buyers to buy products through their Internet stores. Then, defendants have the ordered items shipped to the United States. (*See id.* 35-36; *see also* Martin Decs. [*5] ¶ 6.) In creating their online stores, defendants affirmatively select a shipping template to ship their products, including counterfeit Monster Energy Products, to the United States and Illinois. (*See id.*; *see also* Martin Decs. ¶¶ 7-8; Fu Decs. ¶¶ 3-14.)

## ANALYSIS

### I. Personal Jurisdiction

#### A. Legal Standard

*Rule 12(b)(2)* permits dismissal of a claim based on lack of personal jurisdiction over the defendant. *See Fed. R. Civ. P. 12(b)(2)*. The party asserting personal jurisdiction bears the burden of proof. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)*. When the court rules on the motion without a hearing, the plaintiff need only establish a "prima facie" case of personal jurisdiction." *Id.* (quoting *Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 713 (7th Cir. 2002))*. The court will "read the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff. *Cent. States, 440 F.3d at 878* (quoting *Textor, 711 F.2d at 1393*). Jurisdictional allegations pled in the complaint are accepted as true unless proved otherwise by affidavits or exhibits. *See Purdue Research Found., 338 F.3d at 782*. But "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id. at 783*. If any conflicts arise between the plaintiff's complaint (or supporting materials) [*6] and the defendant's affidavits or evidence, the plaintiff is entitled to have those conflicts resolved in its favor. *Id.*

#### B. Court's Review of Personal Jurisdiction

Plaintiff asserts claims under the Lanham Act, Copyright Act, and Illinois statutory law. Because neither the Lanham Act nor the Copyright Act authorizes nationwide service of process, a court sitting in Illinois may exercise jurisdiction over defendants only if authorized both by the United States Constitution and Illinois law. *be2 LLC v. Ivanov, 642 F.3d 555, 558 (7th Cir. 2011)* (citing *Fed. R. Civ. P 4(k)(1)(A)* and stating that the Lanham Act does not authorize nationwide service); *Tamburo v. Dworkin, 601 F.3d 693, 700 (7th Cir. 2010)* (same); *Janmark, Inc. v. Reidy, 132 F.3d 1200, 1201 (7th Cir. 1997)* (Copyright Act does not authorize nationwide service), *abrogated on other grounds by Advanced Tactical Ordnance, LLC v. Real Action Paintball, Inc., 751 F.3d 796 (7th Cir. 2014)*. The Illinois long-arm statute "permits its courts to exercise personal jurisdiction on any basis permitted by the constitutions of both Illinois and the United States." *Id.*; *735 Ill. Comp. Stat. 5/2-209(c)*. Accordingly, "the state

---

[3] Unless otherwise noted, the following facts are taken from the second amended complaint "with every inference drawn in favor" of the plaintiff. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reins. Co.*, 440 F.3d 870, 878 (7th Cir.2006) (quoting *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1393 (7th Cir.1993)).

statutory and federal constitutional inquiries merge." *Tamburo, 601 F.3d at 700*.

The key constitutional question is whether the defendants have sufficient "minimum contacts" with Illinois such that the suit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* (internal quotations marks omitted). That is to say, each defendant [*7] must have purposely established minimum contacts with the forum state such that he or she "should reasonably anticipate being haled into court" there. *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (quotation marks omitted). A defendant cannot avoid jurisdiction "merely because the defendant did not *physically* enter the forum State." *Id. at 476*. Indeed, as the Supreme Court has observed, "a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* Nevertheless, "[p]otential defendants should have some control over—and certainly should not be surprised by—the jurisdictional consequences of their actions." *RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1278 (7th Cir.1997)*. The *Due Process Clause* "gives some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*.

Under the Illinois long-arm statute, personal jurisdiction may be general or specific. *uBid, Inc. v. GoDaddy Grp., Inc., 623 F.3d 421, 425 (7th Cir. 2010)*. MEC does not argue that the court has general jurisdiction. Accordingly, the court turns to whether it has specific jurisdiction over defendants.

**1. Specific Jurisdiction**

Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden v.*

*Fiore, __ U.S. __, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)* (quoting *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S. Ct. 1473, 79 L. Ed. 2d 790 (1984))*. Specific jurisdiction [*8] requires that "(1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *N. Grain Mktg., LLC v. Greving, 743 F.3d 487, 492 (7th Cir. 2014)* (quoting *Tamburo, 601 F.3d at 701*). "The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *Id.* (citing *Tamburo, 601 F.3d at 702*).

**a. Minimum Contacts - Whether Defendant's Activities Were Purposefully Directed At Illinois**

Whether a defendant has purposefully directed activities at a forum "depends in large part on the type of claim at issue." *Felland v. Clifton, 682 F.3d 665, 674 (7th Cir.2012)*. Where the plaintiff's claims are for intentional torts, as here,[4] the inquiry "focuses on whether the conduct underlying the claims was purposely directed at the forum state." *Id. at 674* (quoting *Tamburo, 601 F.3d at 702*). In this context, courts apply the "express aiming test" and look to whether the defendant engaged in "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Tamburo, 601 F.3d at 703* (citing *Calder v. Jones, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984))*.[5] "The defendant's conduct and [*9] connection with the forum state must be substantial enough to make it reasonable for the defendant to anticipate that he could be haled into court there." *N. Grain Mktg., 743 F.3d at 492*. In other words, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Walden, 134 S. Ct. at 1122* (citations omitted).

**i. Intentional and Tortious Conduct**

---

[4]   "Infringement of a trademark is a tort." *Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1388 (8th Cir.1991)*; *see also Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1353 (11th Cir. 2013)*; *Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 171 (2d Cir.2010)* ("Trademark infringement is ... a tort."); *Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 720 (9th Cir.2004)* ("[T]rademark infringement generally sounds in tort.").

[5]   Courts have applied the *Calder* "express aiming test" in cases involving intentional torts, including trademark infringement. *See, e.g., Medline Indus., Inc. v. Strategic Commercial Sols., Inc., 553 F. Supp. 2d 979 (N.D. Ill. 2008)*; *Euromarket Designs, Inc. v. Crate & Barrel Ltd., 96 F. Supp. 2d 824 (N.D. Ill. 2000)*; *see also Virgin Enters. Ltd. v. Jai Mundi, Inc.*, No.13 C 8339, 2014 U.S. Dist. LEXIS 98437, 2014 WL 3605541, at *5 (N.D. Ill. July 18, 2014) (explaining that it was unnecessary to apply *Calder*'s express aiming test in this trademark infringement case because defendant's "actual (as opposed to imputed) contacts with Illinois were sufficient to support the exercise of specific personal jurisdiction").

*Section 32* of the Lanham Act creates a civil right of action for trademark infringement and counterfeiting. Under the plain language of *15 U.S.C. § 1114*, an offer to sell an infringing or counterfeit item, even without [*10] any other activity, establishes liability for trademark infringement and counterfeiting. *Levi Strauss v. Shilon, 121 F.3d 1309, 1312 (9th Cir. 1997)*; *Chloe SAS v. Sawabeh Information Servs. Co., No. cv 11-04147, 2014 U.S. Dist. LEXIS 124433, 2014 WL 4402218, at *6 (C.D. Cal. Sept. 5, 2014)*. Displaying photos of an item for sale and inviting potential purchasers to place an order and buy the product through an Internet store is an offer for sale. *See Milo & Gabby, LLC v. Amazon.com, No. C13-1932, 2015 U.S. Dist. LEXIS 92890, 2015 WL 4394673, at *14 (W.D. Wash. July 16, 2015)*; *cf. MEMC Elec. Materials Inc v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1376 (Fed. Cir. 2005)* (concluding that letters that conveyed "a description of the allegedly infringing merchandise and the price at which it can be purchased" could be regarded as an "offer to sell" under *35 U.S.C. § 271(a)*).

Here, one of MEC's numerous exhibits filed with the court illustrate that Legend Trading made an offer to sell when it displayed photos of biker gloves with Monster Energy's trademark for sale at $8.99 with 8991 pieces and three colors available on its Internet store. (*See* dkt. 27-7.; *see also* Martin Decs. ¶ 10.) Similarly, another one of MEC's exhibits illustrates that mqxxc made an offer to sell when it displayed photos of Monster Energy graphic sticker decals for sale at $39.99 with 999 pieces available on its Internet store. (*See* dkt. 27-8; *see also* Martin Decs. ¶ 10.) Defendants invite potential purchasers to place orders and buy products through their Internet stores, and MEC's [*11] exhibits show that at least two individuals, Lisa Cho and Gigi Ah, with Illinois shipping addresses attempted to purchase counterfeit Monster Energy biker gloves from Legend Trading, and at least one individual, Tyronn Chen, with an Illinois shipping address attempted to purchase counterfeit Monster Energy sticker decals from mqxxc. (*See* dkts. 27-7, 27-8; *see also* Martin Decs. ¶¶ 7, 10, 11.) MEC's Exhibit 2-17 also includes an email conversation between Ah and Zou in which Zou provides Ah with Legend Trading's PayPal account and indicates that she can pay for her order via PayPal. (*See* dkts. 27-7; *see also* Martin Decs. ¶ 11.) Similarly, MEC's Exhibit 2-18 includes a conversation between Chen and Yuan in which Yuan provides Chen with mqxxc's PayPal account number and indicates that Chencan pay for the Monster decal stickers via a specific PayPal account. (*See* dkts. 27-8; *see also* Martin Decs. ¶ 11.) As such, defendants' offers to sell counterfeit Monster Energy Products on their Internet stores constitute tortious activity committed in Illinois sufficient to establish personal

jurisdiction over both defendants in this court. *See Dental Arts Lab., Inc. v. Studio 360 The Dental Lab, LLC, No. 10 C 4535, 2010 U.S. Dist. LEXIS 124029, 2010 WL 4877708, at *7 (N.D. Ill. Nov. 23, 2010)* ("As long as one tortious act is committed in Illinois, [*12] the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant."); *see also Steuben Foods, Inc. v. Oystar USA, 2012 U.S. Dist. LEXIS 70638, 2012 WL 1854642, at *2 (W.D.N.Y. May 21, 2012)* (citing to *Houbigant, Inc. v. ACB Mercantile, Inc., 914 F. Supp. 964, 979-80 (S.D.N.Y 1995)* ("Offering one copy of an infringing work for sale in New York, even if there is no actual sale, constitutes commission of a tortious act within the state sufficient to imbue this Court with personal jurisdiction.").

## ii. Express Aiming at the Forum State

"[A] defendant's intentional tort creates the requisite *minimum contacts* with a state only when the defendant *expressly aims* its actions at the state with the knowledge that they would cause harm to the plaintiff there." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A., 623 F.3d 440, 445 (7th Cir. 2010)* (emphasis added). This court has characterized the express aiming test to require a showing of "injury plus." *Telemedicine Solutions LLC v. WoundRight Techs., LLC, 27 F. Supp. 3d 883, 895 (N.D. Ill. Mar. 14, 2014)*. That is, the plaintiff must demonstrate not only that the defendant's tortious act injured him in the forum state, but that the defendant acted specifically to harm the plaintiff in the forum state. *See id.*

Citing *Alcar Group, Inc. v. Corporate Performance Sys., 109 F. Supp. 2d 948, 949 (N.D. Ill. 2000)*, defendants argue that infringing sales abroad via their websites do not create the necessary minimum contacts since the Lanham Act has no extraterritorial reach. Defendants' contentions wholly disregard MEC's claim that defendants offered to sell counterfeit Monster Energy Products [*13] to individuals with Illinois shipping addresses, rather than alleging sales by defendants abroad. In *Alcar Group*, the issue was whether the court had jurisdiction over a foreign citizen's *activity in a foreign country*. *Alcar Group, 109 F. Supp. 2d at 951*. Here, the issue is whether the court has personal jurisdiction over a foreign citizen's *activity in the United States*. As such, *Alcar Group* is inapposite.

Defendants also argue that their interactive websites alone are not sufficient to establish minimum contacts. (Dkt. 51 at 3 (quoting *Advanced Tactical, 751 F.3d at 803* ("The operation of an interactive website does not show that the defendant has formed a contact with the forum state.")).) MEC does not dispute that an interactive website alone

would be insufficient but argues that defendants created and operated interactive Internet stores and affirmatively selected a shipping option to ship counterfeit Monster Energy Products to the United States, including to Illinois residents. (Martin Decs. ¶¶ 7-8.) As such, MEC argues that the facts here are directly analogous to *Illinois v. Hemi Group, LLC, 622 F.3d 754 (7th Cir. 2010)*. (Dkt. 87 at 10.) The court agrees.

In *Hemi Group*, the defendant was sued by the State of Illinois for selling cigarettes to Illinois residents in violation of federal and state law. [*14] *Hemi Grp. LLC, 622 F.3d at 755*. The court in *Hemi Group* found that it had personal jurisdiction over defendants because they operated a nationwide business model where they intentionally created and operated several commercial, interactive websites to offer products for sale and allow online orders from Illinois residents. *Hemi Grp. LLC, 622 F.3d at 757-58*. The Seventh Circuit explained that, "[a]lthough listing all forty-nine states by name would have made a stronger case for jurisdiction in this case, . . . the net result is the same—Hemi stood ready and willing to do business with Illinois residents." *Id. at 758*. As such, the court held that specific jurisdiction is proper where a company "h[olds] itself out as open to do business with every state" and is "ready and willing to do business with [that state's] residents."

Similarly, in this case, defendants intentionally created and operated commercial, fully interactive AliExpress Internet stores through which consumers can purchase counterfeit Monster Energy Products. In creating their online stores, defendants affirmatively selected a shipping template to ship counterfeit Monster Energy Products to United States and Illinois residents. (Martin Decs. ¶¶ 7-8; *see also* Fu Decs. ¶¶ 3-14.) As a result, defendants expressly [*15] elected to do business with the residents of all fifty states, including Illinois. *See Hemi Grp. LLC, 622 F.3d at 758*; *see also uBid, 623 F.3d at 428* ("[I]t is easy to infer that GoDaddy's national marketing campaign is intended to reach as large an audience as possible, including the 13 million potential customers in the nation's fifth most populous state [(Illinois).]")

Defendants also argue that the court lacks personal jurisdiction because no sale was made to an Illinois resident (Dkt. 52 ¶ 7; Dkt. 59 ¶ 5), and MEC has presented no evidence that either Cho or Chen is even located in Illinois. (Dkt. 51 at 4.) First, as indicated above, an offer to sell infringing or counterfeit items establishes liability for trademark infringement, a tortious act, and "[a]s long as one tortious act is committed in Illinois the courts of the state, and thus this Court, may exercise personal jurisdiction over

Defendant," *Dental Arts Lab., 2010 U.S. Dist. LEXIS 124029, 2010 WL 4877708, at *7*. As such, defendants did not need to complete a sale to imbue Illinois courts with personal jurisdiction. Second, there is no requirement that MEC or the person placing the order reside in Illinois in order for this court to have jurisdiction over defendants. *Walden, 134 S. Ct. at 1121-22* ("The inquiry whether a forum State may assert specific jurisdiction over [*16] a nonresident defendant focuses on 'the relationship among the defendant, the forum, and the litigation.' . . . [O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.") MEC's claims against defendants are based on defendants' offers to sell counterfeit Monster Energy products through their interactive Internet store, which allows online orders to be placed and shipped to Illinois addresses. MEC, through its exhibits and affidavits, has alleged that at least on one occasion Zou (on behalf of Legend Trading) communicated with a buyer who had placed an order to purchase counterfeit Monster Energy Products, asked the buyer for the order number which clearly reflected an Illinois shipping address, and provided his PayPal account number for the buyer to make the payment for the item. (*See* Dkt. 27-7; *see also* Martin Decs. ¶ 11.) Similarly, MEC's exhibits and affidavits allege that at least on one occasion Yuan (on behalf of mqxxc) communicated with a buyer who wished to place an order on counterfeit Monster sticker decals and provided his PayPal account number for the buyer to purchase the item. [*17] (*See* dkt. 27-8; *see also* Martin Decs. ¶ 11.) It is these tortious acts on which MEC basis its argument that Illinois has specific jurisdiction. *See Dental Arts Lab., 2010 U.S. Dist. LEXIS 124029, 2010 WL 4877708, at *7* ("As long as one tortious act is committed in Illinois, the courts of the state, and thus this Court, may exercise personal jurisdiction over Defendant.")

Defendants also claim that it is insufficient to rely on defendants' "random, fortuitous, or attenuated contacts" or on the "unilateral activity" of MEC. (Dkt. 51 at 5.) First, Legend Trading's actions are not "random, fortuitous, or attenuated contacts." It is true that in the Internet context, there is no specific jurisdiction where the defendant's contacts with the forum state are "entirely fortuitous." *Advanced Tactical, 751 F.3d at 803* (no specific personal jurisdiction over defendant that maintained email list allowing it to send email to past customers, even though some happened to be in forum state). But where a company "h[olds] itself out as open to do business with every state" and is "ready and willing to do business with [that state's] residents," specific jurisdiction over it is proper. *Hemi Grp. LLC, 622 F.3d at 758* (internet seller of cigarettes subject to

2015 U.S. Dist. LEXIS 132283, *17

specific personal jurisdiction in Illinois where Illinois residents purchase cigarettes **[*18]** online and seller then shipped cigarettes to Illinois); *see also Valtech, LLC v. 18th Ave. Toys Ltd., No. 14 C 134, 2015 U.S. Dist. LEXIS 17138, 2015 WL 603854, at *4 (N.D. Ill. Feb. 12, 2015); Payton v. Kale Realty, No. 13 C 8002, 2014 U.S. Dist. LEXIS 118590, 2014 WL 4214917, at *4 (N.D. Ill. Aug. 26, 2014)*. Moreover, in 2011 the court in *Deckers Corp. v. Does 1-500* found that personal jurisdiction existed over China-based defendants operating commercial, interactive Internet stores to offer to sell and to sell counterfeit products to the United States, including Illinois. *Deckers Corp. v. Does 1-55, No. 1:11 CV 00010, 2011 U.S. Dist. LEXIS 119448, 2011 WL 4929036, at *3 (N.D. Ill. Oct. 14, 2011)*. Since *Deckers Corp.*, numerous cases, within this district alone, have exercised jurisdiction over defendants operating commercial, interactive Internet stores offering to sell counterfeit products to the United States, including Illinois. (*See* dkt. 87 at 8; Martin Decs. ¶ 14.)

Second, it is misleading to classify the offer to sell as a "unilateral activity" by the plaintiff. *See Hemi Grp. LLC, 622 F.3d at 758*. In *Hemi Group*, the court explained that

> [c]haracterizing the sales as unilateral is misleading, . . . because it ignores several of Hemi's own actions that led up to and followed the sales. . . . It is Hemi reaching out to residents of Illinois, and not the residents reaching back, that created the sufficient minimum contacts with Illinois that justify exercising personal jurisdiction over Hemi in Illinois.

*Id.* Here, defendants **[*19]** intentionally created and operated commercial, fully interactive Internet stores and affirmatively selected a shipping template to ship counterfeit Monster Energy Products to United States and Illinois residents. (Martin Decs. ¶¶ 7-8.) Further, MEC provides exhibits that include conversations in which defendants provide Illinois buyers with their PayPal account information in order to complete their purchase. (Dkts. 27-7, 27-8.) Thus, it was defendants' reaching out to Illinois residents that created the sufficient minimum contacts with Illinois.

Defendants further argue that "the alleged offer is invalid since it was induced by fraud" and that the MEC "cannot point to a single valid offer to sell an infringing product into Illinois." (Dkt. 51 at 5.) Defendants' argument completely misses the mark. Here, MEC claims that defendants committed tortious acts by offering to sell counterfeit Monster Energy Products and that such offers to sell took place the moment defendants displayed photographs of counterfeit Monster Energy Products for sale and invited

potential buyers, including Illinois buyers, to place orders and buy products through their Internet stores. *See Milo & Gabby, 2015 U.S. Dist. LEXIS 92890, 2015 WL 4394673, at *14*. Defendants do not provide **[*20]** any evidence to suggest that they were induced by fraud to post images of counterfeit Monster Energy Products and invite potential Illinois buyers to place orders and buy counterfeit products.

Lastly, defendants attempt to analogize this case to *Advanced Tactical*. There, the Seventh Circuit found that "it [was] unlikely that those few sales alone, without some evidence *linking* them to the allegedly tortious activity, would make jurisdiction proper." *Advanced Tactical, 751 F.3d at 801*. In other words, plaintiff provided "no evidence that those sales had any connection with this litigation." *Id.* By contrast, here, MEC provides evidence that defendants offered to sell counterfeit Monster Energy Products, *see* dkts. 27-7, 27-8, and MEC bases its claims on that specific tortious conduct of "offering to sell" counterfeit product in violation of the Lanham Act. Based on MEC's affidavits and supporting materials, the court finds Legend Trading expressly aimed its action at Illinois.

### iii. Defendant's Knowledge That the Effects Would be Felt in the Forum State

To establish minimum contacts a defendant must not only "expressly aim" its actions at the state but must do so "with the knowledge that [it] would cause harm to the plaintiff **[*21]** there." *Mobile Anesthesiologists Chicago, 623 F.3d at 445*. Here, the Director of Global Brand Protection & Corporate Investigations of Monster Energy Company, Bruce Kingsland, proffers that MEC uses its registered trademarks and copyrights on and in connection with the creation and distribution of a large variety of products, including but not limited to, energy drinks, stickers, clothing items, helmets, headgear, sports gear, and sports bags. (Kingsland Decs. ¶ 4.) Kingsland also states that "millions of dollars' worth of MEC's MONSTER™ family of products have been sold to Illinois residents through brick and mortar accounts such as 7-Eleven, Walmart, Costco, Sam's Club, CVS, Target, and Circle K, to name a few." (*Id.* ¶ 7.) Based on MEC's considerably large sales in Illinois, the fact that Illinois is the fifth most populous state, and the fact that counterfeit sales lower the market share of the rights holder, MEC has established by a preponderance of the evidence that defendants knew that in targeting consumers in the United States the effects of its tortious acts would likely be felt in Illinois.

### b. Relatedness - Whether MEC's Claim Arose Out Of Such Activities

The court's conclusion that defendants' conduct was "purposely directed" [*22] at Illinois does not end the jurisdictional inquiry. For the court to exercise specific jurisdiction over defendants, MEC's claims must "arise out of" or "relate to" defendants' contacts with Illinois. *RAR, Inc., 107 F.3d at 1277-78*. This requirement is satisfied here. As in *Hemi Group*, MEC's claims arise out of defendants' forum-related activities and contacts with Illinois residents. Defendants offered to sell counterfeit Monster Energy Products on its AliExpress Internet store to individuals with Illinois addresses. Such actions constitute tortious activity committed in Illinois, and defendants' actions surrounding those offers triggered MEC's claims against it. Accordingly, MEC's claims arise directly out of the defendants' contacts with Illinois.

### c. Fairness - Whether Specific Jurisdiction is Consistent with Traditional Notions of Fair Play and Substantial Justice

Finally, the court must consider whether the exercise of personal jurisdiction over defendants would offend traditional notions of fair play and substantial justice. *See N. Grain Mktg., 743 F.3d at 492* (quoting *Int'l Shoe, 326 U.S. at 316*). The factors considered are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective [*23] relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland, 682 F.3d at 677* (quoting *Burger King, 471 U.S. at 477*). "These factors rarely will justify a determination against personal jurisdiction." *Purdue Research Found., 338 F.3d at 781 n.10*.

While defendants may be burdened by having to defend an action in this state, "out-of-state defendants *always* such a burden." *Felland, 682 F.3d at 677* (emphasis in original). Notably, despite any potential claims of hardship, defendants have already retained local counsel and engaged in motion practice in this court. *See Jackson v. N'Genuity Enterprises, Co., 2014 U.S. Dist. LEXIS 119778, 2014 WL 4269448 (2014)* (finding, in part, that exercising personal jurisdiction over the defendant did not run afoul of traditional notions of fair play and substantial justice where the defendant had been litigating the related 2009 suit in this forum and had retained attorneys in the forum). Moreover, modern transportation and communications have made it much less burdensome for a party to defend itself in a state where he derives economic benefits, and it usually will not be unfair to subject him to the burdens of litigating in another forum.

*Burger King, 471 U.S. at 474*. Furthermore, Illinois has an interest in protecting Illinois [*24] consumers from being deceived into purchasing counterfeit Monster Energy Products. Thus, exercising personal jurisdiction over defendants does not run afoul of traditional notions of fair play and substantial justice.

## II. Freezing of Property under Party's Control

"Once personal jurisdiction of a party is obtained, the District Court has authority to order it to 'freeze' property under its control, whether the property be within or without the United States." *United States v. First Nat. City Bank, 379 U.S. 378, 384, 85 S. Ct. 528, 13 L. Ed. 2d 365 (1965)*; *see also Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 129 (2d Cir. 2014)*; *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C. v. Kovalic, No. 94-2545, 1995 U.S. App. LEXIS 15636, 1995 WL 375869, at *2 (7th Cir. 1995)*; *Fed. Trade Comm'n v. Windermere Big Win Int'l, Inc., No. 98 C 8066, 1999 U.S. Dist. LEXIS 12259, 1999 WL 608715, at *4 (N.D. Ill. Aug. 5, 1999)*. On issuing the TRO and preliminary injunction in this case, the court found that it had personal jurisdiction over defendants "since the defendants directly target their business activities towards consumers in the United States, including Illinois." (*See* dkts. 22, 33.) On reviewing defendants' motion to dismiss for lack of personal jurisdiction, this court once again has concluded that it has personal jurisdiction over defendants. As such, the funds contained in defendants' PayPal accounts will remain frozen. *See Lorillard Tobacco Co. v. Montrose Wholesale Candies, 2005 U.S. Dist. LEXIS 28917, 2005 WL 3115892, at *13 (N.D. Ill. Nov. 8, 2005)* (citing *Grupo Mexicano de Desar-rollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 325, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999)*).

## A. Dissolving the Injunction and Funds Unrelated to Infringement

Defendants argue that even if this court has personal jurisdiction to freeze its assets, the court should dissolve the injunction [*25] because MEC cannot show likelihood of success on the merits or irreparable harm. (Dkts. 51 at 7, 58 at 6-7.) This court, however, already found that MEC showed a likelihood of success on the merits and irreparable harm. (Dkt. 33 at 5.) Defendants have not provided evidence to counter such a finding, and thus, this court will not dissolve the injunction.

Defendants also argue that the court should modify the injunction to limit the seizure to an amount corresponding to the products alleged to have been offered for sale, rather than the seizure of their entire PayPal account. (Dkts. 51 at

2015 U.S. Dist. LEXIS 132283, *25

10, 58 at 9-10.) The court declines to modify the injunction at this time. To exempt assets from an asset freeze, "[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities." *Luxottica USA LLC v. The Partnerships, et al., No. 1:14-cv-09061, 2015 U.S. Dist. LEXIS 78961, 2015 WL 3818622 (N.D. Ill. June 18, 2015)* (citing *N. Face Apparel Corp. v. TC Fashions, Inc., No. 05 CIV. 9083(RMB), 2006 U.S. Dist. LEXIS 14226, 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006)).* Defendants have not submitted any evidence regarding their PayPal account transactions to show that these funds are not the proceeds of counterfeiting activities.

**B. Increasing Bond Amount**

Defendants also argue that even if the court does not dissolve the injunction, it should **[*26]** require MEC to post a larger bond in the amount of at least $5,000 per defendant. Defendants argue that the court should increase the bond because they are one of hundreds of defendants whose businesses grounded to a halt the moment their PayPal accounts were frozen, and thus, the $10,000 bond the court previously ordered MEC to pay is insufficient. MEC responds that the court properly required MEC to post a bond of $10,000 because of the strong and unequivocal nature of MEC's evidence.

Under *Federal Rule of Civil Procedure 65(c)*, a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Fed. R. Civ. P. 65(c)*. The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him. *Ty, Inc. v. Publications Intern. Ltd., 292 F.3d 512, 516 (7th Cir. 2002)*. The appropriate amount of the bond is subject to the court's discretion. *Fed. R. Civ. P. 65(c)*; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis, 35 F.3d 1134, 1141 (7th Cir.1994)*. But, because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, the court of **[*27]** appeals has stated that district courts should err on the high side when setting a bond. *See Habitat Educ. Center v. U.S. Forest Serv., 607 F.3d 453, 456 (7th Cir.2010)*. On granting the TRO and preliminary injunction, the court ordered MEC to deposit $10,000 as security, an amount consistent with bonds required in similar cases. *See, e.g., Burberry Limited, et al. v. Su Sheng, et al.*, No. 1:15-cv-02851 (N.D. Ill. May 27, 2015) ($10,000

bond); *Beats Electronics, LLC v. The Partnerships, et al.*, No. 1:14-cv-05209 (N.D. Ill. Oct. 7, 2014) ($10,000 bond); *Calvin Klein Trademark Trust, et al. v. The Partnerships, et al.*, No. 1:13-cv-08186 (N.D. Ill. Jan. 14, 2014) ($10,000 bond); *True Religion Apparel, Inc. v. Does 1-100*, No. 12-cv-9894 (N.D. Ill. Dec. 20, 2012) ($10,000 bond); *Tory Burch LLC v. Zhong Feng, et al.*, No. 1:12-cv-09066 (N.D. Ill. Nov. 15, 2012) ($10,000 bond); *Deckers Outdoor Corp. v. Does 1-1,281*, No. 1:12-cv-01973 (N.D. Ill. Apr. 4, 2012) ($10,000 bond). Now, Legend Trading seeks to persuade the court that the bond amount should be increased.

"A party may move the court to increase or decrease the amount of security so long as the restraint or injunction is in effect." 13 *Moore's Federal Practice—Civil § 65.50*; *see also Gateway, 35 F.3d at 1142* (noting "that it is within the district court's discretion to **[*28]** increase or decrease the amount as necessary to comport with its findings, or to account for changed circumstances"); *Laboratory Corp. of America Holdings v. Kearns, 84 F. Supp. 3d 447, 2015 WL 413788, at *16 (M.D.N.C. 2015)* (explaining that "should either party conclude that a different figure would be proper, it may move for adjustment of the bond amount while the preliminary injunction is still in effect"). The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint. *In re President Casinos, Inc., 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007)*; *APR Energy, LLC v. First Inv. Grp. Corp., No. 3:14-CV-575-J-34JBT, 2015 U.S. Dist. LEXIS 20524, 2015 WL 736275, at *17 (M.D. Fla. Feb. 20, 2015)*; *Philips Electronics N. Am. Corp. v. Hope, 631 F.Supp.2d 705, 724 n. 14 (M.D.N.C.2009)*; *Int'l Equity Investments, Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 566 (S.D.N.Y. 2006)*, aff'd, *246 Fed. App'x 73 (2d Cir. 2007)*. Here, defendants allege that the injunction seized its PayPal funds in the amount of $14,278 (Legend Trading) and $11,744.89 (mqxxc), and that the ten-thousand dollar $10,000 bond is insufficient to compensate all defendants where possibly millions of dollars have been frozen. But, in their request to increase the bond, defendants present nothing more than self-serving affidavits with no supporting evidence to justify such an increase. Given their better position to assess the damage that might result from having their PayPal accounts frozen, defendants should have provided **[*29]** affidavits or other evidence to establish the financial damage it would suffer from the injunction during the pendency of the case. *See Manpower Inc. v. Mason, 377 F. Supp. 2d 672, 681 (E.D. Wis. 2005)* (declining to require a $20 million bond where the restrained party provided no evidence to support that this amount was a reasonable expectation of the pecuniary harm it would suffer due to the

2015 U.S. Dist. LEXIS 132283, *29

injunction). It has not done so. As such, the court will not increase the bond amount. Defendants, however, may apply for a bond increase in the future if they can produce competent evidence of the pecuniary harm they may reasonably expect to suffer on account of this injunction.

**CONCLUSION AND ORDER**

For these reasons, defendants' motions to dismiss and to release frozen funds (dkts. 50, 57) are denied.

Date: September 29, 2015

/s/ Joan Humphrey Lefkow

U.S. District Judge

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DECKERS OUTDOOR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11 C 10 |
| | ) | |
| DOES 1-55 d/b/a the aliases identified on Schedule A and DOES 56-500, | ) | Judge John W. Darrah |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Deckers Outdoor Corporation's ("Deckers") Motion for Entry

of Default and Entry of Default Judgment pursuant to Fed. R. Civ. P. 55(b)(2) against

Defendants, Does 1-55 d/b/a the aliases identified on Schedule A to Deckers' Amended

Complaint (collectively, "the Defendants") based on Deckers' action for trademark

infringement and counterfeiting.

Deckers is known as a source of high quality footwear products, including the

UGG® (the "UGG Trademark") brand of premium sheepskin footwear.

Deckers filed this action on January 3, 2011, alleging federal trademark

infringement and counterfeiting (Count I), false designation of origin (Count II),

cyberpiracy (Count III) and violation of the Illinois Uniform Trade Practices Act

(Count IV), and seeks statutory damages and injunctive relief. (Dkt. No. 5.) On the same

day, Deckers filed an *ex parte* application for entry of a temporary restraining order and

preliminary injunction. (Dkt. No. 49.) The Court granted Deckers' motion for a

temporary restraining order on February 3, 2011 (*see* Dkt. No. 26), and converted the

temporary restraining order to a preliminary injunction on March 8, 2011 (*see* Dkt. No. 37).

On May 24, 2011, the Court denied Deckers' Motion for Entry of Default Judgment on the basis that Deckers had not established that the Court has personal jurisdiction over Does 1-55, consistent with the requirements recently set forth by the Seventh Circuit in *be2 LLC v. Ivanov*, 642 F.3d 555 (7th Cir. 2011). (*See* Dkt. No. 50.)

Deckers filed an Amended Complaint on August 17, 2011. (Dkt. No. 56.) Deckers included newly discovered domain names linked to websites operated by Defendants and added new allegations relating to Defendants' illegal activities that were directed toward Illinois. (*See id.*) The Amended Complaint was served electronically on all Defendants on August 17, 2011. (*Id.*) None of the Defendants has entered an appearance or otherwise defended this action since being notified of this Action in February 2011. The time for responding to the Amended Complaint expired on August 31, 2011, pursuant to Fed. R. Civ. P. 15(a)(3).

In its Motion for Default Judgment pursuant to Rule 55(b)(2), Deckers seeks the entry of an Order, finding that each of the Defendants are liable on all counts of Deckers' Amended Complaint. Deckers further seeks an award of statutory damages pursuant to 15 U.S.C. § 1117(c)(2) for willful trademark counterfeiting against each of the 49 Defendants[1] in the amount of up to $2,000,000 per Defendant for use of a counterfeit UGG Trademark on products sold through each of the 271 Defendant Domain Names. Deckers also seeks an award of statutory damages pursuant to 15 U.S.C. §1117(d) of up

---

[1] Each unique registrant e-mail address is counted as a separate Defendant. The Defendant Domain Names identified are registered using 49 unique email addresses.

to \$100,000 for each of the 140 Defendant Domain Names that incorporate Deckers'

UGG Trademark. Deckers further seeks entry of a permanent injunction, prohibiting

Defendants from selling products containing counterfeit UGG Trademarks, an order that

domain names used by Defendants to sell products containing counterfeit UGG

trademarks be permanently transferred to Deckers, and that all assets in Defendants'

financial accounts operated by PayPal, Inc. ("PayPal") be transferred to Deckers,

including the approximately \$130,617 identified by Deckers.

## ANALYSIS

### *Entry of Default and Default Judgment*

Deckers has met its burden of making a *prima facie* case for personal jurisdiction

over Defendants. *See uBID, Inc. v. GoDaddy Group Inc.*, 623 F.3d 421, 423 (7th Cir.

2010); *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 599 (7th Cir. 2007).

Because Defendants have chosen not to appear or produce any evidence regarding their

illegal activities in Illinois, the allegations in the Amended Complaint, which must be

accepted as true, establish a *prima facie* case for personal jurisdiction against each

Defendant. (*See* Am. Compl. ¶¶ 2, 4, 8, 9 and 11-17.) *See Purdue Research Found. v.*

*Sanofi-Sythelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) ("When determining whether a

plaintiff has met his burden, jurisdictional allegations pleaded in the complaint are

accepted as true unless proved otherwise by defendants' affidavits or exhibits.").

Deckers has pled that each of the Defendants has targeted and solicited sales from

Illinois residents by operating English language websites that offer shipping to Illinois,

has accepted payment in U.S. dollars, and has sold counterfeit UGG products to residents

of Illinois. *See The Gen. Council of the Assemblies of God v. The Ranger Supply Store,*

3

*Inc. et al.*, No. 10 C 07050 (N.D. Ill. June 29, 2011) (entering default judgment against

defendants who sold counterfeit products to Illinois residents through an Internet website)

(*General Council*).

Pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, "when a party

against whom a judgment for affirmative relief is sought has failed to plead or otherwise

defend, and that failure is shown by affidavit or otherwise, the clerk must enter the

party's default." Fed. R. Civ. P 55(a). "Although Rule 55(a) . . . refers to entry of default

by the clerk, it is well-established that a default also may be entered by the court."

*Breuer Elec. Mfg. Co. v. Toronado Sys. of Am., Inc.*, 687 F.2d 182, 185 (7th Cir. 1982).

When motion is made to the court for entry of a default, the decision to enter default lies

within the district court's discretion. *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d

1394, 1398 (7th Cir. 1993).

The Defendants were properly served on August 17, 2011. (*See* Dkt. No. 60,

Gaudio Decl. at ¶ 15, Ex. 14). Despite having been served with process, the Defendants

have ignored these proceedings and failed to plead or otherwise defend this action.

(*Id.* at ¶ 16). Therefore, Deckers has met the requirements for entry of default against the

Defendants pursuant to Rule 55(a).

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides for a court-ordered

default judgment. A default judgment establishes, as a matter of law, that Defendants are

liable to Plaintiff on each cause of action alleged in the complaint.

*United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989). When the Court

determines that a defendant is in default, the factual allegations of the Complaint – except

those relating to damages – are taken as true and may not be challenged and the

defendants are liable as a matter of law as to each cause of action alleged in the complaint. Fed. R. Civ. P. 8(b)(6); *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994).

Deckers has therefore shown the following:

1.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

2.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Deckers' investigation has shown that Defendants have set up fully interactive commercial Internet websites, operating under the 271 domain names, which are identified in Schedule A attached to Deckers' Amended Complaint and Schedule B attached to Deckers' Memorandum in Support of its Motion for Default Judgment, Docket Number 64 (collectively, the "Defendant Domain Names"). (Am. Compl. ¶ 2.) Through these Domain Names, Defendants have targeted and solicited sales from Illinois residents by operating English language websites that offer shipping to Illinois, have accepted payment in U.S. dollars and, on Deckers' information and belief, have sold counterfeit UGG products to residents of Illinois. (*Id.*) Each of the Defendants is committing tortuous acts in Illinois, is engaging in interstate commerce and has wrongfully caused Deckers substantial injury in the State of Illinois. (*Id.*)

3.  Deckers is famous throughout the United States and elsewhere as a source of high quality footwear products, including the UGG® brand of premium sheepskin footwear. (*Id.* ¶ 4.) Deckers' UGG products are distributed and sold to consumers through retailers throughout the United States, including through over 100 authorized retailers in Illinois, the uggaustralia.com website, and UGG

5

Concept Stores, including a Concept Store located at 909 North Rush Street in Chicago, Illinois. (*Id.*)

4.  Since acquiring the UGG Trademark and the goodwill of the business in 1995, Deckers has continuously sold footwear and clothing under the UGG Trademark. (*Id.* ¶ 5.) Deckers has built substantial goodwill in the UGG Trademark and the UGG Trademark, is famous and a valuable asset of Deckers. (*Id.*)

5.  Deckers holds registrations for the UGG Trademark (and stylized variations) in more than 100 countries around the world, including U.S. Trademark Registration No. 3,050,925. (*Id.* ¶ 6.) The UGG Trademark has been used continuously since as early as 1979 by Deckers and its predecessors in interest. (*Id.*) The registration is valid and subsisting. (*Id.*)

6.  The UGG Trademark is distinctive when applied to high quality apparel, footwear and related merchandise, signifying to the purchaser that the products come from Deckers and are manufactured to the highest quality standards. (*Id.* ¶ 7.) Whether Deckers manufactures the products itself or licenses others to do it, Deckers has insured that products bearing its trademarks are manufactured to the highest quality standards. (*Id.*) Deckers' products branded under the UGG Trademark have been widely accepted by the public and are enormously popular, as demonstrated by hundreds of millions of dollars in sales each year. (*Id.*) The UGG Trademark is a famous mark. (*Id.*)

7.  Defendants are unknown individuals and business entities who, upon the information and belief of Deckers, reside in the People's Republic of China or other foreign jurisdictions with lax trademark enforcement legal systems.

6

(*Id.* ¶ 8.) Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive commercial websites operating under the Defendant Domain Names. (*Id.*)

8. Defendants are directly and personally contributing to, inducing, and engaging in the sale of counterfeit products bearing UGG Trademarks. (*Id.* ¶ 9.) The counterfeit products for sale on the Defendant Domain Names bear similar irregularities and indicia of being counterfeit to one another, indicating that the counterfeit products were manufactured by and come from a common source and that Defendants are interrelated. (*Id.*) In addition, the websites linked to Defendant Domain Names include multiple similarities, such as the same page layout, text, and copyright protected images copied from Deckers' uggaustralia.com website. (*Id.*)

9. Defendants are liable on all counts of Deckers' Amended Complaint, specifically for trademark infringement (*see* Dkt. No. 56 at ¶¶ 18-24); false designation of origin (*id.* at ¶¶ 25-29); cybersquatting (*id.* at ¶¶ 30-35); and violation of the Illinois Deceptive Trades Practices Act (*id.* ¶¶ 36-29).

### *Statutory Damages*

As set forth above, Defendants are liable for violations of the Lanham Act. Consequently, Deckers first moves for statutory damages pursuant 15 U.S.C. § 1117(c)(2), for willful trademark counterfeiting against each of the 49 Defendants in the amount of up to $2,000,000 per Defendant for use of a counterfeit UGG Trademark, pursuant to 15 U.S.C. § 1117(d).

The Lanham Act allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, 15 U.S.C. § 1117(a); or (2) statutory damages, 15 U.S.C. § 1117(c). Courts commonly find statutory damages appropriate in default judgment cases because the information needed to prove actual damages is within the infringers' control and is not disclosed. *See Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874 (S.D. Ohio 2007); *Chanel, Inc. v. French*, No. 05-61838, 2006 WL 3826780, *2 (S.D. Fla. Dec. 27, 2006); *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1220 (S.D. Fla. 2004); *Tiffany Inc. v. Luban*, 282 F. Supp. 2d 123, 123 (S.D.N.Y. 2003); *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494 (C.D. Cal. 2003); *Sara Lee Corp. v. Bags of New York*, 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999).

Section 1117(c)(1) allows statutory damages of "not less than $1,000 and no more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(1). "If the court finds that the use of the counterfeit mark was willful," Section 1117(c)(2) allows a statutory damages award of up to $2,000,000 per counterfeit mark. 15 U.S.C. § 1117(c)(2).

"Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights." *Lorillard Tobacco Co. v. S&M Cent. Service Corp.*, No. 03 C 4986, 2004 WL 2534378, *7 (N.D. Ill. Nov. 8, 2004) (*Lorillard Tobacco Co.*). As such, knowledge need not be proven directly but can be inferred from a defendant's conduct. *Id.* Willful infringement may be shown by the fact that the "defendant ignored

8

the plaintiff's notices[,] did not seek advice of an attorney, and passed the matter off as a nuisance." *Id.*

Deckers has sufficiently demonstrated that Defendants' use of the UGG Trademark was willful. (*See* Am. Compl. ¶¶ 9, 12.) Under circumstance similar to those presented here, in *General Council*, the district court deemed defendants' use of plaintiff's trademark willful where the defendants were in default. (*See* 6/29/11 Order, Dkt. No. 47, *General Council*, No. 10-cv-7050.) *See also Tiffany (NJ) Inc. v. Luban*, 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003).

While § 1117(c) sets out a dollar range for possible statutory damage awards, the statute does not provide guidance on how to select a damage figure within that range. Courts assessing statutory damages under § 1117(c) have looked to case law applying the statutory damage provision of the Copyright Act, 17 U.S.C. § 504(c), for guidance. *See Lorillard Tobacco Co.*, 2004 WL 2534378 at *4. Addressing 17 U.S.C. § 504(c) in *Chi Boy Music v. Charlie Club.*, 930 F.2d 1229 (7th Cir. 1991) (*Chi-Boy Music*), the Seventh Circuit held that a court awarding statutory damages is "not required to follow any rigid formula but instead enjoys wide discretion."

An award of statutory damages serves dual interests in that it is remedial in nature but also intended to protect an important public interest. *Sands, Taylor & Wood v. The Quaker Oats Co.*, 34 F.3d 1340, 1348 (7th Cir. 1994). As such, the remedy imposed under statute must provide sufficient deterrent effect to ensure that the guilty party will not engage in further infringing conduct. *Id.* Statutory damages are appropriate to "penalize the infringer and deter future violations" when the infringement is willful. *Lorillard Tobacco Co.*, 2004 WL 2534378 at *4 (quoting *Chi Boy Music*, 930 at 1230).

9

Deckers requests an award up to the maximum statutory damages award authorized by 15 U.S.C. § 1117(c)(2) for willful trademark counterfeiting against each of the 49 Defendants in the amount of $2,000,000 per Defendant, which totals $98,000,000. Elsewhere in its Motion, Deckers notes that this case is "virtually identical to the facts" in *General Council* (Mem. at 11), which involved a non-Illinois trademark owner suing non-Illinois based Defendants for selling counterfeit products to Illinois residents over an Internet website.

In *General Council*, the district court entered an order for default judgment on the plaintiff's claims, among them trademark infringement and copyright infringement. In its motion for default judgment, plaintiff requested $2,000,000 per counterfeit mark. Holding that defendants' use of the trademark was willful, the court awarded $750,000 per infringing use of counterfeit marks. Based on the similarities between the cases, such a statutory award is reasonable and will be applied here. Plaintiff is awarded $750,000 against each of the 49 Defendants for use of a counterfeit UGG Trademark, for a total of $36,750,000.

Second, Deckers moves for statutory damages pursuant to 15 U.S.C. § 1117(d) on the grounds that Defendants violated Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d). 15 U.S.C. § 1117(d) provides that:

> In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

Deckers requests statutory damages of up to $100,000 for each of the 140 Defendant Domain Names that incorporate Deckers' UGG Trademark.

10

An award of $50,000 per domain name, for each of the 140 Defendant Domain Names that incorporate Deckers' UGG Trademark, for a total of $7,000,000, is reasonable and consistent with *General Council*, which, as discussed above, involved similar circumstances. (*See* 6/29/11 Order, Dkt. No. 47, *General Council*, No. 10-cv-7050 (awarding $50,000 per domain name under 15 U.S.C. § 1117(d) where plaintiff requested $100,000 per domain name).)

## CONCLUSION

It is hereby ordered that Deckers' Motion for Entry of Default and Motion for Entry of a Default Judgment is granted in its entirety and that Defendants, d/b/a the aliases identified on Schedule A to Deckers' Amended Complaint are deemed in default; and this Final Judgment is entered against Defendants.

It is further ordered:

1.     Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily and permanently enjoined and restrained from:

    a.     using Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark;

11

b.     passing off, inducing, or enabling others to sell or pass off any product as a genuine UGG branded product or any other product produced by Deckers, that are not Deckers' or not produced under the authorization, control or supervision of Deckers and approved by Deckers for sale under Deckers' UGG Trademark;

c.     committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Deckers, or sponsored or approved by, or connected with Deckers;

d.     further infringing Deckers' UGG Trademark and damaging Deckers' goodwill;

e.     otherwise competing unfairly with Deckers in any manner;

f.     shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Deckers, nor authorized by Deckers to be sold or offered for sale, and which bear any Deckers' UGG Trademark or any reproductions, counterfeit copy or colorable imitation thereof;

g.     using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell counterfeit UGG products; and

12

h.   operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Deckers' UGG branded product or not authorized by Deckers to be sold in connection with Deckers' UGG Trademark.

2.   The registrars and registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc. and the Public Interest Registry are required to:

a.   prevent the Defendant Domain Names from linking to corresponding counterfeit websites; and

b.   at Deckers' election, transfer to Deckers' control or cancel the Defendant Domain Names and any other domain names owned by Defendants, including any domain names registered using the registrant email addresses listed below, that have been identified as being used to engage in their counterfeiting of the UGG Trademark.

3.   Those in privity with Defendants and those with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using the UGG Trademark;

13

4.  That pursuant to 15 U.S.C. § 1117(c)(2), Deckers is awarded statutory damages from each of the 49 Defendants in the amount of seven-hundred-fifty-thousand dollars ($750,000) for use of a counterfeit UGG Trademark on products sold through at least the Defendant Domain Names, for a total award in the amount of thirty-six million seven-hundred-fifty thousand dollars ( $36,750,000).

5.  That pursuant to 15 U.S.C. § 1117(d), Deckers is awarded statutory damages for each the 140 Defendant Domain Names that incorporate the UGG Trademark in the amount of fifty thousand dollars ($50,000), for a total award in the amount of seven million dollars ($7,000,000).

6.  That pursuant to 15 U.S.C. § 1117(a), Deckers is awarded reasonable attorney's fees.

7.  That all monies currently restrained in Defendants' financial accounts, including monies held by PayPal, are hereby released to Deckers as partial payment of the above-identified damages; and PayPal is ordered to release to Deckers said amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

Date: _10·14-11_

_____
JOHN W. DARRAH
United States District Court Judge

14



Positive
As of: June 26, 2013 11:35 AM EDT

# Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.

United States District Court for the Northern District of Illinois, Eastern Division
April 17, *2008*, Decided; April 17, *2008*, Filed
No. 03 C 5311 Consolidated with No. 03 C 4844

**Reporter:** 2008 U.S. Dist. LEXIS 31761

LORILLARD TOBACCO COMPANY, a Delaware Corporation, Plaintiff, v. MONTROSE WHOLESALE CANDIES AND SUNDRIES, INC., et al., Defendant.

**Subsequent History:** Motion granted by *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc., 2008* U.S. Dist. LEXIS 40369 (N.D. Ill., Apr. 30, *2008*)

**Prior History:** *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc., 2008* U.S. Dist. LEXIS 29229 (N.D. Ill., Apr. 8, *2008*)

## Core Terms

statutory damages, evidentiary hearing, the Lanham Act, recommendation, counterfeit, trademarks

**Counsel:** **[*1]** For Lorillard Tobacco Company, a Delaware corporation (1:03-cv-05311), Plaintiff: John S. Pacocha, LEAD ATTORNEY, Cameron Matthew Nelson, Herbert H. Finn, Howard Kevin Jeruchimowitz, Jeffrey G. Mote, Paul A. Haskins, Greenberg Traurig, LLP., Chicago, IL; Jason B. Elster, Greenberg Traurig, Chicago, IL.

For Kirk D Kiryakos (1:03-cv-05311), Defendant, Counter Claimant: Robert A. Egan, LEAD ATTORNEY, Robert A. Egan P.C., Chicago, IL.

For Ameen Enterprises, Inc (1:03-cv-05311), Defendant: Michael J. Boxerman, Marcus Boxerman & Chatman LLP, Chicago, IL.

For Montrose Wholesale Candies and Sundries Inc, (Defendant in 03cv4844), Ray Hazemi, (Defendant in 03cv4844) (1:03-cv-05311), Defendants: Robert A. Habib, LEAD ATTORNEY, Attorney at Law, Chicago, IL.

For Allied Tobacco Consulting and Distribution, Inc., Big Ash Fine Cigars and Tobacco Inc, Peter Karfias (1:03-cv-05311), Respondents: David Michael Kroeger, LEAD ATTORNEY, Jenner & Block LLP, Chicago, IL.

For S&D Pantry Inc., Citation Respondent, Harwood Heights Gas Mart, Inc., Formont Corp. (1:03-cv-05311), Respondents: Robert R. Benjamin, LEAD ATTORNEY, Francisco E. Connell, Querrey & Harrow, Ltd., Chicago, IL.

For Giti Azari (1:03-cv-05311), **[*2]** deponent: Robert R. Benjamin, LEAD ATTORNEY, Francisco E. Connell, Querrey & Harrow, Ltd., Chicago, IL.

For Lorillard Tobacco Company (1:03-cv-05311), Counter Defendant: John S. Pacocha, LEAD ATTORNEY, Cameron Matthew Nelson, Jeffrey G. Mote, Paul A. Haskins, Greenberg Traurig, LLP., Chicago, IL.

For Lorillard Tobacco Company, a Delaware corporation (1:03-cv-04844), Plaintiff: John S. Pacocha, LEAD ATTORNEY, Cameron Matthew Nelson, Herbert H. Finn, Howard Kevin Jeruchimowitz, Jeffrey G. Mote, Kevin D. Finger, Greenberg Traurig, LLP., Chicago, IL; Jason B. Elster, Greenberg Traurig, Chicago, IL.

For Allied Tobacco Consulting and Distribution Inc (1:03-cv-04844), Plaintiff: David Michael Kroeger, LEAD ATTORNEY, Jenner & Block LLP, Chicago, IL.

For Montrose Wholesale Candies and Sundries Inc, Ray Hazemi (1:03-cv-04844), Defendants: Robert A. Habib, Attorney at Law, Chicago, IL.

Ray Hazemi, Sandra Hazemi (1:03-cv-04844), Defendants, Pro se, Lombard, IL.

For Discount Tobacco Distributors Inc, an Illinois corporation, Samina Haq, Syed Haq (1:03-cv-04844), Defendants: William H. Hrabak, LEAD ATTORNEY, Gregory Lawrence Shugar, Sara Louise Spitler, Goldstine, Skrodzki, Russian, Nemec & Hoff, Ltd., **[*3]** Burr Ridge, IL.

For Sandra Hazemi (1:03-cv-04844), Defendant: Jeffrey H. Bunn, LEAD ATTORNEY, Horwood Marcus & Berk Chartered, Chicago, IL; Robert A. Habib, Attorney at Law, Chicago, IL.

For Karfias, Big Ash Fine Cigars and Tobacco Inc (1:03-cv-04844), Respondents: David Michael Kroeger, LEAD ATTORNEY, Jenner & Block LLP, Chicago, IL.

For Formont Corp. (1:03-cv-04844), Respondent: Francisco E. Connell, Robert R. Benjamin, Querrey & Harrow, Ltd., Chicago, IL.

**Judges:** MARVIN E. ASPEN, United States District Judge.

**Opinion by:** MARVIN E. ASPEN

---
**Opinion**
---

### MEMORANDUM ORDER AND OPINION

MARVIN E. ASPEN, District Judge:

On November 18, 2007, we issued a judgment awarding Lorillard Tobacco Company ("Plaintiff") $ 2.5 million in statutory damages under the Lanham Act. [1] Subsequently, Montrose Wholesale Candies and Sundries, Inc., Ray Hazemi, and Sandra Hazemi (collectively referred to as the "Defendants") filed a *Rule 59(e)* motion to alter or amend that judgment. We referred Defendants' motion to Magistrate Judge Cole, and he issued a Report and Recommendation on February 25, **2008** ("Report") recommending that we deny Defendants' motion. Presently before us is Defendants' [2] objections to Magistrate Judge Cole's Report. For the reasons [**4**] set forth below, we overrule Defendants' objections and adopt the Report.

### STANDARD OF REVIEW

*Federal Rule of Civil Procedure 72(b)* sets forth the procedure for objecting to a magistrate judge's report and recommendation on dispositive matters: "Within 10 days after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and [**5**] recommendations." *Fed. R. Civ. P. 72(b)*. To comply with the rule in the Seventh Circuit, a party must "specify each issue for which review is sought[, but need] not [include] the factual or legal basis of the objection." *Johnson v. Zema Sys. Corp.,* 170 F.3d 734, 741 (7th Cir. 1999). Generally, a district court reviews a magistrate's report and rec-

ommendation for clear error. *Fed. R. Civ. P. 72(a)*; *see Hartford Accident & Indemnity v. Beede,* No. 76 C 3319, 1987 U.S. Dist. LEXIS 3216, 1987 WL 9977, at *2 (N.D. Ill. Apr. 20, 1987). However, the district court undertakes a *de novo* review of those portions of the Report to which a party specifically objected. *Johnson,* 170 F.3d at 741; *Fed. R. Civ. P. 72(b)*.

### ANALYSIS

On February 25, **2008**, Magistrate Judge Cole issued a Report recommending that we deny Defendants' *Rule 59(e)* motion. As the Report correctly indicated, "'[a] court may grant a *Rule 59(e)* motion to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact.'" *County of McHenry v. Ins. Co. of the W.,* 438 F.3d 813, 819 (7th Cir. 2006) (quoting [**6**] *Matter of Prince,* 85 F.3d 314, 324 (7th Cir. 1996)). However, a party may not use a *Rule 59(e)* motion "to advance arguments or theories that could and should have been made before the district court rendered a judgment.'" *Id.* (quoting *LB Credit Corp. v. Resolution Trust Corp.,* 49 F.3d 1263 (7th Cir. 1995)).

Contrary to Defendants' arguments, Magistrate Judge Cole's Report found that: (1) we need not conduct an evidentiary hearing to determine statutory damages in this case; (2) the Lanham Act authorizes $ 2.5 million in statutory damages in this case; and (3) Mrs. Hazemi's arguments were insufficient to show that the court erred in holding her jointly and severally liable.

Defendants now object to the Report and argue that we should grant their *Rule 59(e)* motion because: (1) the court failed to make specific findings and conduct an evidentiary hearing regarding the amount of statutory damages; (2) the maximum statutory damages recoverable under the Lanham Act is $ 1 million based on the facts of this case; and (3) Plaintiff's Second Amended Complaint did not request statutory damages under the Lanham Act. We address each of these objections in turn below.

### A. Objections to the Statutory [**7**] Damages Calculation

Defendants argue that Magistrate Judge Cole erred in de-

---

[1] Magistrate Judge Cole provided an in-depth description of the history and background of this case in *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.,* Nos. 03 C 5311 and 03 C 4844, 2005 U.S. Dist. LEXIS 28917, 2005 WL 311582, at *1-13 (N.D. Ill. Nov. 8, 2005), adopted by Docket No. 229 (N.D. Ill. Jan. 30, 2006). Therefore, we will assume familiarity with the facts and only restate them as necessary to examine the issues below.

[2] While we acknowledge that Sandra Hazemi filed a separate response on March 3, 2008 (and a virtually identical reply on March 24, 2008), for the purpose of this opinion we will assume that Mrs. Hazemi would join in Montrose's and Ray Hazemi's arguments. As relevant, we will indicate where Mrs. Hazemi has asserted objections that differ from those of the other Defendants.

2008 U.S. Dist. LEXIS 31761, *7

nying its *Rule 59(e)* motion because Plaintiff never produced evidence sufficient to justify the statutory damage award in this case. Specifically, Defendants now argue for the first time that we were required to weigh the seven factors listed in the Copyright Act in order to award statutory damages in this case. [3] (*See* Def. Objection at 2-4).

While courts have held that the seven factors under the Copyright Act offer some guidance in Lanham Act cases, *see, e.g., Gucci v. Am., Inc. v. Duty Free Apparel, Ltd., 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004),* **[*8]** courts are "not required to follow any rigid formula" when applying these factors. *See Chi-Boy Music v. Charlie Club, 930 F.2d 1224, 1229 (7th Cir. 1991).* In addition, Magistrate Judge Cole acknowledged these factors in his September 10, 2007 Report and found that they weighed against Defendants not only because they are deemed to have acted willfully by virtue of the default judgment, but also because their repeated discovery abuses prevented actual damages from being proven. *See* 9/10/07 Report at 5, 6, 9 (Case No. 03-5311, Docket No. 197)). Thus, we find that Defendants' objection lacks merit.

To the extent that Defendants repeat their request for an evidentiary hearing and/or trial in this case to determine willfulness, we again find that this argument is without merit. [4] As we have previously indicated, because we entered a default judgment in this case, all allega-

tions of the Plaintiff's complaint are taken as true. *See Cass County Music Co. v. Muedini, 55 F.3d 263, 266 (7th Cir. 1955).* [5] By virtue of this rule, Defendants are deemed to have acted willfully. (*See* Second Am. Compl. P 20 (alleging that Defendants acted "with the intent to confuse and mislead the public")). [6]

In addition to the above factors, Defendants also argue that we were required to conduct an evidentiary hearing on statutory damages. Defendants rely upon *Dundee Cement Co. v. Howard Piper Concrete Products, Inc.,* for the proposition that even after a default judgment, a hearing on damages is required unless "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." **[*11]** *722 F.2d 1319, 1323 (7th Cir. 1983).* [7] Magistrate Judge Cole distinguished *Dundee Cement,* however, because it did not involve statutory damages. (*See* Report at 2; *see also* 9/10/07 Report at 6 (explaining that no evidentiary hearing is necessary because "cases like this, where the information needed to prove actual damages is in the infringer's control, are the very reason for the provision allowing statutory damages awards; no prove-up is necessary")).

We agree with Magistrate Judge Cole that the statutory damage award here may be determined without an evidentiary hearing. First, requiring an evidentiary hearing for

---

[3]   These Copyright Act factors include:

> "(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; (7) the potential for discouraging the defendant."

*Gucci v. Am., Inc. v. Duty Free Apparel, Ltd.,* 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004) (internal citations omitted).

[4]   Mrs. **[*9]** Hazemi's objections focus on this argument and emphasize, as she has in the past, that no evidence has been proven against her and that thus she should be afforded a trial to determine the extent of her involvement in the business.

[5]   Defendants also argue that *Top Brand* and *Gucci* support this argument because they require solid evidence of willfulness not present here. (Def. Objection P 6). These cases are distinguishable, however, because neither involved a default judgment. *See Nike, Inc. v. Top Brand,* No. 00 Civ. 8179, 2006 U.S. Dist. LEXIS 76543, 2006 WL 2946472, at *1 (S.D.N.Y. Feb. 27, 2006) (explaining that the decision is limited to the defendants whose liability was determined on summary judgment); *Gucci Am.,,* 315 F. Supp. at 513 (noting that a two-day bench trial was conducted to determine willfulness).

[6]   In addition, we agree with Magistrate Judge Cole that Mrs. Hazemi has failed to provide any legal reason why our judgment should be vacated against her. In her objections, Mrs. Hazemi insinuates that Magistrate Judge Cole is somehow biased against her. Mrs. Hazemi also argues that she is being found guilty by association merely as the wife of Ray Hazemi and that she was never given the opportunity to speak **[*10]** at depositions. (*See* Sandra Hazemi's Objections at 1, 3). However, Plaintiff's Second Amended Complaint includes allegations regarding Mrs. Hazemi's involvement, which are taken as true upon default judgment. (*See* Second Am. Compl. P 4); *see also Cass County Music Co.,* 55 F.3d at 266. In addition, while Mrs. Hazemi may not have had the opportunity to say what she wished during depositions, we find that she had ample time before we entered judgment to put forth any arguments because this case has been pending for five years and she has attended numerous court appearances. (Report at 6). Thus, we do not find that we committed "a manifest error of law or fact" by finding her jointly and severally liable in our November 18, 2007 judgment.

[7]   We note that Defendants only mentioned this argument in one sentence at the end of their brief. (*See* Def. Objections P 13). However, because Defendants' original Rule 59(e) motion had a more lengthy discussion of this case, we will address its arguments here. (*See* Def. Rule 59(e) Motion 4-5).

statutory damages here would defeat the purpose of _15 U.S.C. § 1117(c)(2)_, which recognized that damages in trademark cases may be difficult to prove due to defendant conduct. _See_ S. Rep. No. 104-177, at *10 ("The committee recognizes that under current law, a civil litigant may not **[*12]** be able to prove actual damages if a sophisticated, large-scale counterfeiter has hidden or destroyed information about his counterfeiting."). This purpose is particularly relevant here given Defendants' repeated discovery abuses. (_See_ 11/8/05 Report (Case No. 03-4844, Docket No. 197)). In addition, other courts have awarded statutory damages after default judgment without conducting evidentiary hearings. [8]

Given these considerations and our **[*13]** discretion in determining statutory damages awards, we agree with Magistrate Judge Cole that our award of $ 2.5 million in statutory damages without an evidentiary hearing was not an error of law. [9]

## C. "Type of Goods" Objection

Defendants also argue that the judgment should be amended because the maximum statutory damages award recoverable in this case is $ 1 million because only one type of goods (cigarettes) are at issue. (Def. Objection at 4). The Lanham Act states that "if the court finds that the use of the counterfeit mark was willful," then the court may award **[*15]** "not more than 1,000,000 _per counterfeit mark per type of goods_ or services sold, offered for sale, or distributed." _15 U.S.C. § 1117(c)(2)_ (emphasis added).

Magistrate Judge Cole rejected this argument because not only had Defendants failed to cite any case law in sup-

port of its proffered statutory interpretation, but also because other cases indicate that a plaintiff may recover $ 1 million in statutory damages for each trademark violated even if only one product is involved. (Report at 3); _see also Top Brand Co._, No. 00 Civ. 8179, 2006 U.S. Dist. LEXIS 76543, 2006 WL 2946472, at *3 (awarding $ 12 million in statutory damages for three counterfeit goods each bearing four trademarks and $ 5 million for one counterfeit good bearing five trademarks); _Gucci Am., Inc._, 315 F. Supp. 2d at 521 n.8; _Variety Wholesalers, Inc._, 274 F. Supp. 2d at 1374. Thus, because Plaintiff alleged that five of its trademarks were violated, Magistrate Judge Cole found that we have discretion to award up to $ 5 million in statutory damages. (Report at 6; _see also_ Second Amended Compl. P 16).

Defendants now claim that Magistrate Judge Cole's interpretation of the statute defies commonsense and that none of the above cases are controlling **[*16]** in this district. Regardless, Defendants still have not cited one case that supports their interpretation, and we agree with Magistrate Judge Cole's interpretation of the statutory language.

## C. Dispute regarding Second Amended Complaint

Defendants finally argue that Plaintiff's Second Amended Complaint never requested statutory damages under the Lanham Act specifically, and thus that Magistrate Judge Cole Report incorrectly awarded them. Defendants' argument appears to be essentially that because Plaintiff's statutory damage request is at the end of its complaint, this means that Plaintiff is only claiming statutory damages under the last count of its complaint, Inducement to Commit Fraud. (Def. Objection at 5). We dis-

---

[8]    _See, e.g._, _Ortiz-Gonzalez v. Fonovisa_, 277 F.3d 59, 63-64 (1st Cir. 2002) (finding that no evidentiary hearing on statutory damages was required after default judgment since was within district judge's discretion to award within an amount within the statutory range); _Microsoft Corp. v. Nop_, No. CIV S-07-1276, 549 F. Supp. 2d 1235, 2008 U.S. Dist. LEXIS 18727, 2008 WL 686584, at *4 (E.D. Cal. Mar. 11, 2008) (determining amount of statutory damages without an evidentiary hearing and noting that "statutory damages are appropriate in default judgment cases because the information needed to prove damages is within the infringers' control and is not disclosed" (internal citations omitted)); _Warner Bros. Records, Inc. v. Hentz_, No. 06-cv-686-JPG, 2007 U.S. Dist. LEXIS 63716, 2007 WL 2481289, at *4 (S.D. Ill. Aug. 29, 2007).

[9]    Defendants also attempt to distinguish the statutory damage awards in the cases cited in Magistrate Judge Cole's Report. For example, Defendants argue that: _Top Brand_ is distinguishable because the defendant's infringing operations in that case led to the production of millions of infringing goods; _Gucci_ is distinguishable because the defendants continued to sell counterfeit goods after the lawsuit was filed; and _Variety Wholesalers, Inc._ is distinguishable because the court awarded less than $ 2 million in damages even though defendants was a company with over 450 stores and $ 600 million in gross annual sales. (Def. Objections at 3-4).

However, we find these distinctions irrelevant because these courts also focused upon the defendants' willfulness and abusive conduct during the litigation, as has been repeatedly emphasized in this case. _See Top Brand_, No. 00 Civ. 8179, 2006 U.S. Dist. LEXIS 76543, 2006 WL 2946472, at *2 (examining the extent of the defendants' operation as only one factors in determining the statutory **[*14]** damage amount and also stressing that "the willfulness of their conduct, and their behavior in this litigation all weigh towards a grant of the maximum in statutory damages"); _Gucci Am., Inc._, 315 F. Supp. 2d at 521 (determining that defendant acted willfully not only because defendant continued to sell counterfeit goods after the suit was filed, but also due to defendant's "bold contempt for the law" exhibited both during the two-year period it sold the counterfeit goods and during the course of the litigation).

In addition, Defendants' reliance upon _Nike Inc. v. Variety Wholesalers, Inc._ as evidence that the award here was excessive is misplaced because the award in that case was based upon actual damages determined after a trial, and did not involve a willful defendant. _See_ 274 F. Supp. 2d 1352, 1374 (S.D. Ga. 2003).

2008 U.S. Dist. LEXIS 31761, *16

agree. Reviewing Plaintiff's Second Amended Complaint, Plaintiff specifically asked for "statutory damages in lieu of actual damages, as provided in *15 U.S.C. § 1117(c)*." (Second Amended Compl. P F). While this request was at the end of the complaint and not specifically under Counts I, II, and III, this is of no consequence since Plaintiff is clearly is requesting relief for all of its counts at the end of its complaint and Plaintiff clearly cites to the Lanham Act in **[*17]** Paragraph F. Thus, we agree with Magistrate Judge Cole that this argument is without merit.

**CONCLUSION**

For the reasons set forth below, we overrule Defendants' objections and adopt Magistrate Judge Cole's Report. Accordingly, Defendant's Rule 59(e) motion is denied. It is so ordered.

/s/ Marvin E. Aspen

MARVIN E. ASPEN

United States District Judge

Date: April 17, *__2008__*



Positive
As of: June 26, 2013 1:24 PM EDT

# Lorillard Tobacco Co. v. S&M Cent. Serv. Corp.

United States District Court for the Northern District of Illinois, Eastern Division
November 5, **_2004_**, Decided ; November 8, **_2004_**, Docketed
No. 03 C 4986

**Reporter:** 2004 U.S. Dist. LEXIS 22563; 2004 WL 2534378

LORILLARD TOBACCO COMPANY, Plaintiff, v. S&M CENTRAL SERVICE CORPORATION, Defendant.

**Disposition:** Judgment entered for plaintiff. Plaintiff's request for a permanent injunction granted; Plaintiff's Motion to Amend the Pleadings to Conform to the Evidence and Motion to Strike S&M's Brief on Damages denied.

---

## Core Terms

infringement, counterfeit, cigarettes, statutory damages, trademark, attorney's fees, tax return, actual damage, motion to strike, award damages, packaging, brand, reproduction, imitation, dollar, deter, personal liability, likely to cause, injunction, cartons, genuine, corporate officer, consumer product, destroying, registered, deceive

---

## Case Summary

### Procedural Posture
Plaintiff the owner of five trademarks related to its cigarette products, brought post trial motions, seeking: an award of statutory damages of $ 500,000, pursuant to _15 U.S.C.S. § 1117(c)_; an award of its costs and reasonable attorneys' fees pursuant to _15 U.S.C.S. § 1117(b)_; a permanent injunction barring defendant infringer from selling, offering for sale or distributing counterfeit cigarettes, and, amendment of to add individual defendants.

### Overview
The complaint alleged that the infringers violated the Trademark Act of 1946, _15 U.S.C.S. § 1051 et seq._, by willfully offering for sale, selling, and distributing counterfeit versions of the owner's Newport cigarettes. A jury found that consumers would likely confuse the counterfeits with genuine Newports, and the infringing corporation had acted willfully or with willful blindness. The owner also challenged financial data in the form of tax returns submitted by the infringing corporation as improper. The tax forms were not a pleading, and actually showed real profits for the tax years, and so were

not prejudicial to the owner, so the motion to strike was denied. The court noted that the five trademarks infringed were of considerable value. Since part of the purpose of statutory damages was to deter the current violator and other potential future violators, actual damages were less relevant and statutory damages were appropriate. The court found that a $ 250,000 award was fully supported by its concurrence with the jury's determination. The owner also sought to add, after the fact, two individual officers of the infringer as defendants to conform to the evidence.

### Outcome
The court awarded statutory damages of $ 50,000 per infringed mark, reasonable costs and attorneys' fees, and a permanent injunction. The motion to amend the pleadings to conform to the evidence adding two individuals as defendants was denied.

---

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview

**_HN1_** See _Fed. R. Civ. P. 12(f)_.

Civil Procedure > Pleading & Practice > General Overview
Civil Procedure > Pleading & Practice > Pleadings > Answers
Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

**_HN2_** A memorandum submitted in support of a court's determination of damages is not a pleading under _Fed. R. Civ. P. 7(a)_

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Strike > General Overview
Civil Procedure > ... > Standards of Review > Harmless & Invited Errors > General Overview

**_HN3_** The language of _Fed. R. Civ. P. 37(c)_ allows a court to consider evidence that otherwise would be excluded, when the result of its consideration is harmless.

Tax Law > Federal Income Tax Computation > General Overview
Tax Law > Federal Income Tax Computation > Losses > General Overview
Tax Law > ... > Losses > Net Operating Losses > General Overview

2004 U.S. Dist. LEXIS 22563, *22563

Torts > Remedies > Damages > Taxation

*HN4* A net operating loss is a non cash deduction that allows a company to "carry-forward" and/or "carry-back" prior year losses and recognize them as current year tax deductions. *26 U.S.C.S. § 172*.

Copyright Law > ... > Damages > Types of Damages > Statutory Damages
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Infringement Actions > Remedies > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Damages > Types of Damages > Statutory Damages
Trademark Law > ... > Trademark Counterfeiting Act > Civil Actions > General Overview

*HN5* *15 U.S.C.S. § 1117* allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, *15 U.S.C.S. § 1117(a)*; or *(2)* statutory damages. *15 U.S.C.S. § 1117(c)*. Congress provided the statutory damages option of *15 U.S.C.S. § 1117(c)* through the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, *§ 7*, 110 Stat. 1368. That option was added due to the concern that a counterfeiter might hide, alter, or destroy records, thus making it impossible for a plaintiff to determine the scope of, or be able to prove, actual damages.

Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Trademark Counterfeiting Act > Civil Actions > General Overview
Trademark Law > ... > Civil Actions > Remedies > General Overview
Trademark Law > ... > Civil Actions > Remedies > Damages

*HN6* See *15 U.S.C.S. § 1117(c)(1)*.

Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Trademark Counterfeiting Act > Civil Actions > General Overview

*HN7* *15 U.S.C.S. § 1117(c)(2)* allows a statutory award of up to $ 1,000,000 per counterfeit mark if the court finds that the use of the counterfeit mark was willful.

Copyright Law > ... > Remedies > Damages > General Overview
Copyright Law > ... > Damages > Types of Damages > Compensatory Damages
Copyright Law > ... > Damages > Types of Damages > Statutory Damages
Trademark Law > ... > Remedies > Damages > General Overview

*HN8* A court awarding statutory damages is not required to follow any rigid formula but instead enjoys wide discretion. In computing the award amount, a court may consider factors such as the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent. Additionally, statutory damages are appropriate to penalize the infringer and deter future violations when the infringement was willful.

Trademark Law > Conveyances > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Counterfeiting > Trademark Counterfeiting Act > General Overview

*HN9* A counterfeiter must fear more than just having to turn over his ill gotten gains to the rightful owners. Instead, the counterfeit must understand that he risks his financial future by engaging in his illegal practice.

Trademark Law > ... > Factors for Determining Confusion > Intent of Defendant to Confuse > General Overview

*HN10* Willful infringement may be attributed to a defendant's actions where that party had knowledge that it's conduct constituted infringement or where it showed a reckless disregard for the owner's rights. Thus, knowledge need not be proved directly, but can be inferred from a defendant's conduct. Willful infringement may be shown by the fact that the defendant ignored the plaintiff's notices, did not seek advice of an attorney, and passed the matter off as a nuisance.

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards
Civil Procedure > ... > Costs & Attorney Fees > Costs > General Overview

*HN11* A prevailing party is entitled to its costs other than attorneys' fees as a matter of course pursuant to *Fed. R. Civ. P. 54(d)(1)*.

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act
Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards
Trademark Law > ... > Remedies > Damages > General Overview

*HN12* A court in exceptional cases of infringement may award reasonable attorney fees to the prevailing party, pursuant to *15 U.S.C.S. § 1117(a)*. Exceptional cases allowing for an award of attorneys' fees include acts of infringement that are malicious, fraudulent, deliberate or willful.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Conforming Pleadings to Evidence
Patent Law > Remedies > Equitable Relief > Injunctions
Trademark Law > Conveyances > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Remedies > Equitable Relief > General Overview
Trademark Law > ... > Civil Actions > Remedies > General Overview
Trademark Law > ... > Civil Actions > Remedies > Injunctions

*HN13* A court has power to enter an injunction against future infringement, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office.

2004 U.S. Dist. LEXIS 22563, *22563

*15 U.S.C.S. § 1116 (a).*

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Parties > Defendants > Personal Liability of Corporate Directors, Employees & Shareholders
Trademark Law > ... > Remedies > Damages > General Overview

**HN14** As a general rule, corporate officers cannot be held personally liable for infringing actions taken by the corporation. However, an individual may be held liable for a corporation's infringement under the theory of vicarious liability or contributory liability. Personal liability for trademark infringement is established if a corporate officer is a moving, active, conscious force behind the defendant corporation's infringement.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

**HN15** A district court has the ability, under *Fed. R. Civ. P. 15*, to add new defendants after trial and judgment has been entered. However, if the court adds a new party to the litigation, due process requires that the new party is given an opportunity to respond and contest that personal liability.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

**HN16** Although *Fed. R. Civ. P. 15* provides a liberal policy for amending pleadings, the right to amend is not absolute.

**Counsel:** **[*1]** For LORILLARD TOBACCO COMPANY, A DELAWARE CORPORATION, Plaintiff: John S. Pacocha, Jeffrey G. Mote, Daniel T Fahner, Cameron Matthew Nelson, Greenberg Traurig, LLP., Chicago, IL.

For S&M CENTRAL SERVICE CORPORATION, AN ILLINOIS CORPORATION, Defendant: Alexander Sotirios Michalakos, Zanayed & Michalakos, Ltd., Chicago, IL.

**Judges:** JAMES F. HOLDERMAN, District Judge.

**Opinion by:** JAMES F. HOLDERMAN

| Opinion |
| --- |

*MEMORANDUM OPINION AND ORDER*

JAMES F. HOLDERMAN, District Judge:

Plaintiff Lorillard Tobacco Co., ("Lorillard"), filed suit against defendant S&M Central Service Corporation, ("S&M"), alleging that S&M infringed of five of Lorillard's registered trademarks in violation of the Trademark Act of 1946, *15 U.S.C. § 1051 et seq.,* ("Lanham Act"), by willfully, or with willful blindness, offering for sale, selling and distributing counterfeit versions of Lorillard's Newport cigarettes. At the conclusion of a two day trial on the merits, a jury returned a verdict in favor of Lorillard and stated: (1) yes, consumers would likely confuse the cigarette packs bearing the counterfeit marks sold by S&M with genuine Newport cigarette packs; and (2) yes, S&M's actions were **[*2]** taken willfully or committed with willful blindness. (Dkt. No. 49.)

Lorillard's August 4, *2004* post-trial motions request this court to (1) award Lorillard statutory damages of five hundred thousand dollars, ($ 500,000) [1], pursuant to *15 U.S.C. § 1117(c)*; (2) award Lorillard costs and reasonable attorneys' fees pursuant to *15 U.S.C. § 1117(b)*; (3) enter a permanent injunction barring S&M from selling, offering for sale or distributing counterfeit cigarettes, and, (4) amend the pleadings to add Safwan Alkhawan ("Alkhawan") and Marwan Khawam ("Khawam") as individually liable defendants in order to conform the pleadings to the evidence presented at trial. Lorillard also submitted a motion on August 16, *2004* to Strike the Defendant's Brief on Damages pursuant to *Rules 12, 26* and *37* of the Federal Rules of Civil Procedure, ("Rules").

**[*3]** S&M, in its Brief Regarding Damages of August 6, *2004*, requests that if any damages are awarded, the court should award *15 U.S.C. § 1117(c)*'s minimum amount of $ 500 per infringed mark for a total award of $ 2,500. S&M also argues that an award of attorneys' fees and costs is not appropriate in this case.

For the reasons set forth below, this court awards to Lorillard, pursuant to *15 U.S.C. § 1117(c)*, statutory damages of Fifty Thousand Dollars ($ 50,000) per infringed mark for a total statutory damage award of Two Hundred Fifty Thousand Dollars ($ 250,000). This court also finds that Lorillard is entitled to receive reasonable costs and attorneys' fees pursuant to *15 U.S.C. § 1117(b)* but the parties must comply with the requirements of Local Rule 54.3 before this court can calculate a figure for reasonable costs and attorneys' fees. In addition, this court grants Lorillard's request for a permanent injunction, but denies Lorillard's Motion to Amend the Pleadings to Conform to the Evidence and denies Lorillard's August 16, *2004* Motion to Strike S&M's Brief on Damages.

*BACKGROUND*

---

[1] Lorillard arrived at the $ 500,000 figure by requesting damages of one hundred thousand dollars, ($ 100,000), for each of the five infringed trademarks.

*A. Lorillard Tobacco Company*

 [*4] Lorillard is the fourth largest tobacco company in the United States. (Stipulation and Statement of Uncontested Facts P 4, Ex. 1 to the Pre-Trial Order, [hereinafter Uncontested Facts].) First introduced into the market in 1956, Newport is a Lorillard cigarette brand. (*Id.* at P 6.) Newport is the leading brand of menthol cigarettes sold in the United States, and it is the second leading cigarette brand overall with an eight percent market share. (*Id.* at P 6-7.)

Lorillard has protected the value of the Newport brand by registering the five following trademarks with the United States Patent and Trademark Office: Reg. No. 1,108,876; Reg. No. 1,178,413; Reg. No. 1,191,816; Reg. No. 1,920,066; and Reg. No. 2,600,870. (*Id.* at P 10.) Four of the marks, Nos. 1,108,876; 1,178,417; 1,191,816; and 1,920,666, have attained incontestable status under *15 U.S.C. § 1115(b).* (*Id.*)

*B. S&M Central Service Corporation and its interaction with Lorillard*

S&M operates a gas station in Chicago, Illinois. (Trial Tr. pg. 59.) The station sells gasoline, operates maintenance bays, and sells consumer products including food, magazines and cigarettes. (Uncontested [*5] Facts at P 3.) Lorillard became aware of counterfeit Newport cigarettes at S&M when one of Lorillard's sales representatives made a sales call to S&M. (*Id.* at 16.) The sales representative purchased two cartons of the counterfeit cigarettes. (Trial Tr. at 42.) On July 18, 2003, Lorillard obtained an *Ex Parte* Seizure Order from this court authorizing a seizure of counterfeit cigarettes at S&M. The executed search of S&M resulted in a seizure of 83 cartons and 9 packages of counterfeit Newport cigarettes and associated business records.

*ANALYSIS*

*A. Lorillard's Motion to Strike S&M's Brief on Damages*

On August 16, **2004**, Lorillard filed a motion to strike S&M's August 6, **2004** brief on damages under *Rules 12, 26,* and *37.* Lorillard's motion asserts two separate concerns. First, Lorillard argues that S&M's brief contains misstatement of facts unsupported by citation to the record. Second, Lorillard argues that S&M improperly included its 2001, 2002, and 2003 tax returns as an exhibit to S&M's brief on damages. Lorillard argues that it had requested financial information included tax returns from S&M during discovery, that S&M had failed to disclose these items, and therefore [*6] S&M should be prohibited from using these documents under *Rule 37.* Lorillard requests the court to strike S&M's brief in whole, or in the alternative strike specific offending portions of the brief, and the impose sanctions against S&M.

S&M counters that the documents provided with its brief were specifically requested by the court at the end of the trial, that these documents were not disclosed during discovery because they were not relevant and the information contained in the brief is appropriate since S&M is making arguments to the court. S&M further argues that Lorillard should be sanctioned for bringing its motion to strike.

Lorillard is unable to bring a motion to strike under *Rule 12(f).* *Rule 12(f)* provides that *HN1* "the court may strike from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f).* The plain language of *Rule 12(f)* states that the Rule applies to "pleadings." *HN2* A memorandum submitted in support of a court's determination of damages is not a pleading under the Rules. *See Fed. R. Civ. P. 7(a)* (Defining pleadings as either a complaint, answer, reply to a counterclaim, an answer to a cross-claim, [*7] a third-party complaint, or third-party answer); *see, e.g., E.E.O.C. v. Admiral Maint. Serv., L.P.,* 174 F.R.D. 643, 645-47 (N.D. Ill. 1997). Consequently, by the plain language of Rules, *Rule 12(f)* is not applicable. The court notes, however, that any evaluation of the facts must be based on the record presented to the court and the court will provide proper citations to the record were appropriate.

Furthermore, this court concludes that it will consider the tax returns provided by S&M in its brief on damages. *HN3* The language of *Rule 37(c)* allows a court to consider evidence that otherwise would be excluded when the result is harmless. *Fed. R. Civ. P. 37(c).* In this case, the court concludes that S&M's decision to provide its 2001, 2003 and 2003 tax returns was harmless to Lorillard and actually undercuts certain of S&M's arguments due to the way that S&M uses the tax returns in its brief on damages.

S&M provides its tax returns as support for its statement that "S&M has not been a profitable enterprise. The attached tax returns of 2001, 2002, and 2003 show that there was no taxable income to the company. As a result, any award of damages would cause a hardship to the  [*8]  Defendant." (Def. Br. Regarding Damages of August 6, **2004** at 3.) However, the information contained in the tax returns contradict the statement that any award of damages would be a hardship. It is true that S&M reported zero taxable income on its 2001, 2002 and 2003 federal tax returns. However, the zero taxable figure was the result of a Net Operating Loss deduction, ("NOL"), that S&M was able to take during those three years. *HN4* A NOL is a non cash deduction that allows a company to "carry-forward" and/or "carry-back" prior year losses and recognize them as current year deductions. *See 26 U.S.C. § 172.* Consequently, S&M's statement that it "has not been a profitable enterprise" may be technically correct for tax purposes since S&M reported no taxable income. However, the tax returns actually undermine S&M's statement that "any award of

damages would cause a hardship for the Defendant" because S&M recognized a profit before the NOL deduction. S&M's creditability as to its statement of financial condition is further undermined by the millions of dollars of wire transfers uncovered by Lorillard. (Pls. Brief on Damages and Att'ys Fees of August 6, *2004* at Ex.

 [*9]  I.) Since the tax returns submitted by S&M are actually harmful to S&M and helpful to Lorillard, the court concludes there is no harm as to Lorillard and will deny Lorillard's motion to strike. In light of this decision, S&M's motion to sanction Lorillard for bringing its motion to strike is denied.

*B. Lorillard's Motion for Statutory Damages under 15 U.S.C. § 1117(c)*

**HN5** Title 15, *Section 1117* allows a plaintiff to elect, at any time before final judgment is rendered, one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, *15 U.S.C. § 1117(a)*; or (2) statutory damages. *15 U.S.C. § 1117(c)*. Congress provided the statutory damages option of *15 U.S.C. § 1117(c)* through the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386. This option was added due to the concern that a counterfeiter might hide, alter or destroy records, thus making it impossible for a plaintiff to determine the scope of, or be able to prove, actual damages. *Louis Vuitton v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002) [*10]  (citing S. Rep. No. 177, 104 Cong. (1995)).

*Section 1117(c)(1)* allows **HN6** statutory damages of "not less than $ 500 and no more than $ 100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." *15 U.S.C. § 1117(c)(1)*. In addition, **HN7** *Section 1117(c)(2)* allows a statutory award of up to $ 1,000,000 per counterfeit mark "if the court finds that the use of the counterfeit mark was willful." *15 U.S.C. § 1117(c)(2)*.

Although *section 1117(c)* contains the dollar ranges for possible statutory damage awards, the statute does not provides guidance on how to select a damage figure within statutory dollar range. Courts interpreting *section 1117(c)* have looked by analogy to case law applying the statutory damage provision of the Copyright Act contained in *17 U.S.C. § 504(c)*, *Sara Lee v. Bags of New York, Inc.*, 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999) ("Cases decided under the Copyright Act, which deals with a similar problem and a similar legislative grant to discretion, afford guidance here."). *Accord, Tommy Hilfiger Licensing, Inc. v. Goody's* [*11]  *Family Clothing, Inc.*, 2003 U.S. Dist. *LEXIS* 8788, No. 1:00-CV-1934-BBM, 2003 WL 22331254, at *28(N.D. Ga. May 9, 2003); *Louis Vuitton*, 211 F. Supp. 2d at 583; *Microsoft Corp. v. Logical Choice Computers, Inc.*, 2001 U.S. Dist. *LEXIS* 479, No. 99 C 1300, 2001 WL 58950 at * 11 (N.D. Ill. Jan. 22, 2001); , *Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995, 1008 (S.D.

Tex. 2000).

The Seventh Circuit's standard for awarding copyright statutory damages under *17 U.S.C § 504(c)*, and thus the standard this court will use for awarding trademark statutory damages under *15 U.S.C § 1117(c)*, is enumerated in *Chi-Boy Music v. Charlie Club*. 930 F.2d 1224, 1229 (7th Cir. 1991). Under the *Chi-Boy* standard, **HN8** a court awarding statutory damages is "not required to follow any rigid formula but instead enjoys wide discretion." *Id.* In computing the award amount, a court may consider factors such as "the difficulty or impossibility of proving actual damages, the circumstances of the infringement, and the efficacy of the damages as a deterrent." *Id.* Additionally, statutory damages are appropriate to "penalize [*12]  the infringer and deter future violations" when the infringement was willful. *Id. at 1230*.

Lorillard argues for a damages award of at least $ 100,000 per each of the five infringed marks for a minimum damage award of $ 500,000. Lorillard argues that the $ 500,000 is appropriate in light of (1) S&M's annual total gross sales of approximately $ 1.35 million, (2) S&M's annual total gross sales of cigarettes of $ 300,000, (3) the "immeasurable value" of Lorillard's trademarks and the risk that customers using inferior counterfeit cigarettes will stop buying Newport products, and, (4) will serve to deter both S&M and other potential infringers. (Pls. Brief on Damages and Att'ys Fees of August 6, *2004* at pg 12-13, 18.) In addition, Lorillard argues that the court should reject any of the S&M's arguments about inability to pay a damages award. According to Lorillard, S&M's financial information should be "viewed with a healthy degree of skepticism," since they have failed to provide supporting documentation and Lorillard uncovered "millions of dollars worth of foreign wire transfers" made by S&M. (*Id.* at 13.)

Lorillard also argues for the court to find that S&M was [*13]  willful in its infringement. A finding of willful infringement would allow for a damages award of up to $ 1,000,000 per counterfeit mark, *15 U.S.C. § 1117(c)(2)*, for a total potential award of $ 5,000,000. According to Lorillard, evidence of S&M's willfulness include (1) the purchase of larger than usual quantities of purported Newport cigarettes from Cam-Kat at a price well below market value and in unusual packaging that differed significantly from the genuine Newport packaging, and, (2) the jury's verdict finding willful infringement. (*Id.* at 15.) Additionally, Lorillard argues that S&M's attempts to rebut the question of willfulness merely highlight their own guilt," (*Id.*), and they have exacerbated their willful purchases of counterfeit Newports by "lying throughout this case - from the day of the *ex parte* seizure to the last day of trial." (*Id.* at 16.)

S&M argues the court should impose no damages or at the most the minimum statutory penalty of $ 500 per infringed mark for a total award of $ 2,500. S&M argues that (1) the conduct of defendants in other reported in-

fringement cases is more willful and done with more disdain than in this [*14] case, and therefore warranted higher damages, (Defs. Brief Regarding Damages of August 6, *2004* at pg 2); (2) S&M has not been a profitable enterprise and therefore any damage award would cause a hardship, (*Id.*); (3) the actual damage to Lorillard was very small due to the small number of cartons of counterfeit product purchased, (*Id.* at 4.); (4) despite the jury's finding of willfulness, the evidence for willfulness was not overwhelming, (*Id.*); (5) Lorillard shares some level of responsibility since it possessed specialized and sophisticated knowledge about how to identify counterfeit packages and never shared this information with S&M, (*Id.* at 5; and, (6) the court should not be bound by the jury's findings. (*Id.* at 6)

This court concludes that the appropriate damage award in this case is $ 50,000 per infringed mark for a total statutory damages award of $ 250,000. This amount is appropriate due to the value of the trademarks, the conduct by S&M, and the need to deter future conduct by S&M and other potential counterfeiters. Furthermore, this court notes that an award of $ 250,000 is reasonable and fair in light of the range of awards provided by other courts [*15] awarding damages under *15 U.S.C. § 1117(c)* [2], and that the total potential award could have been as high as $ 5,000,000 due to the maximum statutory award of $ 1,000,000 for each willfully infringed trademark.

 [*16] The five trademarks infringed by S&M are of considerable worth and value. Lorillard has taken considerable action to cultivate, maintain and strengthen these trademarks including: (1) registering the trademarks with the United States Patent and Trademark Office, (Uncontested Facts at P 8); (2) manufacturing the Newport product through strict quality control standards, (*Id.* at P 5); (3) investing substantial time, energy and money in advertising and promoting the Newport product (*Id.* at P 6); (4) training its sales personnel to be aware of counterfeit products so, like in this case, they can identify and report suspicious items, (Trial Tr. at pg 33.); and, (5) protecting the value of its trademarks by litigating against trademark infringers.

Congress has provided the option of statutory damages under *15 U.S.C. § 1117(c)* and Lorillard has elected to pursue that remedy. Consequently, the significant value

of Lorillard's brand and the efforts taken to protect, promote and enhance that brand should be considered by the court in the determination of the appropriate dollar figure for the award. Furthermore, the actual damages incurred by Lorillard are of [*17] lesser concern in determining a proper damage award because Congress' decision to allow statutory damages under *15 U.S.C. § 1117(c)* was in direct recognition of the fact that the calculation of the actual damages may be difficult, if not impossible, to determine. *Louis Vuitton v. Veit*, 211 F. Supp. 2d 567, 583 (E.D. Pa. 2002) (citing S. Rep. No. 177, 104 Cong. (1995)).

The actual damages figure is also less relevant since part of the purpose of statutory damages is to deter the current violator and other potential future violators. Thus, the court believes that a damage award limited to Lorillard's lost profits would have little to no deterrent effect on future violations. *HN9* A counterfeiter must fear more than just having to turn over his ill gotten gains to the rightful owners. Instead, the counterfeit must understand that he risks his financial future by engaging in his illegal practice. As the Seventh Circuit has held, "one who undertakes a course of infringing conduct may neither sneer in the face of the [trademark] owner nor hide its head in the sand like an ostrich." *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 514 (7th Cir. 1994) [*18] (citations omitted).

Furthermore, deterring S&M along with potential future trademark infringers is an important consideration in light of the fact that counterfeiters often times produces lower quality products than the original. Lorillard properly notes that infringement deprives the rightful owner of profits and reduces the value of its brands. But an additional concern, above and beyond the financial harm, is that counterfeit consumer products can also potentially pose the risk of being more harmful or dangerous then the real product. The House of Representatives in its report on the Anticounterfeiting Consumer Protection Act of 1996, Pub. L. No. 104-153, § 7, 110 Stat. 1386, noted, "even more grievous than the enormous economic losses suffered by American companies are the serious health and safety hazards caused by criminal counterfeiting." H. Rep. No. 556, 104 Cong. (1996).

The court is not entering into a discussion of the general health effects of cigarettes or whether the counterfeit

---

2   A figure of $ 50,000 per infringed mark for a total award of $ 250,000 is within the range of statutory awards made by other courts under 15 U.S.C. § 1117(c). *See Philip Morris USA, Inc. v. Felizardo*, 2004 U.S. Dist. LEXIS 11154, No. 03 Civ. 5891, 2004 WL 1375277, at *7 n.16 (S.D.N.Y. June 18, 2004) ($ 62,500 statutory damage award for two infringed trademarks when defendant attempted to sell 7500 counterfeit cartons of cigarettes); *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 501 (C.D. Cal. 2003) ($ 2,000,000 statutory damage award for two infringed trademarks when defendant imported 8,000,000 counterfeit cigarettes); *see e.g., Silhouette Int'l Schmied v. Chakhbazian*, No. 04 Civ. 3613, at *2 (S.D.N.Y Oct. 4, 2004) ($ 250,000 statutory damage award for infringement of multiple eyewear trademarks); *Microsoft Corp v. V3 Solutions, Inc.*, 2003 U.S. Dist. LEXIS 15008, No. 01 C 4693, 2003 WL 22038593, at *16 (N.D. Ill. Aug. 28, 2003) ($ 35,000 statutory damage award for seven infringed Microsoft software trademarks); *Microsoft Corp. v. Logical Choice Computers, Inc.*, 2001 U.S. Dist. LEXIS 479, No. 99 C 1300, 2001 WL 58950, at *11 (N.D. Ill. Jan. 22, 2001) ($ 1,400,000 statutory damage for the infringement of seven Microsoft software trademarks).

cigarettes sold by S&M were more harmful than the authentic Newport product. Instead, the court is noting that there was no proof presented by the parties that the counterfeit Newport products **[\*19]** are subject to any type of safety review or quality control process when manufactured by someone other than Lorillard. Cigarettes are consumer products and the retail establishments that sell cigarettes often sell other consumer products such as food, beverages, over-the-counter medicines and cosmetics. S&M sells food and beverages as well as cigarettes. (Uncontested Facts at P 3.) The statutory damage award will deter S&M and other retail establishments from purchasing counterfeit consumer products, and this in turn will help to reduce the probability that consumers will purchase counterfeit products that may be more dangerous than the authentic items.

The court's belief that a $ 250,000 award is fully supported by its concurrence with the jury's determination of S&M's willful infringement. A finding of willful infringement allows the court to award the maximum statutory damage amount, if appropriate under the circumstances of the case, of $ 1,000,000 per infringed mark, _15 U.S.C. § 1117(c)_, for a total potential award in this case of $ 5,000,000.

**HN10** "Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted **[\*20]** infringement or where he showed a reckless disregard for the owner's rights. Thus, knowledge need not be proved directly, but can be inferred from a defendant's conduct." _Logical Choice Computers, Inc._, 2001 U.S. Dist. **LEXIS** 479, No. 99 C 1300, 2001 WL 58950, at *11 (citing _Wildlife Express Corp._, 18 F.3d at 511). Willful infringement may be shown by the fact that the "defendant ignored the plaintiff's notices ..., did not seek advice of an attorney, and passed the matter off as a nuisance." _Wildlife Express Corp._, 18 F.3d at 511.

Several facts support the jury's determination of willfulness. S&M purchased the counterfeit cigarettes at a price below the market price. Khawam testified that S&M obtained the counterfeit cigarettes at a price of $ 34 per carton instead of the normal rate of $ 40 per carton. (Trial Tr. 155, 161.) Khawam admitted during his testimony that price was low enough to make him inspect the tax stamps and the name brands on a sample of the cartons he purchased from Cam-Kat. (Trial Tr. 160.)

Additionally evidence is that packaging for the counterfeit cigarettes, including the outer boxes, was different from the packaging used for authentic **[\*21]** Newport cigarettes. (Trial Ex. 30 - 32c.) Alkawham, when questioned about the differences in the packaging during his testimony, responded, "it's not my business to find out if they're counterfeit or not." (Trial Tr. 91.)

In light of the reasons set forth above, this court awards to Lorillard, pursuant to _15 U.S.C. § 1117(c)_, statutory damages of Fifty Thousand Dollars ($ 50,000) per in-

fringed mark for a total statutory damage award of Two Hundred Fifty Thousand Dollars ($ 250,000). This amount is within the range authorized by Congress under the statute and is appropriate in light of the evidence presented at trial.

_C. Award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(b) and Rule 54(d)(1)_

Lorillard seeks an award of $ 140,000 for costs and reasonable attorneys' fees. **HN11** As the prevailing party, Lorillard is entitled to its costs other than attorneys' fees as a matter of course pursuant to _Rule 54(d)(1)_. _Fed. R. Civ. P. 54(d)(1)_. **HN12** "The court in exceptional cases may award reasonable attorney fees to the prevailing party." _15 U.S.C. § 1117(a)_. Exceptional cases allowing for an award of **[\*22]** attorneys' fees include "acts of infringement [that] are 'malicious, fraudulent, deliberate or willful.'" _BASF Corp. v. Old World Trading Co., Inc._, 41 F.3d 1081, 1099 (7th Cir. 1994) (quoting _Roulo v. Russ Berrie & Co., Inc._, 886 F.2d 931, 942 (7th Cir. 1989))._

An award of reasonable attorneys's fees under _15 U.S.C. § 1117(a)_ is appropriate in light of the jury's determination, and the court's concurrence in that determination, of willful infringement by S&M. The parties must comply with the Local Rule 54.3, before the court can determine the amount of fees and costs which reasonably should be awarded.

_D. Permanent Injunction Barring S&M from Selling, Offering for Sale or Distributing Counterfeit Cigarettes_

Lorillard seeks a permanent injunction to bar S&M from selling, offering for sale or distributing counterfeit cigarettes. **HN13** This court has power to enter such an injunction, "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." _15 U.S.C. § 1116_ **[\*23]** _(a)_. This court grants the injunction, as detailed below, in the "Conclusion" section of this opinion.

_E. Lorillard's Motion to Amend the Pleadings to Conform to the Evidence Presented at Trial_

Lorillard moves to amend the pleadings to add Safwan Alkhawan, ("Alkhawam"), and Marwan Khawam ("Khawam") as individually liable defendants in order to conform the pleadings to the evidence presented at trial pursuant to _Rule 15(b)_. Alkhawan is the owner of S&M. (Trial at pg. 58.) Alkhawan handles S&M's financial activities including its bank accounts, the paying of bills and the writing of checks. (Trial Tr.pg 60.) Alkhawan has employed his brother Khawam to run the gas station on a daily basis for the past ten years. (_Id._)

**HN14** As a general rule, corporate officers cannot be

held personally liable for infringing actions taken by the corporation. *Drink Group, Inc. v. Gulfstream Communications*, 7 F. Supp. 2d 1009, 1010 (N.D. Ill. 1998) (citing *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir. 1926)). However, this court has recognized that an individual may be held liable for a corporation's infringement under the theory of vicarious liability or **[*24]** contributory liability. *Microsoft Corp. v. V3 Solutions, Inc.*, 2003 U.S. Dist. *LEXIS* 15008, No. 01 C 4693, 2003 WL 22038593, at *13 (N.D. Ill. Aug. 28, 2003) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt.*, 443 F.2d 1159 (2d Cir. 1971)). "Personal liability for trademark infringement … is established if a corporate officer is a moving, active, conscious force behind the defendant corporation's infringement." *Dynamic Force v. Dynamic Force, Ltd.*, 1999 U.S. Dist. *LEXIS* 7892, No. 98 C 5922, 1999 WL 342407, at *4 (N.D. Ill. May 14, 1999).

The factual situation in the present case is different from the situation in the *V3 Solutions* and *Dynamic Force* cases. In those cases, the individual corporate officer had been named as a defendant in the original complaint filed with the court. Thus, the question was whether it was appropriate to find personal liability or only limit liability to the named corporation. However, in the present case, Alkhawan and Khawam have never been named as defendants in the case. Service of process was only effectuated on S&M, not on Alkhawan or Khawam. (Dkt. No. 14.) The U.S. Marshal's served Khawam in person on July 18, 2003, however, Khawam was served **[*25]** in his role as an employee of S&M and not in his capacity as an individual. (Dkt. No. 13.)

**HN15** This court does have the ability under *Rule 15* to add new defendants after trial and judgment has been entered. However, as the Supreme Court held in *Nelson v. Adams*, that if the court adds a new party to the litigation, due process requires that the new party is given an opportunity to respond and contest his personal liability. *529 U.S. 460, 463, 146 L. Ed. 2d 530, 120 S. Ct. 1579 (2000)*. Thus, this court, although it has the power to add Alkhawan and Khawam, cannot immediately award judgment against them in favor of Lorillard. Instead, if this court decides to add Alkhawan and Khawam, it must give them the opportunity to respond.

Furthermore, **HN16** although *Rule 15* provides a liberal policy for amending pleadings, the right to amend is not absolute. *See Crestview Vill. Apartments v. United States Dep't of Hous. and Urban Dev.*, 383 F.3d 552, **2004** WL 1965663, at *5 (7th Cir. **2004**) (citing *Perkins v. Silverstein*, 939 F.2d 463, 471-72 (7th Cir. 1991)). Lorillard provides no reason for its failure to name Alkhawan and Khawam as individual defendants **[*26]** before the trial. Lorillard was aware of Alkhawan and Khawam existence and their roles in the counterfeiting before the trial. Alkhawan was present for this trial, however, his presence was in his capacity as the owner of S&M. Whether he and Khawam would have dealt with

this case in the same way as S&M, if they were facing personal liability and a possible judgment against them as individuals, is a matter of speculation. The only way to know would be to retry the case and the court is unwilling at this point to impose to undertake that burden especially when Lorillard could have named Alkhawan and Khawam as defendants much earlier in the litigation. Consequently, the court denies Lorillard's motion to amend the pleadings to conform to the evidence presented at trial.

*CONCLUSION*

For the reasons set forth above, this court order judgment to Plaintiff Lorillard Tobacco Company of statutory damages of Fifty Thousand Dollars ($ 50,000) per infringed mark for a total statutory damage award, pursuant to *15 U.S.C. § 1117(c)*, of Two Hundred and Fifty Thousand Dollars ($ 250,000) from Defendant S&M Central Service Corporation. This court also finds that Lorillard **[*27]** Tobacco Company is entitled to receive reasonable costs and attorneys' fees from S&M Central Service Corporation, pursuant to *15 U.S.C. § 1117(b)*, but the parties must comply with the requirements of Local Rule 54.3 as follows: Lorillard must provide S&M with its 54.3 material by November 12, **2004** and S&M must provide Lorillard with its 54.3 material by November 23, **2004**. The parties should then attempt to resolve any remaining disputes over attorneys' fees and costs. If an agreement cannot be reached, Lorillard's further petition for fees and costs, including the joint statement under 54.3(e), is due no later than December 6, **2004**. Response is due December 17, **2004** and the reply is December 28, **2004**.

This court denies Lorillard's Motion to Amend the Pleadings to Conform to the Evidence and denies Lorillard's August 16, **2004** Motion to Strike S&M's Brief on Damages.

The court orders the clerk of this court to release the five hundred dollar ($ 500) bond posted by Lorillard Tobacco Company at the commencement of this action on July 18, 2003, plus interest, be immediately released to Martin Kedziora or Thomas Kost in a check payable to Greenberg Traurig, LLP.

**[*28]** Furthermore, it is therefore ordered that defendant S&M Central Service Corporation, and their agents, servants, employees, attorneys, and those personal or entities in active concert or participating with them who receive actual notice of this order by personal service or otherwise, are permanently enjoined from doing, or assisting others in doing, the following acts:

(i) using any reproduction, counterfeit, copy, or colorable imitation of the Lorillard Marks in connection with the importation, sale, offering for sale, or distribution of cigarettes in the United States, which cigarettes

in fact are not connected with Lorillard or are not genuine Lorillard products, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(ii) using the Lorillard Marks or any reproduction, counterfeit, copy, or colorable imitation of the same in any manner likely to cause others to believe that Defendants' products are connected with Lorillard or are genuine Lorillard products if they are not, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(iii) passing off, inducing, or enabling others to sell or pass off any merchandise which is [*29] not genuine Lorillard merchandise as and for genuine Lorillard merchandise;

(iv) committing any other acts reasonably calculated to cause purchasers to believe that Defendant's products are Lorillard's products, when in fact such products are not Lorillard products;

(v) importing, shipping, delivering, distributing, holding for sale, returning, transferring, or otherwise moving or disposing of in any manner such cigarettes falsely bearing one or more of the Lorillard Marks or any reproduction, counterfeit, copy, or colorable imitation of the same;

(vi) discussing or communicating any aspect of the seizure of counterfeit cigarettes or the identifying markers of counterfeit cigarettes with any person or entity selling or attempting to sell cigarettes to Defendants;

(vii) assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in the above paragraphs (i) through (vi); and (viii) other than by an order of this Court,

(1) selling, moving, destroying, or otherwise disposing of any goods, boxes, labels, packaging or other items or documents bearing any reproduction, counterfeit, or imitation of the Lorillard [*30] Marks, which such use is likely to cause confusion, or to cause mistake, or to deceive;

(2) moving, destroying, or otherwise disposing of any business records or documents relating in any way to the manufacture, importation, acquisition, purchase, distribution, or sale of goods or merchandise bearing any of the Lorillard Marks or any reproduction, counterfeit, or imitation of the Lorillard Marks, which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(3) assisting any third party in identifying, moving, destroying, or otherwise disposing of any reproduction, counterfeit or imitation goods, as well as any records pertaining to reproduction, counterfeit or imitation goods, which such use is likely to cause confusion, or to cause mistake, or to deceive.

S&M Central Service Corporation and their agents, servants, employees, attorneys, and those personal or entities in active concert or participating with them who receive actual notice of this order by personal service or otherwise is warned that any act by them in violation of any of the terms of this Order may be considered and prosecuted as contempt of this Court.

ENTER:

JAMES F. HOLDERMAN

United [*31] States District Judge

DATE: November 5, *2004*

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial before the Court. The issues have been tried and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff and against defendant in the amount of $ 250,000.00 plus costs and attorneys' fees.

Date: 11/5/*2004*



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BURBERRY LIMITED, a United Kingdom )
corporation, and BURBERRY LIMITED, a New )
York corporation, )
                                          )      Case No. 14-cv-8220

            Plaintiffs, )
                                          )      **Judge John W. Darrah**

            v. )
                                          )      **Magistrate Judge Geraldine Soat Brown**

THE PARTNERSHIPS and )
UNINCORPORATED ASSOCIATIONS )
IDENTIFIED ON SCHEDULE "A," )
                                          )
                                          )
             Defendants. )

## FINAL JUDGMENT ORDER

This action having been commenced by Plaintiffs Burberry Limited, a United Kingdom corporation ("Burberry UK"), and Burberry Limited, a New York corporation ("Burberry US"), together, "Burberry" or "Plaintiffs," against the Partnerships and Unincorporated Associations identified on Amended Schedule A attached hereto (collectively, the "Defendants"), and using the Defendant Domain Names and Online Marketplace Accounts (collectively, the "Defendant Internet Stores");

This Court having entered upon a showing by Burberry, a temporary restraining order and preliminary injunction against Defendants which included a domain name transfer order and asset restraining order;

Burberry having properly completed service of process on Defendants, the combination of providing notice via electronic publication or email, along with any notice that Defendants received from domain name registrars and payment processors, being notice reasonably

1

calculated under all circumstances to apprise Defendants of the pendency of the action and affording them the opportunity to answer and present their objections; and

None of the Defendants identified in Amended Schedule A attached hereto (collectively, the "Defaulting Defendants") having answered the Complaint or appeared in any way, and the time for answering the Complaint having expired;

THIS COURT HEREBY FINDS that Defaulting Defendants are liable for willful federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designation of origin (15 U.S.C. § 1125(a)), cybersquatting (15 U.S.C. § 1125(d)) and violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS § 510, et seq.).

IT IS HEREBY ORDERED that Plaintiffs' Motion for Entry of Default and Default Judgment is GRANTED in its entirety, that Defaulting Defendants are deemed in default and that this Final Judgment is entered against Defaulting Defendants.

IT IS FURTHER ORDERED that:

1.  Defaulting Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be permanently enjoined and restrained from:

    a.  using Burberry's BURBERRY Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Burberry Product or not authorized by Burberry to be sold in connection with Burberry's BURBERRY Trademarks;

    b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine Burberry Product or any other product produced by Burberry, that is not Burberry's

or not produced under the authorization, control or supervision of Burberry and approved by Burberry for sale under Burberry's BURBERRY Trademarks;

c. committing any acts calculated to cause consumers to believe that Defaulting Defendants' products are those sold under the authorization, control or supervision of Burberry, or are sponsored by, approved by, or otherwise connected with Burberry;

d. further infringing Burberry's BURBERRY Trademarks and damaging Burberry's goodwill;

e. otherwise competing unfairly with Burberry in any manner;

f. shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Burberry, nor authorized by Burberry to be sold or offered for sale, and which bear any of Burberry's BURBERRY Trademarks or any reproductions, counterfeit copies or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Online Marketplace Accounts, the Defendant Domain Names or any other domain name or online marketplace account that is being used to sell or is the means by which Defaulting Defendants could continue to sell Counterfeit Burberry Products; and

h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defaulting Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing the BURBERRY Trademarks or any reproductions, counterfeit copies or

3

colorable imitations thereof that is not a genuine Burberry Product or not authorized by Burberry to be sold in connection with Burberry's BURBERRY Trademarks.

2.    The Defendant Domain Names are permanently transferred to Burberry's control. The domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet and the Public Interest Registry, within three (3) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Burberry's selection, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to Burberry's account at a registrar of Burberry's selection.

3.    Those in privity with Defendants and with actual notice of this Order, including any online marketplaces such as iOffer, social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant Domain Names, and domain name registrars, shall within three (3) business days of receipt of this Order:

   a. disable and cease providing services for any accounts through which Defaulting Defendants engage in the sale of counterfeit and infringing goods using the BURBERRY Trademarks, including any accounts associated with the Defaulting Defendants listed on Amended Schedule A attached hereto;

   b. disable and cease displaying any advertisements used by or associated with Defaulting Defendants in connection with the sale of counterfeit and infringing goods using the BURBERRY Trademarks; and

4

c. take all steps necessary to prevent links to the Defendant Domain Names identified on Amended Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index.

4. Pursuant to 15 U.S.C. § 1117(c)(2), Burberry is awarded statutory damages from each of the Defaulting Defendants in the amount of two million dollars ($2,000,000) for willful use of counterfeit BURBERRY Trademarks on products sold through at least the Defendant Internet Stores.

5. Western Union shall, within two (2) business days of receipt of this Order, permanently block any Western Union money transfers and funds from being received by the Defaulting Defendants identified in Amended Schedule A.

6. PayPal, Inc. ("PayPal") shall, within two (2) business days of receipt of this Order, permanently restrain and enjoin any China or Hong Kong based accounts connected to Defaulting Defendants, Defaulting Defendants' Online Marketplace Accounts or Defaulting Defendants' websites identified in Amended Schedule A from transferring or disposing of any money or other of Defaulting Defendants' assets.

7. All monies currently restrained in Defaulting Defendants' financial accounts, including monies held by PayPal, are hereby released to Burberry as partial payment of the above-identified damages, and PayPal is ordered to release to Burberry the amounts from Defaulting Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

8. Until Burberry has recovered full payment of monies owed to it by any Defaulting Defendant, Burberry shall have the ongoing authority to serve this Order on PayPal in the

event that any new PayPal accounts controlled or operated by Defaulting Defendants are identified. Upon receipt of this Order, PayPal shall within two (2) business days:

    a. Locate all accounts and funds connected to Defaulting Defendants, Defaulting Defendants' Online Marketplace Accounts or Defaulting Defendants' websites, including, but not limited to, any PayPal accounts;

    b. Restrain and enjoin such accounts or funds that are China or Hong Kong based from transferring or disposing of any money or other of Defaulting Defendants' assets; and

    c. Release all monies restrained in Defaulting Defendants' PayPal accounts to Burberry as partial payment of the above-identified damages within ten (10) business days of receipt of this Order.

9.     Until Burberry has recovered full payment of monies owed to it by any Defaulting Defendant, Burberry shall have the ongoing authority to serve this Order on any banks, savings and loan associations, or other financial institutions (collectively, the "Financial Service Providers") in the event that any new financial accounts controlled or operated by Defaulting Defendants are identified. Upon receipt of this Order, the Financial Service Providers shall within two (2) business days:

    a. Locate all accounts connected to Defaulting Defendants, Defaulting Defendants' Online Marketplace Accounts or Defaulting Defendants' websites;

    b. Restrain and enjoin such accounts from receiving, transferring or disposing of any money or other of Defaulting Defendants' assets; and

    c. Release all monies restrained in Defaulting Defendants' financial accounts to Burberry as partial payment of the above-identified damages within ten (10) business days of receipt of this Order.

10. In the event that Burberry identifies any additional online marketplace accounts, domain names or financial accounts owned by Defaulting Defendants, Burberry may send notice of any supplemental proceeding to Defaulting Defendants by email at the email addresses identified in Amended Schedule A attached hereto.

11. The ten thousand dollar ($10,000) cash bond posted by Burberry, including any interest minus the registry fee, is hereby released to Burberry or its counsel, Greer Burns & Crain, Ltd. The Clerk of the Court is directed to return the cash bond previously deposited with the Clerk of the Court to Burberry or its counsel by check made out to the Greer Burns & Crain IOLTA account.

This is a Final Judgment.

DATED: December / / , 2014

U.S. District Court Judge John W. Darrah

7



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| OAKLEY, INC. | ) | |
| | ) | Case No. 13-cv-2958 |
| Plaintiff, | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| v. | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| THE PARTNERSHIPS and | ) | |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE "A" and DOES | ) | |
| 1-100, | ) | |
| | ) | |
| Defendants. | ) | |

## FINAL JUDGMENT ORDER

This action having been commenced by Plaintiff Oakley, Inc. ("Oakley") against the Defendants identified in Schedule A to the Complaint and using the Defendant Domain Names and Online Marketplace Accounts;

This Court having entered upon a showing by Oakley, a temporary restraining order and preliminary injunction against Defendants which included a domain name transfer order and asset restraining order;

Oakley having properly completed service of process on Defendants; the combination of providing notice via electronic publication and email, along with any notice that Defendants received from domain name registrars and payment processors, being notice reasonably calculated under all circumstances to apprise Defendants of the pendency of the action and affording them the opportunity to present their objections; and

None of the Defendants having answered the Complaint or appeared in any way, and the time for answering the Complaint having expired;

THIS COURT HEREBY FINDS that Defendants are liable for willful federal trademark infringement and counterfeiting (15 U.S.C. § 1114), false designation of origin (15 U.S.C. § 1125(a)), cyberpiracy (15 U.S.C. § 1125(d)) and violation of the Illinois Uniform Deceptive Trade Practices Act (815 ILCS § 510, et seq.).

IT IS HEREBY ORDERED that Plaintiff's Motion for Entry of Default and Default Judgment is GRANTED in its entirety, that Defendants are deemed in default and that this Final Judgment is entered against Defendants.

IT IS FURTHER ORDERED that:

1.  Defendants, their officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be permanently enjoined and restrained from:

    a.  using Oakley's OAKLEY Trademarks or any reproduction, counterfeit copy or colorable imitation thereof in any manner in connection with the distribution, advertising, offering for sale, or sale of any product that is not a genuine Oakley product or not authorized by Oakley to be sold in connection with Oakley's OAKLEY Trademarks;

    b.  passing off, inducing, or enabling others to sell or pass off any product as a genuine OAKLEY product or any other product produced by Oakley, that is not Oakley's or not produced under the authorization, control or supervision of Oakley and approved by Oakley for sale under Oakley's OAKLEY Trademarks;

    c.  committing any acts calculated to cause consumers to believe that Defendants' products are those sold under the authorization, control or supervision of Oakley, or are sponsored or approved by, or connected with Oakley;

2

    d.   further infringing Oakley's OAKLEY Trademarks and damaging Oakley's goodwill;

    e.   otherwise competing unfairly with Oakley in any manner;

    f.   shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Oakley, nor authorized by Oakley to be sold or offered for sale, and which bear Oakley's OAKLEY Trademarks or any reproduction, counterfeit copy or colorable imitation thereof;

    g.   using, linking to, transferring, selling, exercising control over, or otherwise owning the Defendant Domain Names or any other domain name that is being used to sell Counterfeit OAKLEY Products; and

    h.   operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, advertising, offering for sale, or sale of any product that is not a genuine OAKLEY product or not authorized by Oakley to be sold in connection with Oakley's OAKLEY Trademarks.

2.    The Defendant Domain Names are permanently transferred to Oakley's control. The domain name registries for the Defendant Domain Names, namely VeriSign, Inc., Neustar, Inc., Afilias Limited and the Public Interest Registry, within five (5) business days of receipt of this Order, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Oakley's selection, and the domain name registrars shall take any steps necessary to transfer the Defendant Domain Names to Oakley's account at a registrar of Oakley's selection.

3. Those in privity with Defendants and with notice of the injunction, including any Internet search engines, web hosts, domain-name registrars and domain name registries that are provided with notice of the injunction, shall cease facilitating access to any and all websites through which Defendants engage in the sale of counterfeit and infringing goods using the OAKLEY Trademarks.

4. Pursuant to 15 U.S.C. § 1117(c)(2), Oakley is awarded statutory damages from each of the Defendants in the amount of two million dollars ($2,000,000) for willful use of a counterfeit OAKLEY Trademark on products sold through at least the Defendant Domain Names.

5. Any banks, savings and loan associations, payment processors, PayPal or other financial institutions, for any Defendant or any of Defendants' websites shall within two (2) business days of receipt of this Order:

   a. Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts; and

   b. Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets.

6. All monies currently restrained in Defendants' financial accounts, including monies held by PayPal, Inc. ("PayPal"), are hereby released to Oakley as partial payment of the above-identified damages, and PayPal is ordered to release to Oakley the amounts from Defendants' PayPal accounts within ten (10) business days of receipt of this Order.

7. Until Oakley has recovered full payment of monies owed to it by any Defendant, Oakley shall have the ongoing authority to serve this Order on any banks, savings and loan associations, or other financial institutions including, without limitation, PayPal,

4

(collectively, the "Financial Service Providers") in the event that any new financial accounts controlled or operated by Defendants are identified. Upon receipt of this Order, the Financial Service Providers shall immediately:

    a.  Locate all accounts connected to Defendants, Defendants' Marketplace Accounts or Defendants' websites, including, but not limited to, any PayPal accounts; and

    b.  Restrain and enjoin such accounts from transferring or disposing of any money or other of Defendants' assets, and any funds in such accounts shall be transferred to Oakley within ten (10) business days of receipt of this Order.

8.    In the event that Oakley identifies any additional domain names or financial accounts owned by Defendants, Oakley may send notice of any supplemental proceeding to Defendants by email at the email addresses identified in Schedule A to the Complaint.

9.    The ten thousand dollar ($10,000) bond including any interest minus the registry fee is hereby released to Oakley.

This is a Final Judgment.

DATED: June __17__, 2013

                                                    U.S. District Court Judge Rebecca R. Pallmeyer

No *Shepard's* Signal™
As of: August 7, 2015 11:35 AM EDT

# *Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*

United States District Court for the Northern District of Illinois, Eastern Division

June 18, 2015, Decided; June 18, 2015, Filed

Case No. 14 c 9061

**Reporter**
2015 U.S. Dist. LEXIS 78961

LUXOTTICA USA LLC, Plaintiff, v. THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", Defendants.

## Core Terms

statutory damages, counterfeit, damages, trademarks, attorneys', awards, products, summary judgment, infringement, seller, eBay, permanent injunction, fees and costs, Injunction, profits, willful, courts, marks, stipulated facts, freeze, online, cases

**Counsel:** **[*1]** For Luxottica USA LLC, Plaintiff: Kevin W. Guynn, LEAD ATTORNEY, Amy Crout Ziegler, Jessica Lea Bloodgood, Paul G. Juettner, Justin R. Gaudio, Greer Burns & Crain, Ltd., Chicago, IL.

For The Partnerships and Unincorporated Associations Identified on Schedule "A", Defendant: Lingzhi Zhao, LEAD ATTORNEY, Zhao & Associates, P.C., Chicago, IL; Michael J. Robins, LEAD ATTORNEY, Robins & Associates LLC, Chicago, IL.

**Judges:** Harry D. Leinenweber, United States District Judge.

**Opinion by:** Harry D. Leinenweber

## Opinion

### MEMORANDUM OPINION AND ORDER

This case arises from the unauthorized sale of counterfeit Ray-Ban eyewear through various online seller accounts. Default judgment has been entered against most Defendants, while others have been voluntarily dismissed. A single Defendant ("Defendant"), who has been identified by two eBay seller IDs, remains.

Before the Court is Plaintiff Luxottica USA LLC's ("Luxottica") Motion for Summary Judgment, Statutory Damages of $450,000, Permanent Injunction, and Attorneys' Fees and Costs [ECF No. 77]. For the reasons stated herein, Luxottica's Motion is granted, except that the Court awards statutory damages in the amount of $150,000.

## I. BACKGROUND

Luxottica is the exclusive wholesale distributor **[*2]** of genuine Ray-Ban products in the United States and holds the exclusive right to enforce RAY-BAN trademarks within the United States. (Joint Stmt. of Stipulated Facts, ECF No. 75, ¶1.) RAY-BAN marks have been used continuously and exclusively by Luxottica and its predecessors since as early as 1937. (*Id.* ¶3.) Luxottica has protected the value of the Ray-Band brand by registering the following trademarks with the United States Patent and Trademark Office: Reg. No. 1,080,886, Reg. No. 1,320,460, Reg. No. 3,522,603. (*Id.* ¶1.)

Defendant stipulates that up until November 2014, it sold and offered for sale knockoff products featuring counterfeit RAY-BAN trademarks via online marketplace accounts associated with the eBay seller IDs "g7178a" and "qhgypchyh2." (*Id.* ¶¶5-8.) (The introductory paragraph of the parties' joint statement of stipulated facts refers to the seller IDs as "g7178" and "qhgypchyh.") Defendant has stipulated to owning the online marketplace accounts associated with these seller IDs, as well as seven PayPal accounts associated with various email addresses. (*Id.* ¶4.) Defendant sold at least 106 counterfeit Ray-Ban products at prices ranging from $6.29 to $6.99 each. (*Id.* **[*3]** ¶5.)

## II. ANALYSIS

Luxottica requests that this Court (1) enter summary judgment in its favor on the two claims asserted against Defendant, (2) award statutory damages of $450,000 pursuant to *15 U.S.C. § 1117(c)*, (3) enter a permanent

injunction against Defendant and transfer to Luxottica all assets currently restrained in PayPal accounts that are connected to Defendant, and (4) award attorneys' fees and costs pursuant to *15 U.S.C. § 1117(a)-(b)*.

**A. Summary Judgment**

Luxottica argues that it is entitled to summary judgment on its claims for false designation of origin under the Lanham Act, *15 U.S.C. § 1125(a)*, and violation of the Illinois Uniform Deceptive Trade Practices Act, *815 ILCS § 510, et seq.* Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. Defendant has already admitted liability on the above-mentioned counts in a Joint Statement of Stipulated Facts filed with the Court on April 7, 2015. (ECF No. 75 ¶¶6-8 ("Defendant knowingly and willfully offered for sale and sold at least one hundred six (106) Counterfeit Ray-Ban Products. . . . Defendant admits liability for false designation of origin using counterfeit trademarks and violation of the Illinois Uniform Deceptive **[*4]** Trade Practices Act.").) Summary judgment is therefore entered in favor of Luxottica.

**B. Statutory Damages**

Luxottica seeks a total damages award of $450,000 - $150,000 for each of the three trademarks that Defendant used on the counterfeit products. Defendant argues that statutory damages of no more than $7,440 are appropriate because it generated only $800 in total revenue from the sale of the counterfeit goods, and only a fraction of that amount within the United States.

Under *15 U.S.C. § 1117(c)*, a plaintiff in a case involving the use of a counterfeit mark may elect to recover an award of statutory damages of "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed" or, in the case of willful infringement, "not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed." Although the Lanham Act permits a plaintiff to choose either actual or statutory damages, statutory damages are "most appropriate" when an infringer's nondisclosure makes actual damages uncertain. *Sara Lee Corp. v. Bags of N.Y., Inc., 36 F.Supp.2d 161, 165 (S.D.N.Y. 1999)*.

Though *§ 1117(c)* places a dollar range on possible statutory damages awards, the statute provides no guidance on how to **[*5]** select a figure within that range. *Lorillard Tobacco Co. v. S & M Cent. Serv. Corp., No. 03 C 4986, 2004 U.S. Dist. LEXIS 22563, 2004 WL 2534378, at *4 (N.D. Ill. Nov. 8,*

*2004)*. Accordingly, "[c]ourts interpreting *section 1117(c)* have looked by analogy to case law applying the statutory damage provision of the Copyright Act contained in *17 U.S.C. § 504(c)*." *Id.*

The Seventh Circuit's standard for the award of statutory damages in copyright infringement cases is set forth in *Chi-Boy Music v. Charlie Club, Inc., 930 F.2d 1224, 1229 (7th Cir. 1991)*. Under *Chi-Boy*, "district courts enjoy wide discretion in awarding fees and may consider various factors such as [1] the difficulty or impossibility of proving actual damages, [2] the circumstances of the infringement, and [3] the efficacy of the damages as a deterrent to future copyright infringement." *Id. at 1229-30* (citation and internal quotations omitted). Courts have considered the value of a plaintiff's brand, "and the efforts taken to protect, promote, and enhance that brand." *Lorillard, 2004 U.S. Dist. LEXIS 22563, 2004 WL 2534378, at *6*. Ultimately, *§ 1117(c)* looks to both "compensatory considerations" such as "actual losses and trademark value," as well as "punitive considerations" such as "deterrence of other infringers and redress of wrongful defense conduct." *Sara Lee, 36 F.Supp.2d at 165*; *see also, Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d 1340, 1347 (7th Cir. 1994)* (noting that statutory damages under *§ 1117(c)* are not merely remedial but serve an important public interest), *modified on reh'g in part, 44 F.3d 579 (7th Cir. 1995)*.

The Court turns first to compensatory considerations. **[*6]** Although there is "no necessary mathematical relationship between the size of [a statutory damages award] and the extent or profitability of the defendant's wrongful activities," *Sara Lee, 36 F.Supp.2d at 165*, statutory damages must "bear some relation" to actual damages, *Coach, Inc. v. Tom's Treasure Chest, No. 2;10-CV-00243, 2011 U.S. Dist. LEXIS 107243, 2011 WL 4399355, at *3 (N.D. Ind. Sept. 21, 2011)* (citation and internal quotations omitted). Courts may look to the size and scope of a defendant's operations to determine a baseline for damages. *Id.* High statutory damages may be appropriate when counterfeiting activities take place online and are capable of reaching a wide audience. *Id.*

Here, Defendant argues that "the parties have a complete record of *all* the sales of the accused products" — namely, PayPal records documenting Defendant's sales, which totaled approximately $800 worldwide and $372 in the United States. (Def.'s Resp., ECF No. 82, at 11.) Plaintiff counters that Defendant's evidence — which was submitted without a declaration — is unauthenticated and contains contradictory information. For instance, the figures displayed on the webpages for Defendant's eBay storefronts indicate that Defendant sold more than 200 pairs of sunglasses, (*see*, Ex.

2 to Joint Stmt. of Stipulated [*7] Facts, ECF No. 75-2), but the PayPal figures Defendant submits show only 106 pairs of sunglasses sold. (Def.'s Resp., ECF No. 82, at 5.) While the parties dispute the exact sales figures, no evidence submitted suggests that Defendant is a large-scale counterfeiter. For instance, all seven PayPal accounts that have been "connected" to Defendant contain only $75,000. (*See, id.* at 2-3.)

On the other hand, Defendant's counterfeiting took place on the Internet, enabling Defendant to reach a "vast customer base," *Burberry Ltd. & Burberry USA v. Designers Imports, Inc., No. 07 CIV. 3997 (PAC), 2010 U.S. Dist. LEXIS 3605, 2010 WL 199906, at *10 (S.D.N.Y. Jan. 19, 2010)*, and making Luxottica's actual losses difficult to calculate, *Brown v. Walker, No. 1:06-CV-218, 2010 U.S. Dist. LEXIS 56933, 2010 WL 2346242, at *7 (N.D. Ind. May 25, 2010), report and recommendation adopted as modified, No. 1:06-CV-218-TLS, 2010 U.S. Dist. LEXIS 57127, 2010 WL 2346225 (N.D. Ind. June 9, 2010)*. In cases involving the online sale of counterfeit goods, courts have found substantial damages awards appropriate. *See, e.g., id.* (awarding $50,000 per mark); *Burberry, 2010 U.S. Dist. LEXIS 3605, 2010 WL 199906, at *10* (awarding $100,000 per mark); *Deckers Outdoor Corp. v. Does 1-55, No. 11 C 10, 2011 U.S. Dist. LEXIS 119448, 2011 WL 4929036, at *5 (N.D. Ill. Oct. 14, 2011)* (awarding $750,000 per mark). In this case, the Court has already awarded damages of $2 million against each defaulting Defendant. (*See,* ECF No. 65 ¶4.)

In addition, the RAY-BAN marks are well known and highly valuable. As noted, Luxottica and its predecessors have used the RAY-BAN marks continuously and exclusively [*8] since as early as 1937, and the marks at issue in this lawsuit are all federally registered. Luxottica submits that it has expended significant resources in promoting the Ray-Ban brand, making Ray-Ban the "undisputed world leader in the field of sun and prescription eyewear." (Pl.'s Mem., ECF No. 78, at 10.) Luxottica has also filed numerous lawsuits within this District in an effort to protect the RAY-BAN marks and their associated goodwill. (*See, id.* at 11 n.6.)

The Court now turns to punitive considerations. "[P]art of the purpose of statutory damages is to deter the current violator and other potential future violators." *Lorillard, 2004 U.S. Dist. LEXIS 22563, 2004 WL 2534378, at *6*. Damages awards limited to lost profits are typically ineffective deterrents because "[a] counterfeiter must fear more than just having to turn over his ill-gotten gains to the rightful owners." *Id.* Here, Defendant has stipulated that it engaged in willful infringement. However, Defendant has

also mitigated the degree of willfulness by ceasing the sale of the counterfeit products immediately, retaining an attorney, and voluntarily providing information to Luxottica.

Because this is not a case of default, and based on the mitigating factors identified above, the Court finds it appropriate [*9] to reduce the statutory damages Luxottica seeks by two-thirds. Pursuant to *15 U.S.C. § 1117(c)*, the Court awards Luxottica statutory damages in the amount of $50,000 per mark, for a total award of $150,000.

## C. Permanent Injunction

Luxottica seeks permanent injunctive relief pursuant to *15 U.S.C. § 1116(a)*, which enables district courts to grant injunctions, "according to the principles of equity and upon such terms as the court may deem reasonable." A plaintiff seeking a permanent injunction must demonstrate the following:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006); accord e360 Insight v. The Spamhaus Project, 500 F.3d 594, 604 (7th Cir. 2007)*.

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Re/Max N. Cent., Inc. v. Cook, 272 F.3d 424, 432 (7th Cir. 2001)*. As this Court recognized in granting Luxottica's Motion for a Temporary Restraining Order and Preliminary Injunction, counterfeiting has eroded [*10] consumer goodwill in the RAY-BAN trademarks and constitutes irreparable harm for which there is no adequate remedy at law. Further, because Defendant's conduct was willful, the balance of hardships favors Luxottica. *See, Bulgari, S.p.A. v. Partnerships & Unincorporated Associations Identified On Schedule "A", No. 14-CV-4819, 2014 U.S. Dist. LEXIS 107218, 2014 WL 3749132, at *6 (N.D. Ill. July 18, 2014), report and recommendation adopted, No. 14 CV 4819, 2014 U.S. Dist. LEXIS 103652, 2014 WL 3765854 (N.D. Ill. July 29, 2014)*. The public interest also favors Luxottica, because "enforcement of the trademark laws prevents consumer confusion," *Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 469 (7th Cir.*

*2000)*, and consumers have a legitimate ″interest in knowing with whom they do business.″ *Re/Max N. Cent., 272 F.3d at 433*.

As part of the injunction, Luxottica seeks the immediate transfer of ″all assets in financial accounts operated by PayPal, Inc. and linked to Defendant, as well as any newly discovered assets, to Luxottica.″ (Pl.'s Mem., ECF No. 78, at 12.) In granting Luxottica's Motion for Preliminary Injunction, the Court previously froze assets held in accounts ″connected″ to Defendant on the basis that Luxottica sought an accounting of profits as an alternative to statutory damages. *See, CSC Holdings, Inc. v. Redisi, 309 F.3d 988, 996 (7th Cir. 2002)* (upholding asset freeze where plaintiff sought accounting in the alternative to statutory damages). Now, relying on the PayPal records, Defendant argues that the asset [*11] freeze is too broad, sweeping up accounts ″wholly unrelated to the accused products.″ (Def.'s Resp., ECF No. 82, at 8.) Defendant urges the Court to scale back the asset freeze to $7,440, an amount it contends is ″more than adequate to satisfy the Court's interests in preserving any equitable accounting of profits.″ (*Id.* at 10.)

In arguing that the asset restraint should be modified, Defendant relies on *Klipsch*. In *Klipsch*, after a preliminary injunction hearing in which a defendant submitted evidence that it had only sold a few thousand dollars' worth of counterfeit goods, a court reduced a prejudgment asset restraint from $2 million to $20,000. *Klipsch Grp., Inc. v. Big Box Store Ltd., No. 12 CIV. 6283 AJN, 2012 U.S. Dist. LEXIS 153137, 2012 WL 5265727, at *3 (S.D.N.Y. Oct. 24, 2012)*. The court held that, under the Supreme Court's ruling in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 119 S. Ct. 1961, 144 L. Ed. 2d 319 (1999)*, asset freezes are limited to preserving the equitable remedy of an accounting for profits. *Klipsch, 2012 U.S. Dist. LEXIS 153137, 2012 WL 5265727, at *3*.

To exempt assets from an asset freeze, ″[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities.″ *N. Face Apparel Corp. v. TC Fashions, Inc., No. 05 CIV. 9083 (RMB), 2006 U.S. Dist. LEXIS 14226, 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006)* (citation and internal quotations omitted). Defendant claims that only two of Defendant's seven PayPal accounts [*12] contain any profits related to the sale of counterfeit Ray-Ban goods. In support of this argument, Defendant has submitted a spreadsheet of transactions associated with one of Defendant's email addresses, as well as an untranslated Chinese email. (*See*, Exs. K & L to Def.'s Resp., ECF No. 82-1.) To rule out the five remaining accounts, Defendant

has submitted PayPal account summaries it claims show no connection to the eBay Seller IDs ″g7178a″ and ″qhgypchyh2.″ (*See*, Exs. C-I to Def.'s Resp., ECF No. 82-1.) Defendant has also provided several hundred pages of eBay feedback ratings associated with the two seller IDs, showing that it sold a variety of products in addition to sunglasses. (*See*, Ex. N to Def.'s Resp., ECF No. 82-1.)

Luxottica, however, disputes the authenticity and validity of this evidence. For instance, Luxottica notes that the evidence was not accompanied by a declaration, that the transaction spreadsheet does not identify the quantity of glasses sold, and that Defendant's sales figures contradict information displayed on the eBay storefronts. Despite Defendant's contention that it is unconnected to five of the seven PayPal accounts, Defendant has admitted to owning the [*13] PayPal accounts associated with the email addresses shown in the account summaries. (Joint Stmt. of Stipulated Facts, ECF No. 75, ¶5.) Luxottica submits that the restraint on these accounts ″was based on PayPal, Inc.'s . . . determination through PayPal's proprietary methods, which have not been disclosed to Luxottica or Luxottica's counsel.″ (Gaudio Decl, Ex. 1 to Pl.'s Reply, ECF No. 84-1, ¶ 2.)

The Court cannot conclude, based on the evidence before it, that Defendant has met its burden in showing that the asset restraint should be limited to only a portion of two of the seven PayPal accounts and declines to modify the asset restraint on this basis.

**D. Attorneys' Fees and Costs**

Finally, Luxottica seeks an award of attorneys' fees and costs. As the prevailing party, Luxottica is entitled to costs under *Federal Rule of Civil Procedure 54(d)(1)*. Under *15 U.S.C. § 1117(a)*, which addresses recovery in terms of profits and actual damages, a court may, ″in exceptional cases . . . award reasonable attorney fees to the prevailing party.″ Exceptional cases include those in which a defendant's conduct is willful. *BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1099 (7th Cir. 1994)*. In assessing damages under *§ 1117(a)*, courts ″shall″ award attorneys' fees, absent extenuating circumstances, in cases involving the intentional use [*14] of a counterfeit mark. *15 U.S.C. § 1117(b)*. An award of attorneys' fees is available where, as here, a plaintiff ″opt[s] to receive statutory damages under *section 1117(c)*.″ *Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 111 (2d Cir. 2012)*; *accord Coach, Inc. v. Treasure Box, Inc., No. 3:11CV468-PPS, 2014 U.S. Dist. LEXIS 28713, 2014 WL 888902, at *5 (N.D. Ind. Mar. 6, 2014)*. Accordingly, and in light of Defendant's willful counterfeiting, Luxottica is awarded reasonable

attorneys' fees and costs in an amount to be determined by the Court.

## III. CONCLUSION

For the reasons stated herein, Luxottica's Motion for Summary Judgment and Statutory Damages is granted in part and denied in part.

The Court enters summary judgment in favor of Luxottica and against Defendant. Pursuant to *15 U.S.C. § 1117(c)*, the Court awards Luxottica $150,000 in statutory damages. The Court also awards Luxottica reasonable attorneys' fees and costs, and will enter a permanent injunction prohibiting Defendant from violating Luxottica's rights in the RAY-BAN marks.

Within seven (7) days of the entry of this order, Luxottica shall submit a revised Final Judgment Order consistent with this opinion. The parties are to attempt to reach an agreement on the issue of attorneys' fees in accordance with Local Rule 54.3. If an agreement cannot be reached, Luxottica is to file a Motion for Attorneys' Fees within thirty (30) days of the entry **[*15]** of this Order.

**IT IS SO ORDERED**.

/s/ Harry D. Leinenweber

Harry D. Leinenweber, Judge

United States District Court

Dated: June 18, 2015


Caution
As of: June 26, 2013 12:26 PM EDT

# Coach, Inc. v. Ocean Point Gifts

United States District Court for the District of New Jersey
June 14, *2010*, Decided; June 14, *2010*, Filed
Civil Action No. 09-4215 (JBS)

**Reporter:** 2010 U.S. Dist. LEXIS 59003; 2010 WL 2521444

COACH, INC. and COACH SERVICES, INC., Plaintiff, v. OCEAN POINT GIFTS and DOES 1 THROUGH 10, Defendant.

---

**Core Terms**

counterfeit, trademark, infringement, statutory damages, default, default judgment, cause of action, attorney's fees, marks, copyright infringement, permanent injunction, actual damage, trademark infringement, cigarette, likelihood of confusion, false designation, unjust enrichment, public interest, trade dress, culpability, dilution, handbags, famous

**Counsel:** [*1] Erica Susan Helms, Esq., STERNS & WEINROTH, PC, Trenton, NJ, for Plaintiffs.

**Judges:** HONORABLE JEROME B. SIMANDLE, United States District Judge.

**Opinion by:** JEROME B. SIMANDLE

---

**Opinion**

**SIMANDLE,** District Judge:

This matter comes before the Court on Plaintiffs Coach, Inc. and Coach Services, Inc.'s ("Coach") motion for default judgment (Docket No. 9) as against Defendant Ocean Point Gifts ("Defendant"). For the reasons expressed below, the Court will grant Plaintiffs' motion.

## I. BACKGROUND

### A. Facts

[1]

For over sixty years Coach has been in the trade of luxury fashion accessories. Coach manufactures, markets, and sells a variety of goods including, most promi-

nently, handbags. Coach sells its goods through its own specialty retail stores, department stores, catalogs, and via the Internet at www.coach.com. Coach owns a number of trademarks, trade dresses, and design elements/copyrights that it uses on its products.

Based on information obtained from a private investigator and Coach staff, Coach alleges that [*2] Defendant Ocean Point Gifts has sold counterfeit Coach items at its store located at 1631 Boardwalk, Atlantic City, New Jersey. (Compl. P 28; Smith Decl. PP 3-4.) For example, Defendant sold a $ 12.99 imitation of a $ 200 Coach wallet that included a paper insert reading "The Coach Signature Collection" with contact information for Coach Consumer Service. (Smith Decl. PP 5-6.) Ocean Point Gifts has not been given permission to use the Coach trademarks. (Pyatt Decl. P 11; Compl. P 33.)

Plaintiffs served Defendant Ocean Point Gifts with a copy of the summons and complaint on August 23, 2009. (Docket No. 5.) On November 20, 2009, nearly three months after process was served, the investigator returned to the store and found that the Defendant was still selling counterfeit Coach products. (Smith Decl. P 8.) Coach alleges that Defendant Ocean Point Gifts has engaged in selling counterfeit goods knowingly and intentionally for the purpose of trading on the reputation of Coach and that Defendant will continue to do so unless otherwise restrained. (Compl. PP 34, 36.)

### B. Procedure

On August 18, 2009, the Plaintiffs filed a nine-count Complaint against Ocean Point Gifts and ten John Does presenting [*3] claims of trademark counterfeiting (*15 U.S.C. § 1114*), trademark infringement (*15 U.S.C. § 1114*), trade dress infringement (*15 U.S.C. § 1125(a)*), false designation of origin and false advertising (*15 U.S.C. § 1125(a)*), trademark dilution (*15 U.S.C. § 1125(c)*), copyright infringement (*17 U.S.C. §§ 501-513*), trafficking in counterfeit trademarks (*N.J. Stat. Ann. § 56:3-13.16*), unfair competition (*N.J. Stat. Ann. §§ 56:4-1, 56:4-2*), and unjust enrichment. The Defendant was properly

---

[1]  The facts recited herein are derived from the Plaintiffs' supporting declaration, including private investigator Richard H. Smith and Coach's Manager of Intellectual Property April E. Pyatt, and documents attached thereto.

2010 U.S. Dist. LEXIS 59003, *3

served on August 23, 2009, but has failed to respond. On November 10, 2009, Coach filed a request for default, which the Clerk of the Court entered pursuant to *Rule 55(a), Fed. R. Civ. P.*, on November 12, 2009. Coach now moves the Court to enter a default judgment against Defendant and seeks a permanent injunction, statutory damages, and an award of attorney fees, investigator fees, and costs.

## II. DISCUSSION

*Fed. R. Civ. P. 55(b)(2)* authorizes the entry of a default judgment against a party that has defaulted. However, default judgment is not a right. *Franklin v. Nat'l Mar. Union of Am.,* No. 91-480, 1991 U.S. Dist. *LEXIS* 9819, 1991 WL 131182, at *1-2 (D.N.J. July 16, 1991) (quoting 10A Wright, Miller, & Kane, *Federal Practice and Procedure* § 2685 **[*4]** (3d ed. 1998)), *aff'd, 972 F.2d 1331, 1331 (3d Cir. 1992)*. The decision about whether default judgment is proper is primarily within the discretion of the district court. *Hritz v. Woma Corp., 732 F.2d 1178, 1180 (3d Cir. 1984).*

### A. Standard of Review

Once a party has defaulted, the consequence is that "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149 (3d Cir. 1990) (internal quotations omitted) (citing *Thomson v. Wooster,* 114 U.S. 104, 5 S. Ct. 788, 29 L. Ed. 105, 1885 Dec. Comm'r Pat. 279 (1885)). Entry of default judgment where damages are not a sum certain requires an application to the court to prove, *inter alia,* damages. *Fed. R. Civ. P. 55(b)(2); Comdyne,* 908 F.2d at 1149. In addition, liability is not established by default alone. *D.B. v. Bloom,* 896 F. Supp. 166, 170 n.2 (D.N.J. 1995) (citing Wright, *supra,* § 2688). The Court must determine whether a sufficient cause of action was stated, *Chanel, Inc. v. Gordashevsky,* 558 F. Supp. 2d 532, 535 (D.N.J. 2008), and whether default judgment is proper. *Chamberlain v. Giampapa,* 210 F.3d 154, 164 (3d Cir. 2000).

### B. Sufficiency of Causes of Action

In the present case, after being properly **[*5]** served on August 23, 2009 (Docket No. 5), the Defendant failed to appear or otherwise defend and the Clerk of the Court entered a default. Therefore, the first issue is whether the Plaintiffs have stated a sufficient cause of action. As will be explained below, the Court determines that Coach has established Defendant's liability for the purposes of this default judgment motion.

#### 1. *Federal Claims*

In their Complaint, Plaintiffs have asserted six federal claims against the Defendant: trademark counterfeiting (*15 U.S.C. § 1114(1)(a)*); trademark infringement (*15 U.S.C. § 1114(1)(a)*); trade dress infringement (*15 U.S.C. § 1125(a)*); false designation of origin and false advertising (*15 U.S.C. § 1125(a)(1)(A)*); trademark dilution (*15 U.S.C. § 1125(c)*); and copyright infringement (*17 U.S.C. §§ 501-513*). Each was stated sufficiently to establish liability based on federal law.

#### a. Trademark Infringement (*15 U.S.C. § 1114(1)(a)*) and False Designation (*15 U.S.C. § 1125(a)(1)(A)*)

Trademark infringement (Count II) and false designation (Count IV) are measured by identical standards. *A & H Swimwear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 210 (3d Cir. 2000). The record must show: (1) the **[*6]** plaintiff has a valid and legally protectable mark, (2) the plaintiff owns the mark, and (3) the defendant's use of the mark causes a likelihood of confusion. *Id.*

The first two elements are satisfied by registration and ownership of the relevant trademarks. (Compl. PP 14-15.) The third element is also satisfied. In the Complaint (Compl. P 49) and through exhibits, (*e.g.* Smith Decl., Ex. B) the record has uncontested assertions and evidence that are sufficient to show a likelihood of confusion between the counterfeit handbags and genuine Coach product. Further, it is reasonable to believe that some consumers would be confused by these counterfeit products. *See Coach, Inc. v. Cellular Planet,* No. 2:09-cv-00241, *2010* U.S. Dist. *LEXIS* 45087, *2010* WL 1853424, at *1, *4 (S.D. Ohio, May 7, *2010*) (holding that although the counterfeit items could be distinguished from genuine Coach items because they were being sold out of a trunk of a car, the counterfeit nature of the products meant they were inherently likely to cause confusion). Therefore, a cause of action for trade infringement and false designation has been sufficiently established.

#### b. Trademark Counterfeiting (*15 U.S.C. § 1114(1)(a)*)

To establish trademark counterfeiting **[*7]** (Count I) the record must show (1) the defendant infringed a registered trademark in violation of the Lanham Act, *15 U.S.C. § 1114(1)(a)* and *(2)* the defendant intentionally used the trademark knowing it was counterfeit or was willfully blind to such use. *Chanel v. Gordashevsky,* 558 F. Supp. 2d at 537. "The only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was a counterfeit." *Chanel v. Gordashevsky,* 558 F. Supp. 2d at 536-537. Intent can be inferred from continued use after being given notice. *Platypus Wear, Inc. v. Bad Boy Club, Inc.,* No. 08-02662, 2009 U.S. Dist. *LEXIS* 60637, 2009 WL 2147843, at *6 (D.N.J. July 15, 2009)

Here, both elements of trademark counterfeiting are met. As discussed above, a trademark was infringed. The al-

leged willfulness of the Defendant (Compl. P 41) is confirmed by evidence showing the Defendant continuing to sell the handbags nearly three months after being served with notice of the Complaint. (Smith Decl. P 8, Ex. C.) Therefore, a cause [*8] of action for trademark counterfeiting has been sufficiently established.

**c. Trade Dress Infringement** (*15 U.S.C. § 1125(a)*)

To establish trade dress infringement (Count III), a plaintiff must show: (1) the allegedly infringing design is nonfunctional, (2) the design is inherently distinctive or has acquired secondary meaning, and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product. *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC,* 511 F.3d 350, 357 (3d Cir. 2007).

Each of these elements was stated in the Complaint, (Compl. PP 57-59) and was not contested. The Court is therefore satisfied that the Plaintiffs have a meritorious claim for trade dress infringement based on the non-functional nature of the infringement, the distinctiveness of the Coach elements, and the likelihood of confusion.

**d. Trademark Dilution** (*15 U.S.C. § 1125(c)*)

To establish trademark dilution under the Lanham Act a plaintiff must prove:

> (1) the plaintiff is the owner of a mark that qualifies as a 'famous' mark in light of the totality of eight factors listed in *§ 1125(c)(1)*; (2) the defendant is making commercial use in interstate commerce of a mark or [*9] trade name; (3) defendant's use began after the plaintiff's mark became famous; and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.

*Times Mirror Magazines, Inc. v. Las Vegas Sports News, LLC,* 212 F.3d 157, 163 (3d Cir. 2000); *800 -JR-Cigar, Inc. v. GoTo.com, Inc.,* 437 F. Supp. 2d 273, 293 (D.N.J. 2006).

As set forth in Count V of the Complaint, the Plaintiff has shown that the relevant Coach marks are "famous" and Defendant's actions lessen the capacity of such marks to identify and distinguish Coach products. (Compl. PP 75 -76.) The interstate nature of the commerce and the timing of the Defendant's use of the mark is not perfectly clear from the record. Private investigator Erin Smith, employed by a Pennsylvania investigative firm, purchased a wallet at Defendant's store. (Smith Decl. PP 2, 5.) This is evidence that the Defendant is involved in interstate commerce. Similarly, although uncertain due to the Defendant's failure to respond, the Defendant's use almost certainly began following the time when the

Plaintiffs' marks became famous. Therefore, the Court will accept that these elements are satisfied [*10] and a cause of action for trademark dilution has been established.

**e. Copyright Infringement** (*17 U.S.C. §§ 501-513*)

To establish copyright infringement pursuant to *17 U.S.C. §§ 501-513*, a plaintiff must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991); *Dam Things from* Denmark v. Russ Berrie & Co., Inc., 290 F.3d 548, 561 (3d Cir. 2002). The copying element can be proven by showing that the defendant had access to the work and there are substantial similarities between the two works. *Dam Things,* 290 F.3d at 561. Both elements have been sufficiently asserted to state a cause of action for copyright infringement. (Compl. PP 84-86.) Therefore, a cause of action for copyright infringement has been established.

**2.** *State Claims*

In their Complaint Plaintiffs have also asserted three state law claims: trademark counterfeiting (*N.J. Stat. Ann. § 56:3-13.16*); unfair competition (*N.J. Stat. Ann. §§ 56:4-1,* 56:4-2); and unjust enrichment. The state common law claim was sufficiently stated and because federal liability has already been established, state statutory [*11] liability is also met.

**a. State Statutory Claims**

*N.J. Stat. Ann. § 56:3-13.16* provides civil liability against a person who engages in trafficking of counterfeit marks and *N.J. Stat. Ann. § 56:4-2* provides civil liability against a person who appropriates trademarks. These state law claims are similar to the federal Lanham Act claims and this Court has found liability under federal law to be sufficient to establish liability under state law. *See Axelrod v. Heyburn,* No. 09-5627, *2010* U.S. Dist. *LEXIS* 43391, *2010* WL 1816245, at *3 (D.N.J. May 3, *2010*); *Zinn v. Seruga,* No. 05-3572, 2009 U.S. Dist. *LEXIS* 89915, 2009 WL 3128353, at *27-*28 (D.N.J. Sept. 28, 2009); *N.V.E., Inc. v. Day,* No. 07-4283, 2009 U.S. Dist. *LEXIS* 72934, 2009 WL 2526744, at *2 (D.N.J. Aug. 18, 2009). Therefore, because Plaintiffs have established liability for their federal claims for trademark counterfeiting, the Plaintiffs have also established trademark counterfeiting under *N.J. Stat. Ann. § 56:3-13.16* and unfair competition under *N.J. Stat. Ann. §§ 56:4-1,* 56:4-2.

**b. Unjust Enrichment**

The Plaintiffs have stated a claim under New Jersey common law for unjust enrichment. (Compl. P 107.) Here the Defendant was profiting from counterfeit items based

on Coach's reputation. It would be unjust for the Defendant [*12] to enrich itself without compensating the Plaintiffs, so a cause of action for unjust enrichment has been established. *See Howard Johnson Int'l, Inc. v. Vraj Brig, LLC,* No. 08-1466, **2010** U.S. Dist. **LEXIS** 3189, **2010** WL 215381, at *9 (D.N.J. Jan. 14, **2010**) (citing *Kopin v. Orange Prods., Inc.,* 297 N.J. Super. 353, 366-68, 688 A.2d 130 (N.J. Super. Ct. App. Div. 1997)).

In sum, each count of the complaint stated a sufficient cause of action that is supported by evidence in the record. The Court now turns to whether default judgment is proper.

## C. Default Judgment

"Before imposing the extreme sanction of default [judgment], district courts must make explicit factual findings as to (1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default." *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds,* 250 F.R.D. 171, 177 (D.N.J. 2008) (citing *Emcasco Ins. Co. v. Sambrick,* 834 F.2d 71, 74 (3d Cir. 1987)).

The current record does not show any meritorious defenses. Because the Defendant did not respond, the Court cannot determine whether the Defendant had meritorious defenses that are not reflected in the record. The Plaintiffs [*13] have been prejudiced by the Defendant's failure to answer because they have been prevented from prosecuting their case, engaging in discovery, and seeking relief in the normal fashion. Defendant was properly served, yet failed to appear or defend itself in any fashion and has continued to sell bags. (*See* Smith Decl. P8.) It has been nearly a year and the Defendant has failed to contact the Court or the Plaintiffs. This shows the Defendant's culpability in its default. *See Platypus Wear,* 2009 U.S. Dist. **LEXIS** 60637, 2009 WL 2147843 at *5. Plaintiff is entitled to default judgment against Defendant Ocean Point Gifts.

## D. Remedies

### 1. *Statutory Damages*

The Lanham Act provides that a plaintiff can elect to recover either actual damages based on the defendant's profits and the plaintiff's damages (*15 U.S.C. § 1117(a)*) or statutory damages (*15 U.S.C. § 1117(c)*). The Plaintiffs have elected to recover statutory damages. (Mem. in Supp. of Mot. for Default J. and Permanent Inj., 11.) As discussed below, after considering past awards in this District, the point of sale, the extent of sales, and the lack of evidence concerning plaintiffs' losses, the Court will award $ 200,000 in statutory damages.

For statutory damages the plaintiff [*14] may recover "not less than $ 1,000 or more than $ 200,000 per counterfeit mark per type of goods or services sold, offered

for sale, or distributed, as the court considers just." *15 U.S.C. § 1117(c)(1)*). If the use of the counterfeit mark was willful, the maximum increases to $ 2,000,000 per mark per type of good. *15 U.S.C. § 1117(c)(2)*. For use to be willful, a defendant must show an "aura of indifference to plaintiff's rights" or a "deliberate and unnecessary duplicating of a plaintiff's mark . . . in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured." *SecuraComm Consulting Inc. v. Securacom Inc.,* 166 F.3d 182, 187 (3d Cir. 1999) (citations and internal marks omitted), *superseded by statute on other grounds as recognized by Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 181 (3d Cir. 2005).

"In the absence of clear guidelines for setting a statutory damage award, courts have tended to use their wide discretion to compensate plaintiffs, as well as to deter and punish defendants, often borrowing from factors considered for statutory damages in copyright infringement." *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 583-84 (E.D. Pa. 2002) [*15] (citing cases showing wide range of statutory damages awarded by district courts). Because statutory damages are meant to serve as a substitute for actual damages the Court should discern whether the requested damages "bear some relation to the actual damages suffered." *Bly v. Banbury Books, Inc.,* 638 F. Supp. 983, 987 (E.D. Pa. 1986); *see also Gucci Am. V. Duty Free Apparel, Ltd.,* 315 F. Supp. 2d 511, 520 (S.D.N.Y. 2004) ("To the extent possible, statutory damages 'should be woven out of the same bolt of cloth as actual damages.'") (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright § 14.04[E][1],* at 14-69 (2003).)

To assess whether the request is appropriate, the Court may be guided by past statutory damage awards. *See Louis Vuitton Malletier, S.A. v. Mosseri,* No. 07-2620, 2009 U.S. Dist. **LEXIS** 100851, 2009 WL 3633882, at *3 (D.N.J. Oct. 28, 2009); *N.V.E.,* 2009 U.S. Dist. **LEXIS** 72934, 2009 WL 2526744, at *3-*4; *Louis Vuitton & Oakley,* 211 F. Supp. 2d at 583-84. The recent Lanham Act cases in this District for counterfeit products can be generally grouped under two categories: Internet cases and cigarette cases.

The typical Internet case involves a suit against someone selling counterfeit luxury items on the Internet. These cases [*16] often have high damage awards due in part to the wide market exposure that the Internet can provide. *See Louis Vuitton v. Mosseri,* 2009 U.S. Dist. **LEXIS** 100851, 2009 WL 3633882, at *3 (awarding $ 25,141.31 per infringement for $ 4,072,892.22 total); *Chanel, Inc. v. Guetae,* 2009 U.S. Dist. **LEXIS** 49365, 2009 WL 1653137, at *5 (D.N.J. June 8, 2009) (awarding $ 490,818.45 total); *Chanel, Inc. v. Mosseri,* No. 07-2619, Order at 2, 2008 U.S. Dist. **LEXIS** 111825, *1-2 (D.N.J. May 20, 2008) (awarding $ 180,000 per infringement for $ 3,780,000 total); *Chanel v. Gordashevsky,* 558 F. Supp. 2d at 538 (awarding $ 2,238,624.50 total);

2010 U.S. Dist. LEXIS 59003, *16

*Chanel, Inc. v. Craddock,* No. 05-1593, 2006 U.S. Dist. *LEXIS* 27424, 2006 WL 1128733, at *1 (D.N.J. April 27, 2006) (awarding $ 100,000 per infringement for $ 8,100,000 total); *see also Louis Vuitton & Oakley,* 211 F. Supp. 2d 567, 584-85 (awarding $ 1,500,000 total and stating "the point of sale is very relevant to the statutory damages discussion").

The typical cigarette case involves a small retail store selling counterfeit cigarettes. These cases have dramatically lower damage awards. *See Philip Morris USA, Inc. v. Jaritza Supermarket, Inc.,* No. 09-CVS-2372, 2009 U.S. Dist. *LEXIS* 127641, 2009 WL 4496047, at *2 (D.N.J. Nov. 9, 2009) (awarding $ 4,000 total); *Philip Morris USA, Inc. v. Dorta Bars & Liquors, Inc.,* No. 07-4599, Order of June 1, 2009 at 3, 2009 U.S. Dist. *LEXIS* 127504, *5 (D.N.J. June 1, 2009) **[*17]** (awarding $ 1,000 each against two defendants). These awards were similar to cigarette case settlement amounts enforced by this Court. *See Lorillard Tobacco Co. v. Asian Am. Mkt.,* No. 06-cv-00948, Order at 2, 2008 U.S. Dist. *LEXIS* 116202 (D.N.J. July 7, 2008) (settlement of $ 2,000); *Lorillard Tobacco Co. v. Atlantic Produce & Supermarket,* No. 06-cv-951, Consent Judgment at 1 (D.N.J. Feb. 13, 2008) (settlement of $ 20,000).

This case falls somewhere between the Internet cases and the cigarette cases. While the counterfeit products at issue were not widely distributed via the Internet, they are counterfeit luxury items of far greater value than cigarettes. If the Internet cases represent "the new era of counterfeiting," *Louis Vuitton & Oakley,* 211 F. Supp. 2d at 584, this case reminds us that there are still hucksters on the boardwalk capitalizing on the famous marks of others. To determine damages when there is less guidance from other cases this Court has adopted factors that have been used in the Second Circuit:

> (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others **[*18]** besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

*Platypus Wear,* 2009 U.S. Dist. *LEXIS* 60637, 2009 WL 2147843, at *7; *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110, 1117 (2d Cir. 1986).

As discussed earlier in the context of trademark counterfeiting, the Defendant's conduct was willful, so the maximum award of $ 2,000,000 per counterfeit mark per type of good sold is available. Four types of goods were sold by the Defendant that carried counterfeit Coach marks: handbags, wallets, scarves, and hats [2]. Five Coach trademarks were infringed: the "Signature C;" [3] "Coach Leatherware Est. 1941;" [4] "COACH;" [5] "Coach & Lozenge Design;" [6] and "Coach Op Art" [7]). Because there are four types of goods and five marks, the statutory damage amount must be not less than $ 20,000 or more than $ 40,000,000. The Plaintiffs have requested one hundred times the minimum statutory damages, $ 100,000 per mark per good for a total of $ 2,000,000. However, the Plaintiffs have provided no information about **[*19]** their lost revenue or the value of their trademarks, trade dresses, and copyrights. While the Court is tempted to follow the approach of *Philip Morris v. Dorta Bars* and ask for an affidavit supporting its damage request, *2009 U.S. Dist. LEXIS* 25799, 2009 WL 872026, at *3 (D.N.J. Mar. 30, 2009), the Court recognizes that the root of this deficiency is Defendant's failure to respond.

The Court chooses to follow the approach of *Platypus Wear* and award $ 10,000 per infringement for $ 200,000 total, ten times the minimum statutory damages. *2009 U.S. Dist. LEXIS* 60637, 2009 WL 2147843, at *7. This amount is within the guidelines established by Congress, takes into account the wilfulness shown by continuing to sell bags after receiving the Complaint and the culpability of failing to respond, and is significant enough to serve as compensation **[*20]** to the Plaintiffs and a deterrent to both the Defendant and others. This award also acknowledges that the sales took place at a small shop on the boardwalk rather than the Internet. This award is consistent with another recent case in this District which only increased the award beyond $ 10,000 per infringement due to the mass-distribution of a banned substance using the Internet. *N.V.E.,* 2009 U.S. Dist. *LEXIS* 72934, 2009 WL 2526744, at *4 (awarding $ 250,000 even though plaintiff requested $ 2,000,000). Because neither the Internet nor a banned substance is present

---

[2]   Neither scarves nor hats are explicitly listed as a class of goods that the "Signature C" mark, Registration 2,822,318, is registered for under International Class 24. But because the class is broad and scarves and hats could be considered "clothing," then this will be sufficient.

[3]   Registration No. 2,822,318

[4]   Registration No. 3,441,671

[5]   Registration No. 1,071,000

[6]   Registration No. 1,309,779

[7]   Registration No. 3,696,470

here, ten times the minimum, namely $ 10,000 per infringement, is appropriate, for each of the twenty infringements.

To check whether this amount "bears some relation," *Bly,* 638 F. Supp. at 987, the Court will approximate what the Plaintiff may have gotten based on an "actual damages" calculation under *15 U.S.C. §§ 1117(a)-(b).* *See Malletier v. Apex Creative Int'l Corp.,* 687 F. Supp. 2d 347, 355-356 (S.D.N.Y. *2010).*

During the November 20, 2009 visit [8] by Investigator Smith there were 25 bags priced at $ 24.99, 60 handbags priced from $ 39.00 to $ 59.00 and 5 scarf and hat matching sets with an unstated price. (Smith Decl. P 8.) If the Court assumes **[*21]** that the scarf and hat sets were also priced $ 39.00 to $ 59.00, then the value of the displayed inventory that day was between $ 3,159.75 and $ 4,459.75. Assuming the store sold this volume of displayed inventory each week and the store had a 300% profit margin, then the amount of trebled damages would be between $ 7,109.44 and $ 10,034.44 per week. Thus, the "actual damages" would equal the Court's determination of statutory damages at some point between 20 and 28 weeks of sales. This period of time is approximately equal to the tourist season on the Jersey Shore. The Court's determination is more reasonable than the requested award of $ 2,000,000 which would not approximate actual damages without four to six years of brisk year-round sales of counterfeit items.

Thus, considering the limited record of losses, the point of sale, and the likely extent of the Defendant's business and consistent with other awards in this District, the **[*22]** Court will award $ 10,000 per infringement for $ 200,000 total.

### 2. *Costs and Attorney Fees*

In addition to statutory damages, Coach asks for both attorney fees and costs, which their evidence shows to be $ 7,648 for attorney fees, $ 443.33 for investigative fees, and $ 434.95 for costs.

The costs of actions brought under § 43(a), § 43(d), or a willful violation under § 43(c) of the Lanham Act (codified at *15 U.S.C. § 1117(a),* *(d),* & *(c),* respectively) can be recovered pursuant to § 35(a) (codified at *15 U.S.C. § 1117(a)).* In "exceptional cases" the court may award reasonable attorney fees. *15 U.S.C. § 1117(a).* "Exceptional" has been interpreted by the Court to mean involving culpable conduct. *Securacomm,* 224 F.3d at 280. Because this case involved the culpable conduct of continuing to sell goods after the Complaint was received,

then consistent with other decisions by this Court, attorney fees and costs will be awarded to the Plaintiffs. [9] *See Louis Vuitton v. Mosseri,* 2009 U.S. Dist. *LEXIS* 100851, 2009 WL 3633882, at *4; *Chanel v. Gordashevsky,* 558 F. Supp. 2d at 539.

Attorneys fees can includes fees for investigators working under the direction of an attorney. *Chanel v. Gordashevsky,* 558 F. Supp. 2d at 539 (citing *Louis Vuitton S.A. v. Downtown Luggage Ctr.,* 706 F. Supp. 839, 842 (S.D. Fla. 1984)); 130 Cong. Rec. H12076, H12083 (Oct. 10, 1984) (*J. Explanatory Statement on Trademark Counterfeiting Legis.*)). Thus, in this case the fees that the Plaintiffs have paid to the investigative firm can be included in damages.

### 3. *Permanent Injunction*

Coach also seeks the equitable relief of a permanent injunction to enjoin the Defendant from infringing Coach's trademarks. This request is consistent with *15 U.S.C. § 1116(a).* The Supreme Court requires that any plaintiff seeking a permanent injunction to show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay,* Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) **[*24]** (citations omitted).

### a. Irreparable Injury

The Third Circuit has explicitly stated that "once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury." *Pappan Enters., Inc. v. Hardee's Food Sys.s, Inc.,* 143 F.3d 800, 805 (3d Cir. 1998) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 196-97 (3d Cir. 1990). Thus, because a likelihood of confusion has been shown, the requirement of irreparable harm has been met.

### b. Inadequacy of Remedies at Law

While a remedy at law would provide a degree of monetary relief, it will not compensate for the injury to Coach's reputation or necessarily prevent future trade-

---

[8] This visit identified the largest inventory of any of the investigator's visits. During the July 13, 2009 visit by Investigator Smith there were "at least 50 different counterfeit Coach products" but no price was entered into evidence. (Smith Decl. P 4.)

[9] In their brief, Plaintiffs request $ 8,113.25 in attorney fees. The supporting documents (Davis Decl. P 8; Confoy Decl. P 8) show attorney costs as **[*23]** $ 7,648. The Court will only award what the evidence shows.

2010 U.S. Dist. LEXIS 59003, *24

mark infringement. *Louis Vuitton v. Mosseri,* 2009 U.S. Dist. *LEXIS* 100851, 2009 WL 3633882 at *5; *See also Audi AG v. D'Amato,* 469 F.3d 534, 550 (6th Cir. 2006) (stating when there is potential for future harm there is no adequate remedy at law). A remedy at law would be inadequate to compensate Coach.

**c. Balancing of Hardships**

The only hardship imposed upon the Defendant is that they obey the law. On the other hand if an injunction were not issued then Coach suffers the hardships that gave rise to this suit, **[*25]** loss of reputation and sales. *Louis Vuitton v. Mosseri,* 2009 U.S. Dist. *LEXIS* 100851, 2009 WL 3633882 at *5 (citing *Microsoft Corp. v. McGee,* 490 F. Supp. 2d 874, 882-83 (S.D. Ohio 2007).

**d. Public Interest**

The Third Circuit has recognized that the public has an interest in trademark and copyright protection.

> Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources that are invested in the protected work.

*Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3d Cir. 1983) (quoting *Klitzner Indus., Inc. v. H.K. James & Co.,* 535 F. Supp. 1249, 1259-60 (E.D. Pa. 1982). Issuing an injunction will serve the public interest goals of preventing consumer confusion and the trademark

holder's property interest. *Microsoft,* 490 F. Supp. 2d at 883. Here the public interest is served by issuing an injunction.

Because each of the *eBay* requirements have been met by Coach, the Court will grant Coach the relief it seeks by enjoining Defendant Ocean Point Gifts from **[*26]** infringing Coach's trademarks and copyrights. Ocean Point Gifts must also surrender the infringing products for destruction by freight prepaid to Coach.

In sum, the Court will grant $ 200,000 in statutory damages under the Lanham Act and $ 8,526.28 in attorney fees and litigation costs, bringing Plaintiffs' total recovery from Defendant Ocean Point Gifts to $ 208,526.28. In addition, the Court will permanently enjoin Ocean Point Gifts from infringing Coach's trademarks and copyrights in the future and require it to surrender all infringing products it currently possesses.

**III. CONCLUSION**

For the foregoing reasons the Court will grant the Plaintiffs' motion for default judgment, award a default judgment of $ 208,526.28, and issue a permanent injunction. The accompanying order for default judgment and permanent injunction shall be entered.

*June 14, 2010*

Date

**/s/ Jerome B. Simandle**

JEROME B. SIMANDLE

United States District Judge


Caution
As of: June 26, 2013 1:28 PM EDT

# Burberry Ltd. v. Designers Imps., Inc.

United States District Court for the Southern District of New York
January 19, 2010, Decided; January 19, 2010, Filed
07 Civ. 3997 (PAC)

**Reporter:** 2010 U.S. Dist. LEXIS 3605; 2010 WL 199906

BURBERRY LIMITED AND BURBERRY USA, Plaintiffs, -against- DESIGNERS IMPORTS, INC., d/b/a DESIGNERS IMPORTS.COM USA, INC., Defendant.

**Subsequent History:** Related proceeding at *Burberry Ltd. v. RTC Fashion Inc., 2012 N.Y. Misc. LEXIS 4099 (N.Y. Sup. Ct., Aug. 17, 2012)*
*Related proceeding at Burberry Ltd. v. Horowitz, 2012 U.S. Dist. LEXIS 167630 (S.D.N.Y., Nov. 26, 2012)*

**Prior History:** *Burberry Ltd. v. Euro Moda, Inc., 2009 U.S. Dist. LEXIS 113407 (S.D.N.Y., Dec. 4, 2009)*

**Core Terms**

counterfeit, trademark, merchandise, infringement, settlement agreement, scarves, famous, trademark infringement, commerce, the Lanham Act, advertising, registered, statutory damages, court finds, dilution, handbags, unfair competition, common law, polo shirt, registrations, permanently, jacket, injunction, authentic, website, coats, marks

**Counsel:** **[*1]** For Burberry Limited, Burberry USA, Plaintiffs: Anthony D Boccanfuso, John Maltbie, LEAD ATTORNEYS, Kimberly Isbell, Arnold & Porter, LLP, New York, NY; Hadrian Ronald Katz, LEAD ATTORNEY, PRO HAC VICE, Arnold & Porter, LLP (DC), Washington, DC; Roberta L. Horton, LEAD ATTORNEY, Arnold & Porter LLP, Washington, DC.

For Designers Imports, Inc., Defendant: Stanley Richard Goodman, LEAD ATTORNEY, Goodman & Saperstein, Garden City, NY.

**Judges:** HONORABLE PAUL A. CROTTY, United States District Judge.

**Opinion by:** PAUL A. CROTTY

**Opinion**

ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

## NATURE OF THE CASE

On May 22, 2007, Plaintiffs Burberry Limited and Burberry USA ("Burberry" or "Plaintiffs") commenced this action against defendants Designers Imports, Inc. d/b/a Designers Imports. Com USA, Inc. ("Designers" or "Defendant"). Their Amended Complaint, filed June 5, 2007, alleges that Defendant used, sold, and advertised merchandise bearing three counterfeit Burberry registered trademarks: the Burberry name, the Burberry Check design, and the Burberry "Equestrian Knight" on horseback device.

Burberry brings claims of trademark counterfeiting and infringement pursuant to *15 U.S.C. § 1114(1)(a)*; false designation of origin **[*2]** and trademark dilution pursuant to *15 U.S.C. § 1125(a)(1)(A)*; common law claims for breach of contract and unjust enrichment; trademark infringement and unfair competition in violation of New York common law; and trademark dilution pursuant to *15 U.S.C. § 1125(c)*; likelihood of injury to business reputation pursuant to *New York General Law Section 360-l*; and deceptive acts and practices pursuant to New York General Law *Section 349*.

Burberry seeks statutory damages and attorneys' fees and costs, and various forms of injunctive relief, including a permanent injunction barring Defendant from selling Burberry-branded merchandise.

Defendant claims half-heartedly that it did not sell counterfeit Burberry-branded merchandise, but its real argument is that it was an innocent infringer whose actions were not willful and were not the product of willful blindness. Defendant also claims that Burberry has not come to Court with clean hands and so Burberry is not entitled to damages, attorney's fees or costs.

## WAIVER OF JURY AND TRIAL

The parties waived jury trial, and the Court conducted a bench trial on September 14 and 15, 2009. The Court heard the testimony of witnesses from Burberry and Defendant **[*3]** and considered the exhibits received in evidence, as well as designated portions of depositions. The

2010 U.S. Dist. LEXIS 3605, *3

parties stipulated to the following facts in the jointly-submitted pretrial order:

1. Plaintiff Burberry Limited is a corporation duly organized and existing under the laws of the United Kingdom with a principal place of business at Horseferry House, Horseferry Road, London SWIP 2AW, United Kingdom.

2. Plaintiff Burberry USA, a sister company of Plaintiff Burberry Limited, is located at 444 Madison Avenue, New York, NY 10022. Burberry USA enforces in North America the trademarks owned by Burberry Limited. Burberry Limited, Burberry USA, and their predecessor are herein referred to collectively as "Burberry."

3. Burberry has continuously used the BURBERRY (R) word mark in commerce since 1856.

4. Burberry introduced the BURBERRY CHECK trademark in its original distinctive red, camel, black and white check design in the 1920's. Burberry has continuously used the BURBERRY CHECK in both the original colors and other distinctive color combinations for over three-quarters of a century.

5. Burberry has continuously used the Burberry equestrian knight on horseback (the "EQUESTRIAN KNIGHT DESIGN") [*4] on numerous products since 1901.

6. Burberry USA is the exclusive importer and distributor in the United States of BURBERRY (R) merchandise that bears the BURBERRY (R) mark, the BURBERRY CHECK, and/or the EQUESTRIAN KNIGHT DESIGN (collectively, the "Burberry Trademarks"). Burberry has used the Burberry Trademarks on, and in connection with, the advertising and sale of Burberry's products, including, but not limited to, scarves, swimwear, coats, jackets, polo shirts, handbags, and t-shirts in interstate and intrastate commerce, including commerce in the State of New York and in this judicial district.

7. Burberry Limited owns the following valid and enforceable U.S. trademark registrations for the BURBERRY (R) word mark, among others: U.S. Reg. No. 260,843; U.S. Reg. No. 510,077; U.S. Reg. No. 1,133,122; and U.S. Reg. No. 3,202,484. These registrations are incontestable pursuant to *15 U.S.C. § 1065*.

8. The BURBERRY word mark is famous within the meaning of *15 U.S.C. § 1125(c)*.

9. The BURBERRY word mark was famous within the meaning of *15 U.S.C. § 1125(c)* prior to Defendant's use and/or sale of the items in dispute in this litigation.

10. Burberry Limited owns the following valid and enforceable [*5] U.S. trademark registrations for the BURBERRY CHECK trademark, among others: U.S. Reg. No. 1,241,222; U.S. Reg. No. 2,732,617; and U.S. Reg. No. 2,022,789. These restrictions are incontestable pursu-

ant to *15 U.S.C. § 1065*.

11. The BURBERRY CHECK trademark is famous within the meaning of *15 U.S.C. § 1125(c)*.

12. The BURBERRY CHECK trademark was famous within the meaning of *15 U.S.C. § 1125(c)* prior to Defendant's use and/or sale of the items in dispute in this litigation.

13. Burberry Limited owns the following valid and enforceable U.S. trademark registrations for the EQUESTRIAN KNIGHT DESIGN trademark, among others: U.S. Reg. No. 863,179; and U.S. Reg. No. 2,512,119. These registrations are incontestable pursuant to *15 U.S.C. § 1065*.

14. The EQUESTRIAN KNIGHT DESIGN trademark is famous within the meaning of *15 U.S.C. § 1125(c)*.

15. The EQUESTRIAN KNIGHT DESIGN trademark was famous within the meaning of *15 U.S.C. § 1125 (c)* prior to Defendant's use and/or sale of the items in dispute in this litigation.

16. Defendant Designers Imports, Inc. d/b/a Designers Imports.com USA, Inc. is a New York corporation located at 11 Lake Street, No. 201, Monroe, New York 10950 and/or 1117 Route 17M, Suite [*6] 2, Monroe, New York 10950.

17. Since at least as early as 2003, Designers has continuously sold apparel and accessories online, including at its website located at www.designersimports.com.

18. Asher Horowitz is the owner and Chief Operating Officer of Designers.

19. Mr. Horowitz is the only officer of Designers, its only Director, and its sole shareholder.

20. Mr. Horowitz sets the price for the goods that his business sells. He also decides what will be displayed on www.designersimports.com.

21. Mr. Horowitz sets his own salary and makes sure that bills at the company are paid.

22. Designers cannot allocate a portion of its expenses to its sale of Burberry-branded items.

23. Mr. Horowitz was aware of BURBERRY products before he founded Designers.

24. Since at least as early as 2003, Designers has sold or offered for sale products that display one or more of the Burberry Trademarks that were not purchased directly from Burberry or one of its authorized retailers.

25. Designers has purchased keywords containing the BURBERRY trademark from Google's Pay Per Click pro-

gram such as "Burberry," "Burberry scarf or scarves, "Burberry jacket," and "Burberry handbag." Designers purchased similar advertising [*7] from Yahoo, including the keyword "Burberry scarf." When potential customers shop online for Burberry products, they are automatically referred to the Designers website.

26. Mr. Horowitz is the only person who decides what Burberry-branded goods Designers will sell on its website.

27. Designers' suppliers include "Moda Oggi." Moda Oggi has since been sued as a third party by Burberry for selling counterfeit Burberry-branded products, and Burberry prevailed on summary judgment against Moda Oggi on this and related claims on June 10, 2009. See *Burberry Limited, et al. v. Euro Moda, Inc., et al.*, Civil Docket for Case No. 1:08-cv-05781-CM, 2009 U.S. Dist. LEXIS 53250, 2009 WL 1675080 (S.D.N.Y. June 10, 2009);

28. On April 12, 2005, Burberry and Designers entered into a settlement agreement ("Settlement Agreement") regarding Designers' sales of items that Burberry contented were counterfeit. The agreement was amended on May 4, 2005. The agreement was received in evidence (Ex. 185).

29. After the agreement was signed, Burberry bought products from Defendant to determine whether it was complying with the agreement.

30. On February 23, 2006, Burberry's attorney sent a letter to Defendant's attorney contending that Designers [*8] sold two counterfeit scarves that infringed the Burberry Trademarks. Designers' lawyer responded that the goods were purchased from a Burberry store and that the goods were not counterfeit.

31. On March 8, 2006, Burberry's lawyer sent another letter to Defendant's counsel contending that Designers sold a counterfeit bikini and three counterfeit polo shirts that infringed the Burberry Trademarks. Designers' counsel responded (Ex. 177).32.

32. On May 9, 2007, Burberry's attorney sent a letter to Defendant's counsel contending that Designers sold two counterfeit quilted coats and two counterfeit white shirts with check trim that infringed the Burberry Trademarks. Designers' counsel responded (Ex. 178).33.

33. On July 9, 2007, Burberry's attorney sent a letter to Defendant's counsel contending that Designers sold two counterfeit scarves that infringed the Burberry Trademarks. Defendant's counsel received this letter (Ex. 179).34.

34. Investigators acting on behalf of Burberry purchased the following Burberry-branded articles of clothing from Designers' website, www.designersimports.com (the "Purchased Goods"):

. One bikini with check trim purchased on March 1, 2006;

. Three polo shirts, one [*9] each in white, black, and gray purchased on March 1, 2006;

. One "Constance" padded jacket purchased on February 7, 2007;

. A second padded jacket, in the longer "Langford" style, purchased on April 7, 2007;

. One cashmere "Baby Blue Happy Scarf" and one cashmere "Classic Plaid Scarf," purchased on June 9, 2007;

. One "Nova Check Cashmere Scarf" purchased on October 11, 2007;

. One cashmere Cream-White Check "Plaid Mini Scarf" purchased on April 7, 2008; and

. Two white t-shirts with checked trim purchased on February 7, 2007 and April 7, 2007.

35. Designers shipped the Purchased Goods to Burberry's investigators.

36. Burberry's investigators shipped the Purchased Goods to Burberry at its New York offices.

37. An employee in Burberry's New York office received the Purchased Goods.

38. On June 28, 2005, Kate McKinnon, an Investigator for Abacus Security, sent three (3) Burberry-branded handbags that had been purchased from Designers to Burberry's New York Office. Burberry determined that these three (3) handbags were not counterfeit, but rather genuine.

39. On December 15, 2005, Ayodele Akingbade, an Investigator for Abacus Security, sent three (3) Burberry-branded handbags that had been purchased [*10] from Designers to Burberry's New York Office. Burberry determined that these three (3) handbags were not counterfeit, but rather genuine.

**ISSUES AT TRIAL AND FINDINGS OF FACT**

Defendant stipulated to the counterfeit nature of substantially all of the products that Burberry found to be counterfeit, except for two scarves, purchased in December, 2005. Accordingly, Burberry had two goals at trial: (a) to establish that Defendants were the source of the counterfeit products; and (b) to establish that Defendant's violations were willful or the result of willful blindness. Defendant's goal was to minimize its damages to the extent possible.

**a. Proof Regarding the Source of Products**

Burberry engaged a series of investigators to buy certain products from Defendant and submit these products,

along with the packing slips, invoices, and shipping information, to Burberry (Trial Tr. 95-100). Burberry would then attach a security tag bearing a unique number to these products, photograph the products, and prepare a chain of custody form (Trial Tr. 95-96). The chain of custody form listed the source of the product, the date of receipt, and the date the recipient sent the product to another party (Trial **[*11]** Tr. 96). For everything but the most obvious counterfeits, Burberry would ship the suspect products to its London office, where Burberry's expert would examine them and determine whether a product was genuine or counterfeit (Trial Tr. 98).

Burberry submitted twenty products for their expert to review (Trial Tr. 41, 46). Burberry's expert found that six products (all handbags) were genuine but that the balance of fourteen were counterfeit (Trial Tr. 36, 42, 44). As previously indicated, Defendant does not contest the counterfeit nature of twelve of the fourteen products.

Defendant does contend, however, that two of the Burberry expert's counterfeit determinations were erroneous: the determinations relating to a blue "happy" scarf and a check cashmere scarf, both purchased in December, 2005 (Trial Tr. 248-52). Mr. Horowitz testified that he suspected that J. Burke was a possible investigator for Burberry when he saw Burke's name on an order for two scarves and a coat (Trial Tr. 248, 271-72). While Defendant had Burberry scarves in stock at the time, Designers was aware that Burberry was monitoring its compliance with the Settlement Agreement, so Mr.

Horowitz enlisted his wife to buy two **[*12]** Burberry scarves from a Burberry store in Boca Raton, Florida (Trial Tr. 249). Mr. Horowitz filled Mr. Burke's order with the two scarves his wife had purchased (Trial Tr. 249-51). Burberry tested these scarves and found them to be counterfeit (Trial Tr. 251-52). Mr. Horowitz challenges Burberry's determinations (Trial Tr. 251-52).

Since Burberry's findings on the two scarves were erroneous, Defendant argues that Burberry's twelve other determinations of counterfeit must be wrong as well. Defendant's argument is *falsus in uno; falsus in omnibus*; but that is inconsistent with Defendant's stipulation that it had no factual basis for challenging Burberry's other determinations. Even if Burberry's determinations regarding the two scarves were incorrect, moreover, this would not impair the validity of Burberry's separate determinations made at different times, on twelve different products, that the Defendant's goods were in fact counterfeit. Finally, Defendant did not establish that the determinations were wrong: Defendant cannot prove that it sent Mr. Burke the two authentic Burberry scarves that Mrs. Horowitz purchased in the Boca Raton Burberry store.

Based on the routine procedures Burberry **[*13]** took to protect its trademarks, and its carefully devised and methodically applied procedures to test the authenticity of Burberry-branded merchandise, the Court finds that Designers sold the following twelve items of counterfeit merchandise to Burberry:

| Date of Purchase | Goods Sold |
| --- | --- |
| March 1, 2006 | 1. Bikini |
| | 2. White Polo Shirt |
| | 3. Black Polo Shirt |
| | 4. Gray Polo Shirt |
| | |
| February 7, 2007 | 5. "Constance" Jacket |
| | 6. White Shirt -- Checked Trim |
| | |
| April 7, 2007 | 7. Quilted Langford Coat |
| | 8. White Shirt -- Checked Trim |
| | 9. Cashmere Cream-White Check Mini Scarf |
| | |
| June 9, 2007 | 10. Cashmere Baby Blue Happy Scarf |
| | 11. Cashmere Classic Plaid Scarf |
| | |
| October 11, 2007 | 12. Nova Check Cashmere Scarf |

**b. Proof of Defendant's Willfulness or Willful Blindness**

Burberry has demonstrated Defendant's willfulness based on its conduct spanning several years during which Defendant repeatedly sold a variety of counterfeit Burberry merchandise. In addition to the April 2005 Settlement Agreement (Ex. 185), Burberry submitted a series of letters and emails proving that it repeatedly placed De-

fendant on notice that Defendant was violating the trademark law by selling counterfeit Burberry merchandise (Ex. 177-79). Additionally, Mr. Horowitz testified that, **[*14]** even after the Settlement Agreement, he occasionally purchased Burberry items from anonymous internet vendors and from vendors whose last names he did not know (Trial Tr. 282-84). Mr. Horowitz also testified that he did not always question his vendors about the

source of their Burberry merchandise (Trial Tr. 284-85); that he used suppliers whose goods had been seized by the Customs Department (Trial Tr. 286-87; 289-90; 292 -93); and that he purchased a substantial amount of Burberry goods from Moda Oggi, a known seller of counterfeit merchandise (Trial Tr. 295). In fact, the United States Customs Service repeatedly notified Defendant that it was seizing Burberry-branded goods addressed to Designers because the goods were counterfeit (Exs. 223-25; 302-05).

Defendant introduced testimony, however, that mitigates the willfulness of his trademark violations. Mr. Horowitz testified, for example, that he often traveled overseas to purchase branded merchandise (Trial Tr. 242); that he visited the offices of his suppliers (Trial Tr. 242); that, following the Settlement Agreement, he ceased selling items that Burberry claimed were counterfeit (Trial Tr. 248); that he generally complied with his **[*15]** obligations under the Settlement Agreement (Trial Tr. 247-48; 300-01); that all the Burberry items he currently sells originated in Burberry outlet centers (Trial Tr. 254); that all the non-Burberry branded produces he recently added to his website originated with authorized distributors or manufacturers (Trial Tr. 257); that he made numerous, sincere efforts to authenticate his merchandise before offering them for sale (Trial Tr. 277-82; 288-89; 292); and that he was unaware that Moda Oggi was a seller of counterfeit items (Trial Tr. 295). Defendant also introduced a supplier's deposition testimony, stating that Mr. Horowitz insisted on buying only authentic goods (Trial Tr. 304-06).

## CONCLUSIONS OF LAW

The Court has subject matter jurisdiction under *15 U.S.C. § 1121*, *28 U.S.C. §§ 1331* and *1338*, and has supplemental jurisdiction under *28 U.S.C. § 1367(a)*.

### Trademark Counterfeiting and Infringement under the Lanham Act (Counts I and II)

Burberry alleges that Defendant committed trademark counterfeiting and infringement under section 32(1)(a) of the Lanham Act through its unauthorized use of the Burberry trademarks. Section 32(1)(a) of the Lanham Act provides that a person shall be civilly **[*16]** liable if, without the registrant's consent, such person:

> use[s] in commerce any reproduction, counterfeit, or copy or colorable limitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

*15 U.S.C. § 1114(1)(a)*.

Section 45 of the Lanham Act, *15 U.S.C. § 1125*, defines a "counterfeit" mark as "a spurious mark which is

identical with, or substantially indistinguishable from, a registered mark."

Defendant is liable for trademark counterfeiting and infringement if Burberry establishes that: (1) Burberry had valid registered marks entitled to protection under the Lanham Act; and (2) Defendant used a similar mark in commerce in a way that would likely cause confusion among the relevant consuming public. *Cartier Int'l B.V. v. Ben-Menachem*, 2007 U.S. Dist. LEXIS 95366, 2008 WL 64005, at *10 (S.D.N.Y. Jan. 3, 2008).

Burberry has met its burden. The parties stipulated that Burberry had valid registered marks entitled to protection under the Lanham Act. These marks include the BURBERRY(R) word mark; the BURBERRY CHECK mark; and the EQUESTRIAN KNIGHT **[*17]** DESIGN. Defendant has offered for sale and has sold merchandise displaying spurious designations that are identical to, or substantially indistinguishable from, Burberry's famous, registered trademarks on goods for which Burberry trademarks are registered, including: a bikini; a jacket; a coat; five shirts; and four scarves. Defendant intentionally used these spurious designations without authorization and in connection with the advertising, sale, offering for sale and distribution of goods for its own financial gain.

Defendant's use of the Burberry trademarks is likely to cause confusion among the relevant consuming public. To determine whether confusion is likely to arise, a court need only determine that the items at issue are counterfeit and that Defendant distributed, offered for sale, and sold the items. *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003).

The Court finds that Defendant is liable for trademark counterfeiting and infringement.

### False Designation of Origin, Trade Name, Infringement, and False Description and Representation under the Lanham Act (Count III)

The Court also finds Defendant liable under *Section 43(a)* of the Lanham Act, *15 U.S.C. § 1125(a)(1)(A)*:

> Any **[*18]** person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, terms, name, symbol, or device, or any combination thereof, or any false designation or origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to "deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by

another person….

Having established its claim for federal trademark infringement under *Section 32*, it is unnecessary for the plaintiff to make any additional showing to satisfy *Section 43(a)*. *Russian Kurier, Inc. v. Russian Am. Kurier, Inc.*, 899 F.Supp. 1204, 1208 (S.D.N.Y. 1995).

**Trademark Dilution under the Lanham Act and Dilution and Likelihood of Injury under Section 360-l of N.Y. Gen. Bus. Law (Counts IV and VI)** [1]

A trademark holder claiming dilution under *15 U.S.C. § 1125(c)* must show that: (1) the senior mark is famous; (2) the defendants are making commercial use of the junior mark in commerce (under the Federal Trademark Dilution Act, the "FTDA" or use of the junior mark in commerce (under the Trademark Dilution Revision Act of 2006, the "TDRA"); (3) defendant's use of the junior mark began after the senior mark became famous; and (4) actual dilution (under the FTDA) or a likelihood of dilution (under the TDRA). See **[*20]** e.g., *Malletier v. Dooney & Bourke, Inc.*, 561 F.Supp.2d 368, 380-81 (S.D.N.Y. 2008).

Plaintiffs have met their burden on their trademark dilution claim, based on the parties' stipulations: the fame of Burberry's mark; Defendant's commercial use of Burberry's mark in commerce; and Defendant's use of Burberry's mark subsequent to Burberry's mark becoming famous. Further, Burberry has established a presumption of actual and likely dilution by showing that Defendant's used counterfeit marks that were identical to the Burberry trademarks. See *Savin Corp. v. Savin Corp.*, 391 F.3d 439, 452-53 (2d Cir. 2005).

Dilution by tarnishment reflects an "association arising from the similarity between a mark or a trade name and a famous mark that harms the reputation of the famous mark." *15 U.S.C. § 1125(c)*. Defendant tarnished Burberry's marks by using them on inferior products (Tr. 18:23-22:19; 36:17-37:4). See e.g., *Hormel Foods v. Jim Henson Products, Inc*. 73 F.3d 497, 507 (2d Cir. 1996) (a trademark may be tarnished when linked to products of shoddy quality). Accordingly, the Court finds Defendant liable for trademark dilution by tarnishment under both the FTDA and the TDRA.

Since Burberry has established **[*21]** that (1) the Burberry trademarks are famous, and (2) there is a likelihood of dilution, Defendants are also liable under New York State Business Law *§ 360-l* for dilution and likelihood of injury to business reputation. See *Malletier*, 561 F.Supp.2d at 381.

**Deceptive Acts and Practices under New York Law (Count V)**

*New York General Business Law § 349* forbids "[d]eceptive acts and practices." Burberry has satisfied the three -factor test for establishing a *§ 349* violation: (1) that Defendant engaged in a consumer-oriented act (sale of Burberry-branded merchandise); (2) that was misleading in a material way (the products were counterfeit); and (3) Burberry suffered injury. See *Vitabiotics, Ltd. V. Krupka*, 606 F.Supp. 779, 785 (E.D.N.Y. 1984) (sale of infringing products creates presumption of injury under *Section 349*). Accordingly, the Court finds Defendant liable under *Section 349 of the New York General Business Law*.

**Trademark Infringement and Unfair Competition under New York Common Law (Counts VII and VIII)**

The New York common law on trademark infringement and unfair competition claims mirrors the Lanham Act. To prevail on its common law claim of trademark infringement, Burberry need only **[*22]** present evidence sufficient to establish a violation of *section 32(1)* of the Lanham Act. *Standard & Poor's Corp., Inc. v. Commodity Exch., Inc.*, 683 F.2d 704, 708 (2d Cir. 1982). Since Burberry has established liability under the Lanham Act, it has also established liability under New York's common law of trademark infringement.

The same principle is applicable to the New York State unfair competition claim. A claim under the Lanham Act, coupled with a showing of bad faith or intent, establishes a claim for unfair competition. *Girl Scouts of U.S.A. v. Bantam Doubleday Dell Publ'g Group, Inc., 808 F.Supp.* 1112, 1131 (S.D.N.Y. 1992). Use of a counterfeit mark creates a presumption of bad faith under New York law. *Philip Morris U.S.A., Inc. v. Felizardo*, 2004 U.S. Dist. LEXIS 11154, 2004 WL 1375277 (S.D.N.Y. June 18, 2004), at *6. Accordingly, Burberry's evidence of Defendant's sale of counterfeit Burberry-branded merchandise creates a presumption of bad faith, satisfying the elements of Burberry's common law unfair competition claim.

---

[1]  The Court will analyze Burberry's federal and state law dilution claims together. The New York State anti-dilution statute, N.Y. Gen. Bus. L. § 360-l, and the Federal Trademark Dilution Act, the federal anti-dilution **[*19]** statute in effect prior to October 6, 2006, are alike. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006). This analysis is essentially unchanged under the Trademark Dilution Revision Act of 2006, effective October 6. 2006. *Tiffany (NJ) Inc. v. eBay*, Inc., 576 F. Supp. 2d 463, 523 (S.D.N.Y. 2008). Some courts have held that the New York State statute provides greater protection against dilution than the TDRA. See *GMA Accessories*, 2008 U.S. Dist. LEXIS 16052, 2008 WL 591803, at *11. But the Court need not engage in a separate analysis for Burberry's New York State claims because the Court concludes that Burberry's dilution claim succeeds under the more exacting FDTA standard.

Jessica Bloodgood

## Common Law Breach of Contract (Count IX)

The April 12, 2005 Settlement Agreement is governed by New York law (Ex. 185 P11). The parties do not dispute the existence or validity of the [*23] April 12, 2005 Settlement Agreement, nor does Defendant argue that Burberry failed to perform under the Settlement Agreement.

Burberry has also established Defendant's non-performance. Paragraph 2.6 of the Settlement Agreement provides that Defendant will not "knowingly infringe or dilute Burberry's trademarks." The same paragraph defines "knowingly" as occurring when Defendant "knows or should have known that their actions violate Burberry's trademark rights."

The Court has already found that Defendant committed trademark infringement. It now finds that the same infringing conduct constituted a breach of contract. See e.g., *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F.Supp.2d 320, 329 (S.D.N.Y. 2009) (evidence of trademark infringement shows the likelihood of success on breach of settlement agreement claim).

Regarding damages, Section 12 of the Settlement Agreement contains a liquidated damages clause providing that Defendant is obligated to pay "$ 1,500.00 per day for each day a breach occurs."

Defendant's breach of contract liability, however, is limited to violations that occurred prior to Burberry's commencement of the lawsuit. Under New York's doctrine of the election of remedies, [*24] when a party breaches a contract, the adverse party has to make an election: to either treat the entire contract as breached and pursue damages for the breach or, alternatively, to reject the proposed breach, demand performance, and continue to treat the contract as valid. See e.g., *Inter-Power of New York Inc. v. Niagara Mohawk Power Corp.*, 259 A.D.2d 932, 934, 686 N.Y.S.2d 911 (3d Dept. 1999).

Accordingly, Defendant is liable only for trademark violations occurring prior to May 22, 2007, the date Burberry commenced this lawsuit. These pre-commencement violations include nine of the twelve items: the four items Defendant sold on March 1, 2006 (Bikini; White Polo Shirt; Black Polo Shirt; and Gray Polo Shirt); the two items Defendant sold on February 7, 2007 (the "Constance" Jacket and the White Shirt - Checked Trim); and the three items Defendant sold on April 7, 2007 (the Quilted Langford Coat; the White Shirt-Checked Trim; and the Cashmere Cream-White Check Mini Scarf).

## Common Law Unjust Enrichment (Count X)

The Court dismisses Burberry's unjust enrichment claim because a party cannot prevail on remedies under both contract and quasi-contract theories. See e.g., *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 521 N.Y.S.2d 653 (1987) [*25] ("quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment).

## Defendant 's Willfulness or Willful Blindess

The Court finds that Defendant acted willfully in selling twelve counterfeit Burberry-branded items of merchandise. Actual knowledge is not necessary for willful trademark infringement liability; rather, "[i]nfringement is willful when the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Hermes Int'l v. Kiernan*, 2008 U.S. Dist. LEXIS 70506, 2008 WL 4163208, at *3 (E.D.N.Y. Aug. 28, 2008).

Here, Burberry established Defendant's willfulness by demonstrating a course of conduct spanning several years during which Defendant repeatedly sold a variety of counterfeit Burberry merchandise. Defendant repeatedly and knowingly violated its obligations under the Settlement Agreement. Defendant willfully failed to investigate the bona fides of Burberry-branded goods it purchased for sale and by failing to implement procedural safeguards against the sale of counterfeit goods. When Defendant became aware that Burberry, through [*26] its agent J. Burke, placed a test order for Burberry items, Defendant did not fill the order from its own inventory, but rather sent Mrs. Horowitz to an authorized Burberry store to purchase items to fill the order. This is further evidence that Defendant was not confident in the authenticity of its own Burberry-branded inventory. Accordingly, the Court finds that Defendant's trademark violations were willful.

Defendant, however, has introduced some evidence of compliance with the terms of the Settlement Agreement and of some level of diligence. These factors mitigate the degree of Defendant's willfulness.

## DAMAGES

The Court asked the parties to provide summations of their damages. Burberry claimed statutory damages under *15 U.S.C. § 1117(c)* in the amount of $ 6.5 million (Dkt. # 30, at 2, 10). Defendants argued that its maximum exposure is $ 18,000 (Dkt. # 32 at 13).

Section *15 U.S.C. § 1117(c)* provides:

> In a case involving the use of a counterfeit mark (as defined in *section 1116(d)* of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead [*27] of actual damages and profits under subsection (a) of this sec-

tion, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--

(1) not less than $ 1,000 or more than $ 200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $ 2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

_15 U.S.C. § 1117(c) (2004)_ (amended 2008). [2]

In determining the amount of statutory damages, courts consider several factors, including:

(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the [trademark]; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant.

_Kenneth Jay Lane, Inc. v. Heavenly Apparel, Inc._, 2005 U.S. Dist. LEXIS 28815,, 2006 WL 728407, at *6 (S.D.N.Y. November 17, 2005).

Several of these factors support a substantial award. Defendant has acted willfully in selling twelve counterfeit Burberry-branded items of merchandise. Burberry's trademarks are highly valuable and of worldwide renown. The goal of deterring others from similar conduct requires a significant award. _Louis Vuitton Malletier, S.A. v. LY USA_, 2008 U.S. Dist. LEXIS 107592, 2008 WL 5637161, at *2 (S.D.N.Y. Oct. 3, 2008). A large award

is also necessary because the Settlement Agreement failed to deter Defendant and because of Defendant's ability to reach a vast customer base through internet [*29] advertising. See e.g., _Rolex Watch U.S.A., Inc. v. Jones_, 2002 U.S. Dist. LEXIS 6657, 2002 WL 596354, at *5 (S.D.N.Y. Apr. 17, 2002). [3]

There are other factors which mitigate the degree of Defendant's willfulness. Defendant cooperated in providing financial records. These records indicate that Defendant reported sales of $ 4,276,581 for Burberry-branded merchandise sold between March 29, 2005 and June 26, 2008 (Ex. 308). Defendant also reported net income of $ 1,158,295 for scarves, shorts, jackets, and coats sold between March 29, 2005 and May 13, 2008 (Ex. 220). [4] Burberry-branded merchandise, however, represented only a percentage of Defendant's entire business, and not all Burberry-branded items were counterfeit. [5] Finally, few courts have awarded maximum statutory damages on the basis of a per mark, per type of good calculation. See e.g., _Gucci Am., Inc. v. MyReplicaHandbag.com_, 2008 U.S. Dist. LEXIS 14047, 2008 WL 512789, at *5 (S.D.N.Y. Feb. 26, 2008) (collecting cases to note that "[M]ost judges have [*30] issued awards well below the maximum available on the basis of per-mark-per-type-of-goods").

Having considered all relevant factors, the Court awards Burberry statutory damages in the amount of $ 1,500,000. This amount represents $ 100,000 per mark per types of goods sold. Specifically, Defendant infringed three of Burberry's registered trademarks (the Burberry name, the Burberry Check design, and the Burberry "Equestrian Knight" on horseback device) and sold five types of counterfeit Burberry-branded merchandise (Bikini; Shirts; Jacket; Coat; and Scarves). An award of $ 100,000 per mark per type of good sold totals $ 1,500,000.

Since there was willful infringement and [*31] no "extenuating circumstances," the Court allows Burberry attorneys' fees and costs, as required by _15 U.S.C. § 1117(b)_. _Sara Lee Corp. v. Bags of New York, Inc._, 36 F.Supp.2d 161, 170 (S.D.N.Y. 1999). Burberry's counsel

---

[2]   Prior to October 13, 2008, the minimum for § 1117(c)(1) was $ 500 and the maximum was $ 1,00,000; and the maximum for § 1117(c)(2) was $ 1,000,000. See Prioritizing Resources and Organization for Intellectual Property Act of 2008, Title I, sec. 104, § 1117, 122 Stat 4256, 4259 (Oct. 13, 2008). Defendant's sales of counterfeit Burberry items occurred prior to October 13, 2008. Accordingly, the Court applies the pre-amendment statutory amounts. See e.g., _Century 21 Real Estate LLC v. Bercosa Corp._, __F.Supp.2d __, 666 F. Supp. 2d 274, 2009 U.S. Dist. LEXIS 94094, 2009 WL 3111759, at *12 n.9 (E.D.N.Y. Sept. 18, 2009). [*28]

[3]   Plaintiffs' Ex. 300 indicates that between September 13, 2003 and June 11, 2008, Designer's Burberry advertising in Google had been clicked 1,021,744 times.

[4]   Plaintiffs' Ex. 220 was not introduced at trial. After the trial, however, on September 25, 2009, the Court reopened the trial record to admit this exhibit into evidence (Dkt. # 28).

[5]   Plaintiffs' Ex. 308 indicates that Burberry-branded merchandise represents the following percentages of Designer's overall sales: 65.13% between March 29, 2005 and December 31, 2005; 34.44% between January 1, 2006 and December 31, 2006; 21.35% between January 1, 2007 and December 31, 2007; and 6.97% between January 1, 2008 and June 26, 2008.

should submit an itemized fee application, supported by time-sheets, along with a statement of the nature of the work performed, as well as explanations of each attorney's expertise and any other relevant factors. See e.g., *Pressman v. Estate of Steinvorth*, 886 F. Supp. 365, 367 (S.D.N.Y. 1999).

## INJUNCTIVE RELIEF

Section 34(a) of the Lanham Act provides for injunctive relief to prevent trademark violations "according to the principles of equity and upon such terms as the court may deem reasonable." *15 U.S.C. § 1116(a)*. Courts may grant permanent injunctions where a plaintiff demonstrates actual success on the merits and irreparable harm. *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d at 290. As indicated, Burberry has established success on the merits. Burberry has also established irreparable harm by establishing a likelihood of confusion. See *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997). Accordingly, the Court permanently **[*32]** enjoins Defendant from infringing on any Burberry trademarks.

The Court denies Burberry's request to completely bar Defendant from selling Burberry goods. Defendant may continue to participate in the secondary market provided Defendant sells only legitimate products. In light of Defendant's continuing pattern of trademark infringement, however, any further violation of the injunction will result in Defendant's being permanently enjoined from selling, offering for sale, advertising, or distributing any Burberry-branded merchandise.

## CONCLUSION

The foregoing constitutes the Court's findings of fact and conclusions of law. Defendant is liable to Burberry for a total of $ 1,500,000 in statutory damages. Defendant is further liable for Burberry's reasonable attorneys' fees and costs, in an amount to be determined by the Court, after Burberry's counsel submits contemporaneous time records, reflecting the work done in this litigation. Finally, Defendant is hereby permanently enjoined from infringing on any Burberry trademarks. If Defendant violates Burberry's trademarks in the future, then Defendant will automatically be permanently enjoined from selling, offering for sale, advertising, or distributing **[*33]** any Burberry-branded merchandise.

Plaintiff is directed to submit a proposed order of judgment on 10 days notice.

Dated: New York, New York

January 19, 2010

SO ORDERED

/s/ Paul A. Crotty

PAUL A. CROTTY

United States District Judge


Caution
As of: June 26, 2013 12:41 PM EDT

# Phillip Morris USA Inc. v. Marlboro Express

United States District Court for the Eastern District of New York
August 26, 2005, Decided
CV-03-1161 (CPS)

**Reporter:** 2005 U.S. Dist. LEXIS 40359; 2005 WL 2076921

PHILLIP MORRIS USA INC., Plaintiff, - against - MAR-LBORO EXPRESS, TOBACCO TRADERS AND TRUST, TIMOTHY FARNHAM, individually and doing business as Tobacco Traders and Trust and Marlboroexpress.com, MARY KIM JAMIESON, individually and doing business as Tobacco Traders and Trust and Marlboroexpress.com, NATIVE EXPRESS, DON DOCTOR, individually and doing business as Marlboroexpress.com and Nativeexpress.com, DENNIS KENNEDY, individually and doing business and Double D Smoke Shop, SOVEREIGNTY VENTURES, INC., DON DELAND, individually and doing business as Sovereignty Ventures, Inc., IROQOUIS TOBACCO COMPANY, SCOTT SNYDER, individually and doing business as Iroquois Tobacco Company, SIMON MOSHEL, an individual; MICHAEL MOSHEL, an individual, ROBERT BERARDELLI, an individual, and Does One Through Ten Inclusive, Defendants.

**Subsequent History:** Related proceeding at *Phillip Morris USA Inc. v. A & V Minimarket, Inc., 2008 U.S. Dist. LEXIS 120183 (S.D.N.Y., Dec. 15, 2008)*

## Core Terms

counterfeit, trademark, cigarette, infringement, register, statutory damages, summary judgment, default, brand, label, default judgment, district court, maximum, violation of section, injunctive relief, statutory award, registrant, permanent, carton, roof, entry of default, do business, plea guilty, indictment, injunction, pentagonal, traffic

**Counsel:** **[*1]** For Philip Morris USA Inc., Plaintiff: Samuel L. Barkin, Heller Ehrman LLP, New York, NY.

For Michael Moshel, as individual, Defendant: Saul E. Feder, Regosin, Edwards, Stone & Feder, New York, NY.

**Judges:** Charles P. Sifton, United States District Judge.

**Opinion by:** Charles P. Sifton

## Opinion

MEMORANDUM OPINION AND ORDER

SIFTON, Senior Judge.

Plaintiff Philip Morris USA, Inc. ("Philip Morris") brings this trademark action seeking damages and injunctive relief against defendants Marboro Express, Tobacco Traders and Trust, Timothy Farnham, individually and doing business as "Tobacco Traders and Trust" and "Marlboroexpress.com," Don Doctor, individually and doing business as "Marlboroexpress.com" and "Nativeexpress.com," Dennis Kennedy, individually and doing business as "Double D Smoke Shop," Don Deland, individually and doing business as "Sovereignty Ventures, Inc.," Iroqois Tobacco Company, Scott Snyder, individually and doing business as "Iroqois Tobacco Company," and Robert Berardelli. [1] Plaintiff's claims arise out of defendants' sale of counterfeit Marlboro[R] brand cigarettes. Specifically, plaintiff alleges the following claims against the defendants: (1) infringement of plaintiff's **[*2]** registered trademarks in violation of Section 32 of the Lanham Act, *15 U.S.C. § 1114* (Claims 1-4); (2) importation of counterfeit goods bearing an infringing trademark in violation of Section 42 of the Lanham Act, *15 U.S.C. § 1124* (Claims 5-6); (3) false designation of origin in violation of Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)* (Claims 7-8); (4) trademark dilution in violation of the Federal Trademark Di-

---

[1] Plaintiff's complaint also named as defendants Simon Moshel, Michael Moshel and Mary Kim Jamieson. Plaintiff has entered a Consent Judgment with defendants Simon and Michael Moshel, which was "so ordered" by this Court on February 2, 2005. Pursuant to the Consent Judgment, defendants Simon and Michael Moshel agreed to pay plaintiff $ 150,000 and were permanently enjoined from selling counterfeit or illegally imported Marlboro cigarettes. (*See* Consent Judgment at 2). Plaintiff also filed a notice of voluntary dismissal of the claims asserted against defendant Mary Kim Jamieson without prejudice, pursuant to *Rule 41(a) of the Federal Rules of Civil Procedure* on July 22, 2005.

2005 U.S. Dist. LEXIS 40359, *2

lution Act, *15 U.S.C. §§ 1125(c)* and *1127* (Claims
9-10); (5) "cybersquatting" in violation of the Anti-
Cybersquatting Consumer Protection Act, *15 U.S.C. §
1125(d)* (Claim 11); (6) unfair competition in violation of
the common law of New York (Claim 12); (7) trade-
mark infringement in violation of the common law of New
York (Claim 13); and (8) trademark dilution in viola-
tion of *New York General Business Law § 360-l et seq.*
(Claim 14).

 [*3] Presently before the court are the following mo-
tions: (1) plaintiff's motion for partial summary judg-
ment against defendant Snyder on Claims 1, 2, 5, and
7 alleged in the complaint, pursuant to *Rule 56 of the Fed-
eral Rules of Civil Procedure* ("Fed. R. Civ. P."); and
(2) plaintiff's motion for entry of default judgment and or-
der granting damages and injunctive relief against defen-
dants Berardelli, Deland, Farnham, Kennedy, and Doc-
tor (collectively "Default Defendants"), pursuant to *Fed.
R. Civ. P. 55(b)*. The defendants have not responded to
plaintiff's motions. [2] For the reasons set forth below, the
motions are granted.

## BACKGROUND

The following facts are drawn from the pleadings, depo-
sitions, answers to interrogatories, and admissions on
file, together with the affidavits in connection with this
motion. The facts are undisputed unless [*4] otherwise
noted.

Plaintiff Phillip Morris is a corporation organized under
the laws of Virginia with its principal place of business in
New York. For several decades, Phillip Morris has manu-
factured and sold tobacco products under the Marl-
boro[R] brand (Pl. 56.1 Statement P1). Among the distinc-
tive features of the Marlboro[R] brand is its pack
design, which features the Marlboro Roof Design La-
bel[R] Mark (a pentagonal figure with a horizontal top and
two vertical sides with two upwardly and inwardly slop-
ing diagonals). Phillip Morris is the registered owner
of the "Marlboro Marks" on the Principal Register of the
United States Patent and Trademark Office ("USPTO").

The "Marlboro Marks" include the Roof Design La-
bel[R] Mark, Marlboro[R], Marlboro Lights[R], Marl-
boro Menthol[R], Marlboro Lights Menthol[R], Marl-
boro Ultra Lights[R]. (*See* Registration Certificates,
Johnson Decl. Ex. A). Phillip Morris has invested substan-
tial time, effort, and money to advertise and promote
the Marlboro Marks, and as a result, they are widely rec-
ognized trademarks for which significant "good will"
has developed.

Between August 2000 and February 2003, defendants Sny-
der, Deland, Farnham, [*5] and Berardelli, in conjunc-
tion with others, imported approximately 200,000 car-
tons of counterfeit Marlboro[R] and Marlboro Lights[R]
cigarettes from China. (Pl. 56.1 P3; Johnson Dec. Ex.
B). These cartons were imported in at least five separate
shipments, and were monitored by the United States
Customs Service after arrival in the United States from
China. (Pl. 56.1 PP3-4; Johnson Dec. Ex. B). Defen-
dants sold counterfeit Marlboro brand cigarettes at re-
tail stores, including the "Double D Smoke Shop," lo-
cated on the Seneca Indian Cattaraugus reservation and the
"Iroqious Tobacco Company," located in Irving, New
York, and through various Internet websites, including
"Marlboroexpress.com" and "Smokeheap.com." (Pl. 56.1
P5; Johnson Dec. Ex. C). Defendants purchased coun-
terfeit cigarettes at prices between $ 2.00 and $ 2.20 per
carton and sold them at retail prices between $ 19.00
and $ 29.99 per carton. (Pl. 56.1 P6; Johnson Dec. Ex.
H).

On February 14, 2003, the United States Customs Ser-
vice filed a criminal complaint in the United States Dis-
trict Court for the Eastern District of New York
against defendants Snyder, Deland, Farnham, Berardelli,
and others [3] for conspiracy to smuggle [*6] and traffic in
counterfeit goods, in violation of *18 U.S.C. §§ 545* and
*2320*. [4] (*See* Criminal Complaint, *United States v. Moshel,
et. al.,* 1:03-m-276 (E.D.N.Y.), Johnson Decl. Ex. B).
On March 20, 2003, defendants Snyder, Deland, Farn-
ham, Berardelli were indicted in the United States Dis-
trict Court for the Eastern District of New York on three
counts of trafficking and conspiring to traffic counter-

---

[2]  The defendants against whom these motions are brought appear to be proceeding *pro se*.

[3]  The criminal complaint also named Simon and Michael Moshel as defendants. (Johnson Dec. Ex. B at 1).

[4]  *18 U.S.C. § 545* provides in relevant part that:

   Whoever knowingly and wilfully . . . smuggles or clandestinely introduces . . . into the United States any merchan-
   dise which should have been invoiced . . . . or fraudulently or knowingly imports or brings into the United States
   any merchandise contrary to law. . . shall be fined under this title or imprisoned. . .

18 U.S.C § 2320 provides in relevant part that:

   Whoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on
   or in connection with such good or services shall be fined. . . or imprisoned. . . .

2005 U.S. Dist. LEXIS 40359, *6

feit goods in violation of *18 U.S.C. §§ 545* and *2320*. (*See* Indictment, Johnson Decl. Ex. C). On September 30, 2003, defendant Farnham pled guilty before Magistrate Judge Cheryl Pollack to Count One of the indictment which accused them of knowingly and intentionally conspiring to traffic in counterfeit cigarettes. On October 1, 2003, defendants Snyder and Deland also pled guilty before Judge Raymond Dearie to Count One of the indictment. (*See* Johnson Decl. Ex. D; Barkin Decl. Ex. 7-8; Pl. 56.1 Statement P29). [5] Defendant Berardelli pled guilty to Count Two of the Indictment which accused him of knowingly and intentionally trafficking in counterfeit goods in violation of *18 U.S.C. § 2320*.

[*8] Plaintiff commenced this action by filing a complaint and summons against the defendants on March 10, 2003 (the "Complaint"). Between March 2003 and June 2003, plaintiff served process upon each of the defendants. To date, defendants Berardelli, Deland, Farnham, Kennedy, and Doctor [6] have not filed an answer or otherwise responded to the Complaint. On May 11, 2005, the Clerk of this Court issued a Notation of Default pursuant to *Fed. R. Civ. P. 55(a)* against defendants Farnham, Doctor, Kennedy and Deland. [7]

[*9] **DISCUSSION**

**Jurisdiction**

The Court has jurisdiction over this action pursuant to *15 U.S.C. § 1121* and *28 U.S.C. § 1338*, which confers jurisdiction over actions involving violations of patents and trademarks, *28 U.S.C. § 1331*, which authorizes jurisdiction over civil actions arising under federal law, and principles of pendent jurisdiction over the state law claims.

**Motion for Partial Summary Judgment**

Summary Judgment Standard

A motion for summary judgment may be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *Celotex Corp v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. A motion for summary judgment may be defeated by the non-moving party if that party produces sufficient specific facts to establish that there is a material issue of fact for trial. *See Montana v. First Federal Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 103 (2d Cir. 1989).* [*10] The role of the court on such a motion is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986)*. The "court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

Defendant Snyder's Failure to Respond

*Local Rule 56.1* of the Eastern and Southern Districts of New York requires that all summary judgment motions be accompanied by a "short or concise statement of material facts as to which the moving party contends there is no genuine issue to be tried." *Local Rule 56.1(a)*. The rule also requires that the party opposing summary judgment file a response setting forth the material facts about which it contends there exists a triable issue. Because defendant Snyder has failed to file any response, all facts contained in plaintiff's *Rule 56.1* statement are deemed admitted. [8] *See Local* [*11] *Rule 56.1(b)* and *(d)*. However, defendant Snyder's failure to respond to plaintiff's motion does not mean that plaintiff automatically prevails. *See e.g. Adickes v. S.H. Kress & Co., 398 U.S. 144, 160, 90 S. Ct. 1598, 26 L. Ed. 2d 142*

---

[5] Defendants Snyder, Deland and Farnham were also charged in the United States District Court for the Western District of Texas with smuggling and trafficking counterfeit cigarettes in violation of *18 U.S.C §§ 371*, *2342(a)* and *2320(a)*. Defendant Snyder pled guilty and was sentenced to 27 months imprisonment in December 2003. He was also ordered to pay $ 861,260 in restitution for unpaid cigarette taxes. Phillip Morris is not entitled to any part of that restitution award. (*See* Johnson Decl. Ex. G.). Defendants Deland and Farnham also pled guilty, and were sentenced to 24 and 18 months imprisonment, respectively. (*See* Barkin Decl. Ex. 11-12).

[6] Although defendants Kennedy and Doctor were not named in the related criminal action, they are alleged in plaintiff's complaint to be co-owners or operators of some of the outlets through which the counterfeit cigarettes were sold, including "Double D Smoke Shop," "Marlboroexpress.com" and "Nativeexpress.com."

[7] Defendant Berardelli is not listed on the Clerk's Notation of Default. However, this appears to be an oversight, as plaintiff provided the Clerk of Court with a copy of the summons and complaint served by personal service on defendant Berardelli on March 25, 2003. (*See* Barkin Decl., Ex. 14 PP7-8; Ex. 15). The default is hereby noted.

[8] Plaintiff filed a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" on May 23, 2005, informing defendant Snyder of the consequences of failing to respond to a summary judgment motion. *See Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996)* (an "easily comprehensible notice" from the party moving for summary judgment provides sufficient notice to a *pro se* litigant).

(1970). The moving party must "nevertheless offer facts supporting its *Rule 56.1* Statement, and must satisfy the movant's *Rule 56* burden." *Smith v. Principi, 2004 U.S. Dist. LEXIS 16418, 2004 WL 1857582, at *1, n.1 (S.D.N.Y. 2004); see also Vermont Teddy Bear Co., Inc. v. 1-800 BEARGRAM Co., 373 F.3d 241, 242 (2d Cir. 2004)* ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.").

**[*12] Lanham Act**

Plaintiff seeks summary judgment against defendant Snyder on its First, Second, Fifth and Seventh Claims for relief, which allege (1) trademark infringement in violation of Section 32 of the Lanham Act, (2) importation of goods bearing an infringing trademark in violation of Section 42 of the Lanham Act, and (3) false designation of origin and trademark and dress infringement in violation of Section 43(a) of the Lanham Act. [9] *See 15 U.S.C. §§ 1114(1), 1124, 1125(a).*

*Sections 32 and 43(a)*

Section 32 of the Act prohibits the use in commerce, without consent, of any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, **[*13]** distribution, or advertising of any goods," in a way that is likely to cause confusion with plaintiff's registered trademarks. *15 U.S.C. § 1114 (1)(a).* Section 43(a) prohibits similar conduct, though it is not limited to registered trademarks, and deems liable for false designation of origin "any person who. . .uses in commerce any container for goods. . . name, symbol, device. . .or any false designation of origin . .which is likely to cause confusion." *15 U.S.C. § 1125(a); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir.2002).* Liability is established under both *Sections 32* and *43(a)* of the Lanham Act if a plaintiff can demonstrate (1) that it has a valid trademark entitled to protection under the Act, and (2) defendant's actions are "likely to cause confusion." *Arrow Fastener v. Stanley Works, 59 F.3d 384, 390 (2d Cir.1995).*

In this case, plaintiff's certificates of registration with the USPTO for the Marlboro Marks are "prima facie evidence that the mark[s] [are] registered and valid (i.e. protectible), that the registrant owns the mark[s], and that the registrant has the **[*14]** exclusive right to use the mark[s] in commerce." *Lane Capital Management, Inc. v. Lane Capital Management, Inc., 192 F.3d 337, 345 (2d Cir. 1999); 15 U.S.C. § 1067(b)*("A certificate of registration of a mark...shall be prima facie evidence of the validity of the registered mark"). Thus, the plaintiff has es-

tablished that its Marlboro Marks are valid and entitled to protection under the Act.

In considering the likelihood of confusion, district courts generally apply eight nonexclusive factors, known as the *Polaroid* factors:

> (1) the strength of the plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the competitive proximity of their products; (4) the likelihood that plaintiff will "bridge the gap" and offer a product like defendant's; (5) actual confusion between products; (6) defendant's good faith; (7) the quality of defendant's product as compared to plaintiff's; and (8) the sophistication of the purchasers.

*Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 742-43 (2d Cir.1998)* (citing *Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir.1961).* **[*15]** However, in cases involving counterfeit marks, "the Court need not undertake a factor-by-factor analysis under *Polaroid* because counterfeits, by their very nature, cause confusion." *Gucci America, Inc. v. Duty Free Apparel, Ltd., 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003); Phillip Morris USA Inc. v. Felizardo, 2004 U.S. Dist. LEXIS 11154, 2004 WL 1375277, at *5 (S.D.N.Y. 2004).* Thus, the Court "need only determine the more fundamental question of whether there are items to be confused in the first place--that is, whether the items at issue here are, in fact, counterfeit, and whether defendant [Snyder] sold those items." *Gucci America, Inc., 286 F.Supp.2d at 287.* In this case, it has not been disputed that the items at issue are counterfeit Marlboro brand cigarettes, and that defendant Snyder sold and distributed these items. *See Pl. 56.1 Statement at P29.* Accordingly, defendant Snyder's actions caused a likelihood of consumer confusion, and plaintiff has established liability under *Sections 32* and *43(a)* of the Lanham Act. *See Phillip Morris Inc. v. Felizardo, 2004 U.S. Dist. LEXIS 11154, 2004 WL at *5.*

*Section 42*

*Section 42* of the Lanham Act, *15 U.S.C. § 1124,* **[*16]** provides in relevant part that "no article of imported merchandise...which shall copy or simulate a trademark registered in accordance with the provisions of this chapter...shall be admitted entry at any customhouse of the United States." The Second Circuit has explained that

---

[9] During oral argument before this Court on July 21, 2005, plaintiff's counsel stated that plaintiff intends to dismiss the remaining claims against defendant Snyder if plaintiff's motion for partial summary judgment on the claims which are the subject of this motion is granted.

*15 U.S.C. § 1124* "applies only to merchandise bearing counterfeit or spurious trademarks that copy or simulate genuine trademarks." *Olympus Corp. v. U.S.,* 792 F.2d 315, 322 (2d.Cir. 1986), *cert. denied, 486 U.S. 1042, 108 S. Ct. 2033, 100 L. Ed. 2d 618 (1988); Disenos Articos E Industriales, S.A. v. Work,* 676 F.Supp. 1254, 1271 (E.D.N.Y. 1987). In this case, it has not been disputed that defendant Snyder, together with others, imported at least five separate shipments of cigarettes from China bearing counterfeit Marlboro marks. [10] Accordingly, plaintiff has established defendant Snyder's liability under *Section 42* of the Lanham Act. [11]

Injunctive Relief

Plaintiff seeks to permanently enjoin defendant Snyder from future trademark infringement. [12] Section 34(a) of the Lanham Act provides courts with the "power to grant injunctions according to the principles of equity and upon such terms as the Court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." *15 U.S.C. § 1116(a)*. To obtain a permanent injunction, plaintiff must demonstrate (1) actual success on the merits and (2) irreparable harm. *See e.g., Gucci America, Inc.,* 286 F.Supp.2d at 290; *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 148, n.13 (S.D.N.Y. 1990).

[*18] As previously discussed, plaintiff has established success on the merits on its Lanham Act claims. Moreover, in this Circuit, "proof of a likelihood of confusion establishes both likelihood of success on the merits and irreparable harm." *Brennan's Inc. v. Brennan's Rest.,* 360 F.3d 125, 129 (2d Cir.2004); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997). Accordingly, plaintiff is entitled to a permanent injunction enjoining defendant Snyder from further infringement of plaintiff's trademarks. *See e.g., Phillip Morris v. Felizardo,* 2004 U.S. Dist. LEXIS 11154, 2004 WL at *7; *Gucci America, Inc.,* 286 F.Supp.2d at 290.

[*19] Damages

Plaintiff seeks statutory damages rather than actual damages for defendant Snyder's infringement. Plaintiff argues that it is entitled to recover $ 4 million in statutory damages based on defendant Snyder's willful use of

counterfeit versions of four registered Marlboro Marks. Section 35(c) of the Lanham Act provides that:

> in a case involving the use of a counterfeit mark. . .in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits. . ., an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services. . .

*15 U.S.C. § 1117(c)*. Congress added the statutory damages provision of the Lanham Act in 1995 because "counterfeiters' records are frequently nonexistent. . .making proving actual damages in these cases extremely difficult, if not impossible." *See Gucci America, Inc.,* 315 F. Supp. 2d 511, at 520. A plaintiff may recover "not less than $ 500 or more than $ 100,000 per counterfeit mark [*20] per type of goods or services sold. . ." *15 U.S.C. § 1117 (c)(1)*. If the Court finds that "the use of the counterfeit mark was willful," then the plaintiff may recover "not more than $ 1,000,000 per counterfeit mark. . ." *Id.* at 1117(c)(2). "The standard for willfulness is whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Kepner-Tregoe, Inc. v. Vroom,* 186 F.3d 283, 289 (2d Cir. 1999).

District courts have wide discretion in awarding statutory damages. *See Cable/Home Communication Corp. v. Network Prod., Inc.,* 902 F.2d 829, 852 (11th Cir.1990). Although *Section 1117(c)* "does not provide guidelines for courts to use" in determining an appropriate statutory damage award, "many courts have found guidance in the caselaw of an analogous provision of the Copyright Act, *17 U.S.C. § 504(c)*, which also provides for statutory damages for willful infringement." *Gucci America,* 315 F.Supp.2d at 520; *Sara Lee Corp. v. Bags of New York, Inc.,* 36 F.Supp.2d 161, 165-67 (S.D.N.Y. 1999); *Rodgers v. Anderson,* 2005 U.S. Dist. LEXIS 7054, 2005 WL 950021, [*21] at *2 (S.D.N.Y. 2005). Using Copy-

---

[10]  I should note that in this case, defendant Snyder has not argued nor do plaintiff's submissions indicate that the cigarettes imported by defendant Snyder and his co-conspirators were genuine Marlboro cigarettes bearing a genuine trademark. The importation of genuine goods, unlike counterfeit goods, is not actionable under the Lanham Act. *Olympus Corp.,* 792 F.2d at 321-22.

[11]  While plaintiff moves for summary judgment on this claim, plaintiff does not brief this issue in its supporting memorandum, apart from stating that "the same facts that support Phillip Morris USA's First and Second Claims also establish Plaintiff's Fifth claim for violation of *Section 42* of the Lanham Act, *15 U.S.C. § 1124*." (Pl. Summary Judgment Memo at 1).

[12]  Specifically, plaintiff seeks to permanently enjoin defendant Snyder from the following: (1) importing, distributing, purchasing, selling, offering for sale, or otherwise using in commerce any counterfeit Phillip Morris USA branded cigarettes; (2) aiding or abetting others in the importation, distribution, purchase, sale, or offering for sale or other use in commerce of any Philip Morris USA branded cigarettes; and (3) engaging in any other activity constituting infringement of Phillip Morris USA's rights in any Phillip Morris USA trademarks, including without limitation the Marlboro Marks. (*See* Pl. Summary Judgment Memo at 12).

right Act caselaw as a guide, courts have considered the following factors in setting statutory damage awards under the Lanham Act: defendant's profits from infringement, the defendant's wilfulness, the size of defendant's counterfeiting operation, defendant's efforts to mislead and conceal, "the deterrent effect on others besides the defendant. . . and the potential for discouraging the defendant." *Sara Lee Corp., 36 F.Supp.2d at 166.*

In this case, I find that defendant Snyder's conduct was willful. Defendant Snyder recently pled guilty to knowingly and intentionally conspiring to traffic counterfeit cigarettes. (Johnson Decl. Ex. D). Moreover, defendant's counterfeiting operating was large, involving at least 200,000 cartons and millions of cigarettes. (Johnson Decl. Ex. B, Criminal Compl. at 3). The government, using a conservative retail price of $ 23.50 per carton, estimated the total value of the five infringing shipments to be $ 4,773,790. (Johnson Decl. Ex. I at 7). Given the evidence of willfulness, demonstrated by defendant Snyder's own admissions, the size of the potential profit, the large quantities of cigarettes involved, **[*22]** and the need for a substantial deterrent to future misconduct by Snyder and other similarly situated counterfeit cigarette traffickers, I find that the maximum statutory award is warranted. *See e.g. Philip Morris USA, Inc. v. Castworld Products, Inc., 219 F.R.D. 494, 501-02 (C.D.Cal. 2003)* (awarding maximum statutory award of $ 2 million for the infringement of two trademarks where the defendant "imported 8,000,000 counterfeit cigarettes, having a street value of millions of dollars."); *Phillip Morris USA, Inc. v. David Banh, et.al., 2005 U.S. Dist. LEXIS 43113, CV-03-4043 (GAF) (C.D.Cal. 2005)* (awarding maximum statutory award); *Philip Morris United States v. Sheng Chen Lin & Does One ex rel. Ten, 2004 U.S. Dist. LEXIS 29904, CV-03-08923 (CAS) (C.D.Cal. 2004)* (same); *Gucci America, Inc., 315 F.Supp.2d at 520-21* (awarding $ 2 million in statutory damages for use of two counterfeit marks). The counterfeit cigarettes imported and sold by defendant Snyder and his co-conspirators infringed upon four of plaintiff's registered and valid trademarks: the Marlboro(R) brand trademark (i.e. the word "Marlboro"), the Marlboro Roof Design Label(R) mark (i.e. the red and gold pentagonal label), the Marlboro Lights(R) brand trademark (i. **[*23]** e. the phrase "Marlboro Lights"), and the Marlboro Lights Roof Design Label(R) mark (i.e. the gold pentagonal label). (*See* Supplemental Decl. of Samuel Barkin PP3-4; Newman Aff. Ex. 1). [13] Accordingly, plaintiff is entitled to a maximum statutory award of $ 4,000,000.

### [*24] Motion for Default Judgment, Damages and Injunctive Relief

#### Default Judgment

Plaintiff also moves for an entry of default judgment against defendants Berardelli, Deland, Farnham, Kennedy, and Doctor pursuant to *Fed. R. Civ. P. 55(b)*. Pursuant to *Fed. R. Civ. P. 55(b)*, a Court may enter a default judgment against a party who "has failed to plead or otherwise defend" an action, and this constitutes a final judgment in the action. [14] *Id. at 325.* The Second Circuit has noted that default judgments are "left to the sound discretion of the district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties." *Enron Oil, 10 F.3d at 95.* An entry of default judgment should be made only where there was willful default, involving more than a failure to answer as a result of negligence or carelessness. *See SEC v. McNulty, 137 F.3d 732, 738 (2d Cir.1998).*

**[*25]** In this case, defendants Berardelli, Deland, Farnham, Kennedy, and Doctor have failed to file an answer or otherwise respond to the complaint, which was filed by plaintiff in March 2003, or to respond to plaintiff's application for default judgment. [15] Having failed to provide any explanation for their failure to defend, I find that these defendants have defaulted willfully. *See Cablevision Sys. N.Y. City Corp. v. Leath, 2002 U.S. Dist. LEXIS 13768, 2002 WL 1751343, at *2 (S.D.N.Y. 2002)* (default willful where defendant never responded

---

[13] Plaintiff's original submissions did not provide sufficient evidence of the number of counterfeit marks used by defendant Snyder and his co-conspirators. During oral argument held on July 21, 2005, the Court advised plaintiff to provide additional evidence on the issue. Plaintiff subsequently provided an affidavit from Assistant United States Attorney Debra D. Newman, the attorney assigned to the criminal proceedings against defendant Snyder and his co-conspirators, dated August 2, 2005 ("Newman Aff."), accompanied by two sample counterfeit cigarette packs that were seized by customs officials. The sample packs were packaged to look like genuine Marlboro and Marlboro Lights cigarette packs, and contain counterfeit versions of the four trademarks discussed above. (Newman Aff. Ex. 1).

[14] *Fed. R. Civ. P. 55(a)* provides that a "clerk may enter a default upon being advised by affidavit or otherwise that a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." *Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993).* Unlike a court's entry of default judgment pursuant to *Fed. R. Civ. P. 55(b)*, a clerk's "default notation is an interlocutory action; it is not itself a [final] judgment." *Dow Chemical Pacific Ltd. v. Rascator Maritime S.A., 782 F.2d 329, 335 (2d Cir. 1986).*

[15] In a letter to the Court, plaintiff's attorney Samuel Barkin stated that he had "received a request from defaulting defendant Timothy Farnham for a 3 week extension of time to respond to Phillip Morris's default judgment against him." As a result of that letter, oral argument on this motion was continued from June 6 to July 21, 2005. However, since that last communication, Farham has not filed any response to the default judgment motion.

to the complaint, appeared, or explained default). Plaintiff has documented service of its complaint and of its motion papers. There is no indication that requiring plaintiff to take further steps prior to a determination on the merits would be effective in eliciting a response. *See id.* Accordingly, an entry of default judgment is appropriate.

**[\*26]** Damages and Injunctive Relief

"While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *See Greyhound Exhibitgroup v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir.1992), *cert. denied, 113 S.Ct. 1049, 506 U.S. 1080, 122 L. Ed. 2d 357 (1993).* A plaintiff must substantiate a claim with evidence to prove the extent of damages. Although an evidentiary hearing may be held, "it is not necessary for the district court to hold a hearing, as long as …there was a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir. 1997); *Tamarin v. Adam Caterers, Inc.,* 13 F.3d 51, 54 (2d Cir.1993) (district judges are given much discretion to determine whether an inquest need be held).

In this case, plaintiff seeks a permanent injunction against all defaulting defendants enjoining them from future distribution and sale of counterfeit Marlboro brand cigarettes. As previously discussed, Section 34(a) of the Lanham Act gives courts the "power to grant injunctions…to prevent **[\*27]** the violation of any right of the registrant of a mark registered in the Patent and Trademark Office." *15 U.S.C. § 1116(a).* Given the risk of irreparable harm caused by default defendants' continued sale of counterfeit Marlboro brand cigarettes, I find that permanent injunctive relief is warranted. *See Philip Morris, USA v. Castworld Products, Inc.,* 219 F.R.D. 494, 502 (C.D.Cal.2003) ("failure to grant injunction would needlessly expose Plaintiff to the risk of continuing irreparable harm").

Plaintiff also seeks statutory damages against three of the defaulting defendants, Berardelli, Deland and Farnham, [16] jointly and severally, in the amount of $ 4 million, based on their willful use of counterfeit versions of four Marlboro Marks. (*See* Pl. Default Judgment Memo at 2, 9). Plaintiff submits evidence that these defendants, along with defendant Snyder and others, imported counterfeit cigarettes that infringed upon four registered Marlboro Marks: the Marlboro(R) brand trademark (i.e. the word "Marlboro"), the Marlboro Roof Design Label(R) mark (i.e. the red and gold pentagonal label), the Marlboro Lights(R) brand trademark (i.e. the phrase **[\*28]** "Marlboro Lights"), and the Marlboro Lights Roof Design Label(R) mark (i.e. the gold pentagonal la-

bel). (*See* Supplemental Decl. of Samuel Barkin PP3-4; Newman Aff. Ex. 1). As previously discussed, under *15 U.S.C. § 1117(c)* a plaintiff may elect to pursue statutory rather than actual damages. "Several courts have found statutory damages especially appropriate in default judgment cases due to infringer nondisclosure." *PetMed Express, Inc. V. MedPets.Com, Inc.,* 336 F.Supp.2d 1213, 1219 (S.D.Fla. 2004) (citing *Sara Lee Corp.,* 36 F.Supp.2d at 165). Here, given the willfulness of Berardelli, Deland and Farnham who each pled guilty to knowingly trafficking counterfeit cigarettes, the size of the potential profit given the large quantities of cigarettes involved, and the need for a substantial deterrent to future misconduct by defendants and other counterfeit cigarette traffickers, I find that plaintiff is entitled to the maximum statutory award under *15 U.S.C. § 1117(c)(2)*--$ 4,000,000 or $ 1,000,000 per counterfeit mark. *See e.g. Philip Morris USA, Inc. v. Castworld Products, Inc.,* 219 F.R.D. at 501-02 (C.D.Cal. 2003) **[\*29]** (awarding maximum statutory award of $ 2 million for the infringement of two trademarks where the defendant "imported 8,000,000 counterfeit cigarettes, having a street value of millions of dollars"); *Phillip Morris USA, Inc. v. Glenda Patton,* CV-03-2569 (GAF) (C.D.Cal.2003) (granting default judgment and awarding plaintiff maximum statutory damages in the amount of $ 4 million).

**CONCLUSION**

For the reasons set forth above, (1) plaintiff's motion for partial summary judgment against defendant Snyder on Claims 1, 2, 5, and 7 alleged in the complaint is granted; (2) plaintiff's motion for an entry of default judgment against defendants Berardelli, Deland, Farnham, Kennedy, and Doctor pursuant to *Fed. R. Civ. P. 55(b)* is granted; (3) defendants Snyder, Berardelli, Deland, Farnham, Kennedy, **[\*30]** and Doctor are permanently enjoined from future infringement of plaintiff's trademarks; and (4) plaintiff is awarded $ 4 million in statutory damages, for which defendants Snyder, Berardelli, Deland, and Farnham are liable, jointly and severally.

Plaintiff is directed to settle a final judgment on notice in accordance with this opinion and its undertaking to discontinue claims not made the subject of the motion. The Clerk is directed to furnish a filed copy of the within to all parties and to the Magistrate.

SO ORDERED.

Dated: Brooklyn, New York

August 26, 2005

By: /s/ Charles P. Sifton (electronically signed)

United States District Judge

---

[16]  Plaintiff does not seek any damages against defendants Doctor and Kennedy, the two defendants who were not criminally prosecuted. (*See* Pl. Default Judgment Memo at 10, n.8).